# 𝕴𝔫 𝔱𝔥𝔢 𝖀𝔫𝔦𝔱𝔢𝔡 𝖘𝔱𝔞𝔱𝔢𝔰 𝕮𝔬𝔲𝔯𝔱 𝔬𝔣 𝔣𝔢𝔡𝔢𝔯𝔞𝔩 𝕮𝔩𝔞𝔦𝔪𝔰

No. 18-1070
(Filed:  18 October 2022)

*****************************************

| | | |
|---|---|---|
| JOHN HIPPELY, *et al.*, | * | |
| | * | |
| Plaintiffs, | * | Motion for Partial Summary |
| | * | Judgment; Cross-motion for |
| v. | * | Summary Judgment; Rails-to-Trails; |
| | * | Fifth Amendment Taking; Causation. |
| THE UNITED STATES, | * | |
| | * | |
| Defendant. | * | |
| | * | |

*****************************************

*Thomas S. Stewart*, with whom were *Elizabeth G. McCulley* and *Reed W. Ripley*, Stewart Wald & McCulley LLC, all of Kansas City, Missouri, for plaintiffs.

*Brad E. Leneis*, Trial Attorney, U.S. Department of Justice, Environment and Natural Resources Division, Natural Resources Section, with whom were *Brian Herman*, Trial Attorney, and *Todd Kim*, Assistant Attorney General, all of Washington, DC, for defendant.

## OPINION AND ORDER

**HOLTE, Judge.**

After two years of inactivity, CSX Transportation, Inc., the railroad which owned the right-of-way at issue in this case, sought an exemption from the Surface and Transportation Board ("STB") to abandon the rail line at issue.  Shortly after the STB approved the railroad's request, the local county formally requested the STB issue a Notice of Interim Trail Use ("NITU") to enable the county and the railroad to negotiate potentially converting the right-of-way to a public trail.  The STB issued the NITU and adopted a historic preservation condition in the same decision on 6 July 2018.  The NITU period expired before the historic preservation condition was satisfied.  Shortly after the STB removed the historic preservation condition—the last obstacle to abandonment—the railroad formally abandoned the line.  Plaintiffs argue the NITU caused a Fifth Amendment taking under the Rails-to-Trails Act.  The government argues the NITU could not have caused a taking because the historic preservation condition prevented the railroad from abandoning the rail line during the NITU period.  For the following reasons, the Court finds there is compensation for a taking when only part of the NITU period is also encumbered by a historic preservation condition, it follows even if the condition lasts beyond the duration of the NITU, the NITU period should be compensable.  The Court denies the government's cross-motion for partial summary judgment and grants plaintiffs' motion for partial summary judgment on liability.

I.      **Factual Background**

At issue is an easement for railroad purposes across plaintiffs' land owned by CSX Transportation, Inc. ("CSXT" or "the railroad"). *See* Pls.' Second MSJ at 5, ECF No. 63.  The rail line runs approximately 13.9 miles in Trumbull County, Ohio.  *See* Pls.' Second MSJ Ex. A at 3, ECF No. 63-1 (CSXT's Verified Notice of Exemption).  On 10 May 2018, CSXT filed a request for exemption from the STB to abandon the rail line, stating "no local rail traffic has moved over the [l]ine during the past 2 years."  *Id.* at 1.  CSXT proposed to consummate abandonment on 29 June 2018, *id.* at 3, and on 30 May 2018 the STB approved the formal request for abandonment and the suggested abandonment date, Pls.' Second MSJ Ex. B at 1–2, ECF No. 63-2 (30 May 2018 STB Decision).

On 31 May 2018, the Trumbull County Commissioners filed a Trail Use Request and requested a NITU be issued.  Pls.' Second MSJ Ex. C at 1, ECF No. 63-3 (Trumbull County Commissioners Letter).  The STB issued the NITU on 6 July 2018 along with a public use condition.  *See* Pls.' Second MSJ Ex. D, ECF No. 63-4 (6 July 2018 STB Decision). Additionally, the STB's Office of Environmental Analysis ("OEA") advised the STB to adopt a condition preventing CSXT from altering the historic integrity of all historic properties within the right-of-way until completion of Section 106 of the National Historic Preservation Act ("NHPA").  *Id.* at 1.  Regarding the NITU, the public use condition, and the historic preservation condition the STB stated:  "This decision issues a NITU and imposes, among other things, a Section 106 historic preservation condition, both of which are barriers to consummation . . . . CSXT cannot consummate the abandonment and the [l]ine will stay under the Board's jurisdiction while those conditions remain in place." *Id*. at 4.  The historic preservation condition specifically mandated CSXT:

> retain its interest in and take no steps to alter the historic integrity of all historic properties including sites, buildings, structures, and objects within the project right-of-way . . . that are eligible for listing or are listed in the National Register until completion of the section 106 process of the NHPA . . . , and not file its consummation notice or initiate any salvage activities related to abandonment (including removal of tracks and ties) until the section 106 process has been completed and the Board has removed this condition.

*Id.*

The NITU ran from 6 July 2018, when the STB issued the decision, until 2 January 2019. Gov't Resp. Ex. 1 ¶ 18, ECF No. 65–1 (Payne Decl.).  There were no extensions requested or issued.  *Id.*  The public use condition expired on 5 January 2019.  *Id.* ¶ 19.  The NHPA historic preservation condition extended past the NITU and public use conditions until its removal on 26 June 2019.  *Id.* ¶ 22.  From 5 January 2019 to 26 June 2019, only the historic preservation condition prevented the railroad from abandoning the line.  *Id.* ¶¶ 19, 22.  The negotiations for interim trail use and railbanking were unsuccessful, and CSXT consummated the abandonment of the railway on 9 July 2019.  Pls.' Second MSJ at 7.  Plaintiffs owned one or more parcels of real property abutting the railroad line at the time of the NITU.  Pls.' Second MSJ at 1.

## II.      Procedural History

This case began in 2018 while the NITU was still in effect.  *See* Compl., ECF No. 1.
After an initial period of discovery, briefings on partial summary judgment were stayed due to
additional stipulations and pending the Federal Circuit's decision in *Caquelin v. United States
(Caquelin II)*, 959 F.3d 1360, 1372 (Fed. Cir. 2020).[1]  *See* Orders, ECF Nos. 26, 31, 33.  This
case was reassigned to the undersigned judge during the stay.  *See* Order, EFC No. 27.  The
Court lifted the stay after the Federal Circuit issued *Caquelin II*, Order, ECF No. 35, but briefing
remained suspended while the parties engaged in settlement discussions.  *See* Orders, ECF
Nos. 35, 37, 39, 41.  The Court then dismissed plaintiff Brian Neuman's claims without
prejudice for failure to prosecute pursuant to Rule 41(b) of the Rules of the Court of Federal
Claims ("RCFC").  *See* Order, ECF No. 58.  The parties informed the Court on 26 October 2021
the settlement discussions had failed.  *See* Joint Status Report, ECF No. 60.  The Court then
ordered briefing on the parties' summary judgment motions regarding liability.  *See* Order, ECF
No. 61.

The court held a status conference on 31 March 2022 to discuss various issues.  *See*
Order, ECF No. 69.  One issue raised was whether delay caused by a NHPA historic preservation
condition is a taking.  Status Conference Tr. at 36:22–38:4, ECF No. 75.  The government
argued plaintiffs did not allege this issue in their complaint, *id.* at 37:2–4, but plaintiffs argue
they did not have to because the NHPA is part of the "regulatory process of what is triggered
when the NITU is issued."  *Id.* at 39:4–8.  When asked whether there was a case confirming or
denying delay caused by the NHPA historic preservation condition as a taking, neither the
government nor plaintiffs could point to a case which raised the issue.  *Id.* at 33:17–20, 37:19–
20.  Oral argument was held on 7 June 2022.

## III.      Relevant Law

This Court grants summary judgment when the evidence demonstrates "there is no
genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of
law."  RCFC 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  An issue is
"genuine" if it "may reasonably be resolved in favor of either party."  *Anderson*, 477 U.S. at 250.
Material facts are those that "might affect the outcome of the suit" and exclude factual disputes
that are "irrelevant or unnecessary."  *Id.* at 248.

When considering whether summary judgment is appropriate, inferences must be drawn
in the light most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio
Corp.*, 475 U.S. 574, 587 (1986).  The burden is on the moving party to establish "the absence of
a genuine issues of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the
moving party meets this burden, the burden shifts to the nonmovant to point to sufficient

---

[1] *Caquelin v. United States* has a lengthy litigation history dating back to 2015.  *See Caquelin v. United States*, 121
Fed. Cl. 658 (2015), *vacated,* 697 Fed. Appx. 1016, 1019–20 (Fed. Cir. 2017), *remanded to*, 140 Fed. Cl. 564
(2018), *aff'd,* 959 F.3d 1360 (Fed. Cir. 2020).  The Federal Circuit in the 2020 decision defines *Caquelin v. United
States*, 697 F.App'x 1016 (Fed Cir. 2017) as "*Caquelin II.*"  In this action, the parties in briefing and oral argument
refer to *Caquelin v. United States*, 959 F.3d 1360 (Fed. Cir. 2020) as "*Caquelin II.*"  The Court will refer to the 2020
Federal Circuit decision as *"Caquelin II"* for consistency with the parties' arguments.

evidence to show a dispute exists over a material fact. *Anderson*, 477 U.S. at 256. The nonmovant may rely on evidence that would not be admissible at trial. *Celotex*, 477 U.S. at 324.

To preserve shrinking rail trackage, Congress enacted the National Trails System Act ("Trails Act"), Pub. L. 90-543, 82 Stat. 919 (codified, as amended, at 16 U.S.C. § 1241 *et seq.*), and National Trails System Act Amendments of 1983, Pub. L. 98-11, 97 Stat. 42, which promote converting rail lines to public trails to preserve unused rights-of-way. *Preseault v. Interstate Com. Comm'n ("Preseault I")*, 494 U.S. 1, 5 (1990). The Trails Act allows the Interstate Commerce Commission (now the STB) to "delay the disposition of rail property for up to 180 days after the effective date of an order permitting abandonment, unless the property had first been offered for sale on reasonable terms for public purposes including recreational use." *Id.* at 6 (citing 49 U.S.C. § 10906 (1982)). The 1983 Amendments allow "a railroad wishing to cease operations along a particular route may negotiate with a State, municipality, or private group" regarding the right-of-way. *Id.* at 6–7 (citing 16 U.S.C. § 1247).

The Tucker Act provides a process for compensating property owners for Fifth Amendment takings resulting from the Trails Act. *Id.* at 11–12. According to Federal Circuit precedent, liability for a taking in a rails-to-trails case depends on three considerations: (1) whether the railroad owns an easement or a fee simple estate; (2) whether the terms of the easement are "limited to use for railroad purposes," or whether the terms also include "future use as public recreational trails;" and (3) "even if the grants of the Railroad's easements were broad enough to encompass recreational trails, had these easements terminated prior to the alleged taking so that the property owners at that time held fee simples unencumbered by the easements." *Preseault v. United States* ("*Preseault II*"), 100 F.3d 1525, 1533 (Fed. Cir. 1996) (*en banc)*.

A Fifth Amendment taking occurs under the Trails Act "when [a] NITU is issued and state law reversionary interests that would otherwise take effect pursuant to normal abandonment proceedings are forestalled." *Caldwell v. United States*, 391 F.3d 1226, 1236 (Fed. Cir. 2004). Courts must consider whether the government action caused the alleged taking because "there is no taking until the time as of which, had there been no NITU, the railroad would have abandoned the rail line, causing termination of the easement that the NITU continued by law." *Caquelin II*, 959 F.3d at 1372.

Apart from the Trails Act, the NHPA requires "the head of any federal agency having direct or indirect jurisdiction over a proposed Federal or federally assisted undertaking . . . shall take into account the effect of the undertaking on any historic property." 54 U.S.C. § 306108. In accordance with the NHPA, the STB requires submission of a Historic Report when a rail line applies for abandonment. 49 C.F.R. §§1105.6(b)(2), 1105.8(a). "The purpose of the Historic Report is to provide the [STB] with sufficient information to conduct the consultation process required by the Historic Preservation Act." § 1105.8(a). As per STB policy, "[i]n cases where a condition is imposed under NHPA, a notice of consummation should not be filed for any part of the line until the historic review process is completed and the condition is removed." *Consummation of Rail Line Abandonments That Are Subject to Historic Pres. and Other Envtl. Conditions*, STB Ex Parte No. 678, 2008 WL 1815592 (Apr. 16, 2008). The NHPA process has been described as a "'stop, look, and listen' provision, requiring an agency to acquire and

consider information prior to making a decision and approving a federal undertaking." *Friends of the Atglen-Susquehanna Trail, Inc. v. Surface Transp. Bd.*, 252 F.3d 246, 263 (3d Cir. 2001) (citing *Concerned Citizens All., Inc. v. Slater*, 176 F.3d 686, 695–96 (3d Cir. 1999), *Illinois Commerce Comm'n v. Interstate Commerce Comm'n*, 848 F.2d 1246, 1260–61 (D.C. Cir. 1988)). The STB cannot construct a new rail line without adhering to the NHPA process. *Mid States Coalition for Progress v. Surface Transp. Bd.*, 345 F.3d 520, 555 (8th Cir. 2003). The STB also may not unilaterally terminate NHPA procedures. *Friends of the Atglen-Susquehanna Trail, Inc.*, 252 F.3d at 266–67.

## IV.    The Parties' Arguments for Summary Judgment

### A.    Whether the NITU Effected a Taking

Plaintiffs argue the STB triggers a "categorical physical taking" when it issues a NITU. Pls.' Second MSJ at 14. In their motion for summary judgment, plaintiffs emphasize, "the issuance of a NITU, which blocks the landowners' reversionary interests, triggers accrual of a Trails Act taking regardless of whether the taking later becomes temporary." *Id*. at 17 (citing *Barclay v. United States*, 443 F.3d 1368, 1373 (Fed. Cir. 2006). According to plaintiffs, events occurring after the issuance of the NITU, such as whether a trail use agreement is reached, are irrelevant because the issuance of the NITU itself is what causes a taking. *Id*. at 19. Relying on *Ladd v. United States*, 630 F.3d 1015 (Fed. Cir. 2010)*,* plaintiffs argue that the government's action of issuing the NITU is "what blocks the reversionary interests and results in a taking." *Id.* at 20. Plaintiffs continue, "the minds of third parties is irrelevant" but "what is important is that the federal government's regulatory scheme blocks reversionary interests upon the railroad's representation that it intends to abandon the line and a NITU is issued." *Id*. at 20. Plaintiffs also cite the Supreme Court's decision in *Cedar Point Nursery v. Hassid*, holding when the government's regulation authorizes or appropriates a physical occupation, this is a per se taking. *Id*. at 23–24 (citing *Cedar Point Nursery*, 141 S. Ct. 2063, 2074 (2021)).

The government argues the NITU did not affect a per se taking because "proof of causation is an essential element in rails-to-trails takings actions." Gov't's Resp. at 20, ECF No. 65 (citing *Caquelin II*, 959 F.3d at 1363). The government rejects plaintiffs' argument claiming liability is immediately assumed upon the issuance of the NITU. *Id*. This assumption, according to the government, would contradict binding precedent from the Federal Circuit set forth in *Caquelin II*, and such an argument—to ignore *Caquelin II*—was already rejected by this court in *Hardy v. United States*, No. 14-388, 2021 WL 4839907, at \*4–5 (Fed. Cl. Oct. 18, 2021). *Id*. at 20–21. The government also argues "a NITU does not authorize a new easement, nor does it extinguish the existing railroad purposes easement." *Id*. at 21. Instead, the government argues the NITU is a "procedural vehicle" which "maintains the status quo" while negotiations are underway. *Id*. Without a trail use agreement—which there was not here—a new easement was never created and the existing easement for railroad purposes remained in place until abandonment was consummated. *Id*.

The government argues *Cedar Point Nursery* involved an access regulation, while the NITU did not grant any public access. Gov't's Resp. at 22*.* The government also argues *Cedar Point Nursery* does not invalidate or weaken *Caquelin II*. *Id.* at 21.

- 5 -

**B.      Whether Plaintiffs Have Shown the NITU Caused a Taking**

Plaintiffs argue causation is satisfied in this case because causation was satisfied in *Caquelin II*, and "the facts of this case are basically identical to the facts of *Caquelin II*." Pls.' Second MSJ at 8. Citing the holding in *Caquelin II*, plaintiffs assert causation is established if plaintiffs can "show[] the railroad's affirmative intent to abandon the corridor at the time of the NITU." Pls.' Reply at 6, ECF No. 66. Plaintiffs identified five facts that are similar to what the Federal Circuit relied upon in *Caquelin II* to support finding the NITU caused a taking: (1) the railroad's application to abandon before the NITU "indicated an affirmative intent to abandon at the time the NITU was issued"; (2) "the railroad never sought any further extension of the NITU"; (3) the railroad consummated abandonment three months after the NITU expired; (4) the NITU authorized the removal of the track during the pendency of the NITU, which "correlates with the railroad's intent to abandon after they request permission to abandon"; and (5) "[t]he railroad met the state standard for abandonment" which "requires nonuse with an intent to abandon." *Id*. at 6–7. Plaintiffs allege these facts are present in this case too.

The government acknowledges this similarity with *Caquelin II* but argues plaintiffs cannot establish causation because regulatory conditions unrelated to the NITU barred CSXT's abandonment during and after the NITU period, and "the earliest that CSXT could consummate abandonment was five months after the NITU's expiration." *See* Gov't's Resp. at 15. The government points to the historic preservation condition, which arose under the NHPA. *Id*. The historic preservation condition was still effective on 2 January 2019 when the NITU expired and remained effective until the STB removed it on 26 June 2019. *Id*. at 11. Since the historic preservation condition prevented the railroad from consummating abandonment during the NITU period, the government argues the NITU could not have caused the delay in the consummation of abandonment during the NITU period. *Id*. at 15. Specifically, the government asserts the evidence on the record proves:

> (1) even absent the NITU, CSXT could not have abandoned the [l]ine during the NITU period;
> (2) the earliest that CSXT could have abandoned the [l]ine was five months after the NITU expired;
> (3) regulatory conditions unrelated to the Trails Act delayed consummation of abandonment, not the NITU;
> (4) CSXT did not enter a trail use agreement with a trail sponsor;
> (5) no public trail use right in the corridor was created;
> (6) CSXT consented to the NITU's issuance;
> (7) CSXT had not decided to abandon the [l]ine when the NITU was issued; and
> (8) CSXT knew that it could ask the STB to vacate the NITU and reinitiate the administrative abandonment process during the NITU, yet did not do so.

*Id*. 15–16; Gov't's Resp. Ex. 1 ¶¶ 6, 12, 13, 15, 16; Pls.' Second MSJ Ex. D at 4. The government emphasizes the regulatory conditions, rather than the NITU, barred CSXT's abandonment during the NITU period. Gov't's Resp. at 16.

The government argues plaintiffs incorrectly frame the *Caquelin II* "causation" analysis and "disregard the dispositive question:   when would the railroad in fact have abandoned absent the NITU?"  Gov't's Reply at 3, EFC No. 67.  The government further asserts:  "Legally, it cannot be correct that causation turns solely on the railroad's intent at the time of the NITU because factors *independent from* the railroad's intent may prevent the railroad from abandoning during the NITU period, no matter how firmly set the railroad is upon abandoning its line."  *Id*. The government argues in *Caquelin II* the Federal Circuit never discusses "intent" in the discussion of causation.  *Id*.

Plaintiffs respond the government's focus on regulatory conditions as the cause of abandonment rather than the NITU is not relevant because what happens after the NITU's issuance is not an element of the claim.  Pls.' Reply at 8–9 (citing *Ladd*, 630 F.3d at 1024). Plaintiffs argue under *Preseault II*, issuance of the NITU triggered a takings claim, regardless of whether a trail use agreement was signed or abandonment was consummated.  *Id*. at 9.  As for the Payne Declaration upon which the government relies, plaintiffs assert it is "nothing more than a retrospective summation of events and does not provide any evidence of the railroad's intent at the time of the NITU."  *Id*. at 10.  Instead, plaintiffs argue the railroad's intent to abandon is verified by the railroad's Petition for Exemption, which was then consummated.  *Id.*

## V.   Whether the NITU Caused a Fifth Amendment Taking

Both parties agree *Caquelin II* is binding precedent and causation is a necessary element of a Trails Act takings claim.  *See* Gov't's Resp. at 14 ("Plaintiffs [m]ust [p]rove [c]ausation [u]nder [b]inding Federal Circuit [p]recedent."); Pls.' Reply at 4 ("As a result, the causation standard enunciated in *Caquelin II* is the law in the Federal Circuit and is binding on this Court when considering this motion unless it is changed by an en banc ruling of the Federal Circuit or by the Supreme Court.").  This Court has already concluded *Caquelin II* is binding precedent and the question of causation must be addressed in rails-to-trails cases.  *See Sauer West LLC v. United States*, 157 Fed. Cl. 619, 633–34 (2022) (Holte, J.).  As this Court noted in *Sauer West*:

> *Caquelin [II]* clarifies that causation was always an implied element of the Federal Circuit's precedents in *Caldwell*, *Barclay*, and *Ladd* because those cases are based on *Caldwell*'s holding that a "Fifth Amendment taking, if any, under the Trails Act is accomplished when an NITU is issued and state law reversionary interests that would otherwise [have] take[n] effect pursuant to normal abandonment proceedings are forestalled."  *Caquelin II*, 959 F.3d at 1371 (quoting *Caldwell*, 391 F.3d at 1236).  The Federal Circuit applied this holding in, *Barclay*, a Trails Act case involving a statute of limitations issue.  *Barclay*, 443 F.3d at 1374.  In *Barclay*, the Federal Circuit held a NITU triggers accrual of a Trails Act claim and adverted to the plaintiff's admission that "the easement continued in existence beyond the time when it otherwise would have been abandoned."  *Id.* (citation omitted).  Then in *Ladd*, the Federal Circuit found a taking under the Fifth Amendment occurred despite a trail-use agreement never being reached because "a takings claim accrues on the date that a NITU issues, events arising after that date . . . cannot be necessary elements of the claim."  *Ladd*, 630 F.3d at 1024.

*Sauer West*, 157 Fed. Cl. at 633–34.  This Court is bound by Federal Circuit precedent, and therefore, the question of causation must be addressed.  *Id.*

Both parties also agree there is no claim of a taking solely based on the NHPA historic preservation condition.  *See* Oral Argument Tr. at 18:24–19:5, ECF No. 77 (plaintiffs' counsel stating:  "I'm not aware, Your Honor, of any case where any plaintiff has ever sought a taking based on the National Historic Preservation Act, and I don't believe it would be successful if they did.  I, frankly, think it's immaterial to this discussion as to whether a taking actually occurred or not based on all the precedent"); Tr. at 55:11–14 ("THE COURT:  [W]ould you agree that your complaint only alleges a taking under the Trail Act and no taking is being argued under the NHPA?  [PLAINTIFFS]:  Totally agree, Your Honor."); Tr. at 93:2–4 (government's counsel stating "I'm not aware of any cases . . . where Plaintiff has succeeded or even brought a takings claim based on the application of the National Historic Preservation Act.").  The Federal Circuit stated previously, "[t]he issuance of the NITU is the only government action in the railbanking process that operates to prevent abandonment of the corridor and to preclude the vesting of state law reversionary interests in the right-of-way."  *Caldwell*, 391 F.3d at 1233–34.  The Court, therefore, will only address whether the NITU caused a taking, not whether the historic preservation condition caused a taking.

### A.   Whether Causation is Satisfied Absent the Historic Preservation Condition

Both parties agree the facts presented in this case resemble the facts of *Caquelin II*, and therefore, the Court will consider the similarities between the two fact patterns.  *See* Pls.' Reply at 6–7 (noting five factual similarities between the two cases which were central to the holding in *Caquelin II*); Oral Argument Tr. At 17:5–13 (government's counsel stating, "if there was no historic condition, then . . . this case . . . would . . . be on all fours with the facts of the *Caquelin II* case"),

In *Caquelin II*, the Federal Circuit held "[i]n the absence of contrary evidence, this evidence suffices to support an inference that, had there been no NITU, the railroad would have completed abandonment during the period in which the NITU was in effect."[2]  *Caquelin II*, 959 F.3d at 1373.  The Federal Circuit pointed to five pieces of evidence which supported this

---

[2] The Federal Circuit recently addressed and reaffirmed *Caquelin II* in *Memmer v. United States*, Nos. 2021-2133, 2021-2220, 2022 WL 4488903 (Fed. Cir. Sept. 28, 2022).  In *Memmer*, the Court of Federal Claims determined landowners established the railroad would have abandoned rail lines in the absence of the NITU and relied on facts regarding the railway initiating the process for abandonment through filing a notice of exemption representing it had no local traffic move over the lines (for at least the preceding two years) and noted a date to consummate abandonment of the lines.  *Id.* at *5.  In this case, CSXT filed a request for exemption from the STB after no traffic had moved over the line for two years and proposed an abandonment date of 29 June 2018.  Pls' Second MSJ Ex. A at 1, ECF No. 63-1.  On appeal in *Memmer*, the Federal Circuit affirmed the NITU effected a taking and reaffirmed its holding in *Caquelin II*, stating, "[I]n order to determine if a NITU has [a]ffected a taking, we must consider whether the railroad would have abandoned the line, i.e., relinquished its rights to the rail right-of-way, during the period of the NITU had there been no NITU."  *Id.* at *7.  The Federal Circuit explained it could not "conclude that the facts found by the [Court of Federal Claims] are insufficient to support … [the railroad] had every intent to abandon the railroad lines during the period of time that the NITU was in effect and was prevented from doing so by the existence of the NITU."  *Id.*  Moreover, the Federal Circuit concluded the government did not present evidence to indicate that the "Court of Federal Claims erred in finding the evidence that [the railroad] would have relinquished its rights to its right-of-way during the NITU period outweighed the evidence to the contrary."  *Id.*

holding. *Id.* First, "[t]he railroad filed an application to abandon, indicating an affirmative intent to abandon." *Id.* Second, "[w]hen it was asked for consent to an extension of the December 30 expiration date, it refused, confirming an interest in abandoning sooner rather than later." *Id.* Third, the railroad "completed the abandonment just three months after December 31, 2013, the date on which it became legally authorized to abandon the line." *Id.* Fourth, the NITU included authorization to remove track, "suggesting an expectation of comparatively prompt completion of abandonment." *Id.* Fifth, the railroad removed track, which was a "precondition to abandonment-based easement termination under Iowa law" at the time. *Caquelin II*, 959 F.3d at 1373.

Plaintiffs argue "[e]ach of the five pieces of evidence that were relevant in *Caquelin II* are also present in this case . . . ." Pls.' Reply at 6–7. First, plaintiffs note "[t]he railroad's verified application to abandon, which was filed on May 10, 2018 (before the NITU was issued), indicated an affirmative intent to abandon at the time the NITU was issued." Pls.' Reply at 6. Second, "[a]fter the NITU was issued by the STB on July 6, 2018 and after the initial 180-day period for negotiations expired on January 5, 2019, the railroad never sought any further extension of time to negotiate trail use, just like the railroad in *Caquelin II* did not seek or consent to a further extension of the negotiating period." *Id.* Third, plaintiffs state "[t]he negotiating period set forth when the NITU expired on January 5, 2019, and the railroad consummated abandonment six months later, on July 9, 2019." *Id.* Fourth, "[t]he NITU . . . authorized the removal of the track during the pendency of the NITU . . . ." *Id.* at 6. Plaintiffs assert this authorization "comports with the STB's acknowledgement that, once the railroad requests permission to abandon and is then granted permission to abandon, that the removal of the track correlates with the railroad's intent to abandon after they request permission to abandon and the STB grants them permission to remove the tracks." *Id.* at 6–7.[3] Fifth, "[t]he railroad met the standard of abandonment under state law . . . ." *Id.* at 7. Plaintiffs argue "because the standard in Ohio merely requires nonuse with an intent to abandon, and the railroad's own filings before the STB satisfied the standard because they specifically confirmed and verified nonuse and the railroad's intent to abandon in their Verified Notice of Exemption." Pls.' Reply at 7. Plaintiffs summarize, "[a]ll of the evidence from the railroad, including evidence before the NITU, during the pendency of the NITU, and after the NITU expired, confirms the railroad's intent to abandon when the NITU was issued, which is the test for causation under *Caquelin II*." Pls.' Reply at 7.

At oral argument, the government stated several times the facts of this case are similar to *Caquelin II*, absent the historic preservation condition. *See* Oral Argument Tr. At 17:5–13("THE COURT:  If there was no historic condition, would the NITU time period be compensable? [GOVERNMENT]:  Under the controlling law, if there was no historic condition, *then the facts of this case . . . would . . . be on all fours with the facts of the Caquelin case*, and the Federal Circuit held that the period of time that the NITU was in place in the Caquelin case was compensable.  So yes . . . .") (emphasis added), 120:2–8 ("THE COURT: …So…causation in

---

[3] The NITU prohibited the railroad from removing track in this case. *See* Pls.' Second MSJ Ex. D at 4 (6 July 2018 STB Decision) ("CSXT shall…not file its consummation notice or initiate any salvage activities related to abandonment (including removal of tracks and ties) until the section 106 process has been completed and the Board has removed this condition.").  Removing track is, therefore, not a useful indicator of the railroad's intent in this case because the railroad was prohibited by the STB from doing so.

this case would be met but for the NHPA.  [GOVERNMENT]:  Yes, I think that that is correct, but it doesn't depend upon the railroad's intent.  *If there was not the NHPA condition in this case, then the facts of this case would be essentially exactly the same as—or essentially the same as Caquelin II*.") (emphasis added).

In *Caquelin II*, the Federal Circuit stated the causation standard is "straightforward" and there is no causation "if the railroad would not have abandoned the rail line during that period even in the absence of the NITU."  *Caquelin II*, 959 F.3d at 1371.  To answer the question of causation, the Court must look to the intent of the railroad at the time of the NITU.  *See Ladd*, 630 F.3d at 1023–24; *Sauer West*, 157 Fed. Cl. at 636.  "Events occurring before, during, and after the NITU issues are relevant when assessing the railroad's intent."  *Id.* (citing *Caquelin*, 959 F.3d at 1372–73).

In their briefing, the government argues the Payne Declaration "establishes that the railroad would not have abandoned while the NITU was in effect, and Plaintiffs offer no contrary facts to establish any genuine dispute," but the government's argument is inconsistent.  Gov't's Reply at 2.  At oral argument, even after stating that without the NHPA condition, this case is "on all fours" with *Caquelin II*, the government still tries to argue the Payne Declaration shows the railroad could not have abandoned during the time the NITU was in effect and had not made a final decision on whether to abandon.  Oral Argument Tr. at 17:9, 106:20–23, 118:7–18.  Plaintiffs argue the Payne Declaration should be disregarded, as a similar declaration from Mr. Payne was dismissed by Judge Roumel in *Blevins.  See Blevins v. United States*, 158 Fed. Cl. 295, 311 (2022); Oral Argument Tr. At 53:1–6 (plaintiffs' counsel stating Judge Roumel's handling of the Payne Declaration in *Blevins* dictates "the timing of consummation of abandonment is immaterial to whether a taking occurred.").[4]  In *Blevins*, Judge Roumel disagreed the Payne Declaration "reveal[ed] anything about CSXT's intent to abandon in the 'but for' world in which no NITU had issued . . . . [T]he Draft Declaration contain[ed] legal conclusions, and even when 'viewed in the light most favorable to the nonmoving party,' its statements of fact [did] not address CSXT's intentions during the relevant timeframe."  158 Fed. Cl. at 311.  Similarly, the Payne Declaration in this case states:  "Based on the conditions imposed by the Board, CSXT *could not have consummated* the abandonment until June 26, 2019….CSXT *could not have abandoned* the line during the period that the NITU was in effect."  Gov't's Resp. Ex. 1 ¶ 6 (emphasis added).  The declaration later states, "When the NITU was issued, CSXT had not made a final decision on whether it would abandon the [l]ine.  CSXT could have been required to continue rail service or sell the [l]ine . . . . [and] CSXT would have withheld its consent to the issuance of the NITU if it had made a final decision to abandon the line."  *Id.*  ¶ 16.

The government asserts this court was wrong to disregard the Payne declaration in *Blevins*.  Oral Argument Tr. At 117:20–25 (government's counsel stating, "Judge Roumel . . . was weighing the credibility of the potential witnesses on summary judgment, which is not

---

[4] The Payne declaration in *Blevins* discusses the history of the rail line and steps taken by CSXT regarding the rail line.  *See* Payne Declaration, *Blevins v. United States*, 158 Fed. Cl. 295, (2022).  The Payne declaration purports to prove CSXT's intent.  *Id.*  The government argued, relying on the Payne declaration, "the NITU cannot constitute a taking because CSXT had not yet made up its mind about whether to consummate abandonment when it filed it exemption notice."  *Id.* at 310–11.

an appropriate thing to do.  So that, we believe, is erroneous and should not have been done.").
At oral argument, the government distinguished this case from the *Blevins* because "there's not a trail use agreement in *Blevins* at this point and the declaration from the railroad in that case actually explains that the railroad initiated the abandonment procedure so they could explore ways to sell the line."  *Id.* at 78:10–16.  The government argued that *Blevins* was "wrongly decided and not persuasive, but it doesn't present the issue that's presented here because there's no actual abandonment of the line and the NITU process is still ongoing."  *Id.* at 78:17–20.

The government argues "CSXT would have withheld its consent to the NITU's issuance if it had made a final decision to abandon the [l]ine."  Gov't's Resp. at 10 (citing Gov't's Resp. Ex. 1 ¶ 16).  This contradicts prior Federal Circuit precedent where intent is satisfied despite the issuance of a NITU.  *See Caquelin II*, 959 F.3d at 1373; *Ladd*, 630 F.3d at 1025; *Caldwell*, 391 F.3d at 1236.  The government also argues CSXT did not *intend* to abandon because it *could not* abandon.  Gov't's Resp. at 9–10; Gov't's Resp. Ex. 1 ¶ 6.  The evidence in the Payne Declaration, however, shows CSXT filed a Verified Notice of Exemption with the STB on 10 May 2018, CSXT did not file for an extension of the NITU period, and CSXT consummated abandonment on 9 July 2019 (only thirteen days after the historic preservation condition was lifted).  Gov't's Resp. Ex. 1 ¶¶ 7, 18, 22, 24.  Similar to *Blevins*, this Court finds the statements in the declaration are unpersuasive to show an intent not to abandon and, in fact, suggest an affirmative intent to abandon similar to *Caquelin II*.  *See Blevins*, 158 Fed. Cl. at 311; *Caquelin II*, 959 F.3d at 1373.

As the government agrees, this case is "on all fours" with the facts of *Caquelin II*, with the exception of the historic preservation condition.  All the evidence which pointed to causation in *Caquelin II* is present in this case, as plaintiffs assert, and the railroad's intent at the time of the NITU was to abandon.  Notably, the railroad abandoned the line on 9 July 2019, just thirteen days after the historic preservation condition expired.  *See* Pls.' Second MSJ at 7.  All the conditions necessary for a taking—including the railroad's intent to abandon—are present in this case.  *See Caquelin II*, 959 F.3d at 1373.

**B.      Whether the Existence of the Historic Preservation Condition Negates the Government's Liability**

**1.      Maintaining the Status Quo:  Prior Precedent and When a Taking Occurs**

The presence of a NITU and a NHPA historic preservation condition is not a new issue in the context of rails-to-trails takings, and therefore the Court must consider such instances to maintain consistency with prior caselaw.  *See Balagna v. United States*, 145 Fed. Cl. 442, 443–44 (2019) (Kaplan, C.J.); *Blevins*, 158 Fed. Cl. at 312.  In *Balagna*, this court considered a rails-to-trails case involving both a NITU and a NHPA condition.  145 Fed. Cl. at 443–44.  The NITU expired on 22 November 2018, but on 4 February 2019, "the Railroad asked the STB to extend the sixty-day period for consummating the abandonment of the rail line" until 21 January 2020 "so that it might resolve a condition that the STB had earlier placed on the consummation of the abandonment under § 106 of the National Historic Preservation Act" relating to a bridge at milepost 52.68.  *Id.* at 443–44 & n.3.  There is no mention of argument regarding the NHPA

causing the delay such that causation cannot be shown for the NITU. The court, in *Balagna*, decided that "the takings ended with expiration of the NITU" on 22 November 2018, thus granting the government's motion for partial summary judgment.[5] *Id.* at 444.

Even though *Balagna* was decided before *Caquelin II*, *Caquelin II* was merely a "clarification of the legal standard" rather than a change, and therefore, *Balagna* is still persuasive. *Caquelin II*, 959 F.3d at 1370. Both *Balagna* and *Blevins* present situations where historic preservation conditions and NITUs were issued concurrently, and this court still found a taking in favor of plaintiffs. *See Balagna*, 145 Fed. Cl. at 443–44; *Blevins*, 158 Fed. Cl. at 312 ("That CSXT has not yet completed tasks required under the National Historic Preservation Act to abandon a railroad does not impact the causation analysis because Defendant has not shown that CSXT would have also delayed this process in the hypothetical world where a NITU never issued.").

The government argues this case is factually distinguishable from *Balagna*. At oral argument, the government noted one factual difference is "when the NITU eventually expired [in *Balagna*], . . . the historic conditions had already been lifted for the entirety of the in [sic], except for this single bridge." Oral Argument Tr. at 128:18–22. The government continued, "[w]hat's different, I suppose, is that the NITU, if you were to take away the challenged action, which is the NITU, then there's a period, starting in 2016 and continuing then in 2017, until 2018, during which there was no legal or regulatory barriers to consummation besides the NITU, so it's the converse of this case*." Id.* at 129:14–20. When asked whether there was compensation in *Balagna* during time periods where there was both a NITU and historic preservation condition, the government agreed and added "it doesn't look like the Historic Preservation Act issue was raised, considered, and decided…in the same way that it is here*." Id.* at 130:10–15. Plaintiffs responded, "I think [*Balagna*] speaks for itself . . . . I think it definitely covers an NHPA argument that existed at all or some portion of the NITU period. They didn't raise the argument and it was before *Caquelin* [*II*]. All of those things are true. But the rationale is the same*." Id.* at 132:9–14.

The Court finds no reason why the outcome of this case should not be consistent with previous outcomes; the presence of a dual NITU and NHPA condition can still result in a taking. *See Balagna*, 145 Fed. Cl. 443–44; *Blevins*, 158 Fed. Cl. at 312. The government cannot argue the abandonment delay was caused by the historic preservation condition when that condition outlasts the NITU, but simultaneously admit the government is liable as long as the historic preservation condition expires before the NITU. If both the NITU and historic preservation condition existed together, as they did in this case, it is illogical for the "cause" to be whichever one expires last. Causation is about intent and the conditions at the time of the NITU, not the order conditions expire. *Ladd*, 630 F.3d at 1023–24; *Sauer West*, 157 Fed. Cl. at 636. If there is

---

[5] Notably, the court held the duration of the taking did not extend past the NITU. *Balagna*, 145 Fed. Cl. at 444. Here, as in *Balagna*, plaintiffs argue for compensation from "the date the NITU was issued until the date they consummated abandonment." Oral Argument Tr. at 19:20–22. Plaintiffs do not, however, argue for compensation prior to the NITU if the NHPA process had already begun. *Id.* at 63:4–25 ("THE COURT: So if the NHPA process begins a month before the NITU . . . and then the NITU lasts for 12 months and then the NHPA process extends for one more month . . . does Plaintiff there deserve compensation for 12 months or 14 months? . . . [PLAINTIFFS]: …it would be 13 months . . . I'm not talking about the month before").

compensation for a taking when only part of the NITU period is also encumbered by a historic preservation condition, it follows the NITU period should be compensable, even if the condition lasts beyond the duration of the NITU.[6]

It is helpful to look to other rails-to-trails contexts to examine when compensation is owed.  At oral argument, the government walked through Trails Act takings cases by dividing them into three categories.  *See id.* at 21:8–11.  According to the government, in "type one" cases, "the railroad and the trail sponsor reach a trail use agreement, and, at that point, a new easement is laid down on the properties for trail use.  In those cases, there's a taking" even if "[t]here may be historic conditions that are imposed." *Id.* at 21:12–16.  The government stated there would still be a taking if a historic preservation condition is present and a trail use agreement is ultimately reached because "there's never a period of time during which only the historic condition is in place.  So it's always the case that both the NITU and whatever historic condition is imposed are concurrently in effect." *Id.* at 22:21–25.  The government stated "type two" cases occur where "conditions may be imposed and there's a period of time where the railroad goes through negotiations.  The negotiations are not successful, no trail use agreement is reached, but the railroad doesn't consummate abandonment either and the line remains with the federal regulatory jurisdiction." *Id.* at 24:1–6.  "In those cases," the government contends, "there's no compensation because there's simply no taking in that set of cases because the NITU doesn't cause any delay in the reversion of rights because the railroad never abandons." *Id.* at 24:6–10.  The third type of case "is the type we have here, which is where the trail use negotiations don't succeed and then the railroad consummates abandonment," and compensation would be due for the period the NITU was in place if a historic preservation condition was satisfied before the NITU expired.  Oral Argument Tr. at 24:11–20.

Plaintiffs disagreed with the government's assessment of "type two" cases, stating it "[s]ounds like *Sauer West*, where they didn't consummate abandonment.  But I'm not aware of any case where it's ever been held that there was no compensation due under that scenario." *Id.* at 25:1–4.  As for "type one" cases, plaintiffs assert, "I believe it's entirely immaterial as to whether or not there's a pending historic preservation condition under the law." *Id.* at 25:14–16.  Plaintiffs continued, "I'm sure there are probably cases out there…where there was a Historic Preservation Act condition that was resolved prior to the time a trail use agreement was entered into, which obviously the law is in that category that it's a permanent taking and the compensation relates back to the NITU." *Id.* at 25:23–26:4.

For "type one" cases, "a Fifth Amendment taking occurs when, pursuant to the Trails Act, state law reversionary interests are effectively eliminated in connection with a conversion of a railroad right-of-way to trail use." *Caldwell*, 391 F.3d at 1228 (citing *Preseault II,* 100 F.3d at 1543).  As for "type two" cases, if a NITU does not result in a trail use agreement but

---

[6] Another concern with the government's argument is the ability to escape liability by using historic preservation conditions in the future.  When asked at oral argument whether the STB could use historic preservation conditions to delay abandonment in every NITU case in order to eliminate any liability, the government replied, "I don't think the premise of that question is one that comports, I suppose, with the presumption that the [g]overnment is going to act in good faith.  So I don't know that it would even occur to an agency to take an action that was denying—to do that sort of thing." Oral Argument Tr. at 71:2–10.  There does not appear to be any practical reason, however, for allowing the government to escape liability in this circumstance.

abandonment is also not consummated, causation may be satisfied, and a taking may occur. *See Ladd*, 630 F.3d at 1025; *Sauer West*, 157 Fed. Cl. at 637. This is true even when a historic preservation condition exists for part of the NITU period. *See Balagna*, 145 Fed. Cl. at 443–44. For a "type three" case, causation is satisfied, and a taking occurs, if the railroad would have abandoned absent the NITU. *See Caquelin II*, 959 F.3d at 1373.

As the government's breakdown illustrates, there are three potential outcomes of a NITU—trail use agreement, the railroad's continued ownership of the line, or abandonment. A NITU can cause a taking regardless of which of the three outcomes occurs. For both "type one" and "type two," the government concedes, and prior caselaw shows even if a historic preservation condition is present alongside the NITU, causation can still be satisfied and a taking can occur, although the government contends this is only true in "type two" cases when the historic preservation condition expires before the NITU. *See* Oral Argument Tr. at 21:12–16. (government's counsel agreeing if historic preservation condition is present and trail use agreement is reached, there is a taking); *Balagna*, 145 Fed. Cl. at 443–44 (finding taking when historic preservation condition and NITU both present and no abandonment or trail use agreement); Oral Argument Tr. at 129:14–20 (government's counsel distinguishing *Balagna* because historic preservation condition had almost entirely been lifted prior to expiration of NITU). As discussed *supra*, the Court finds no reason to only require compensation if the historic preservation condition expires before the NITU. Also discussed *supra* Section V.A, the Court finds this "type three" case to be indistinguishable from *Caquelin II* other than the historic preservation condition. In all these scenarios, compensation is owed. It would be odd if in this one specific scenario, where the historic preservation condition outlasts the NITU, there is no compensation. Prior precedent shows as long as there is a NITU and the required causation, there is a taking. *See Caldwell*, 391 F.3d at 1228; *Ladd*, 630 F.3d at 1025; *Balagna*, 145 Fed. Cl. at 443–44; *Caquelin II*, 959 F.3d at 1373.

## 2.    Torts and Takings:  Multiple Sufficient Causes

The parties further disagree whether tort principles of but-for causation can be applied to takings law. The government asserts while "there are elements of but-for causation in tort law" and "certainly takings law . . . has some connection to tort law . . . there's a dividing line between takings and torts and that dividing line is something that the Federal Circuit often needs to police." Oral Argument Tr. at 80:20–21; 81:6–15. When discussing *SL Serv., Inc. v. United States*, 357 F.3d 1358 (Fed. Cir. 2004), a case from the Court of International Trade regarding duties imposed by customs on dry-docking expenses and where the Federal Circuit considered the two independent reasons for dry docking the ship, the government said "it is analogous [to a taking] in a factual sense," but "the question is whether . . . legally it makes sense to apply a rule that's been applied in the context of a statute that involves levying duties on shippers for having work done outside of the United States in the context of takings law." Oral Argument Tr. at 87:23–88:9. The government asserts "the fact that a tort-like approach was taken by the Federal Circuit in a case that is more closely akin to torts than takings cases are akin to torts, [doesn't give] the Court a reason to apply this same logic in the takings context." *Id.* The government also noted "the United States is not akin or equivalent to a tortfeasor." *Id.* at 88:24–25. Plaintiffs, on the other hand, assert the legal analysis is "fairly analogous, frankly, on the duration of the taking issue." Tr. at 89:16–17. The government also pointed out the tort theory

of multiple sufficient causes is not applied by the Federal Circuit in flooding cases. *See id.* at 79:15–80:1; 81:23–82:22. Plaintiffs argued against this, stating, "the flooding cases are unique, both in practice and in the law*." Id.* at 83:1–2.

It is well established that takings law is rooted in common law property and tort law. *See Hansen v. United States*, 65 Fed. Cl. 76, 79–80 (2005) (Judge Block); Kris W. Kobach, *The Origins of Regulatory Takings: Setting the Record Straight*, 1996 Utah L. Rev. 1211, 1229 (1996) ("constraints upon the power of eminent domain were drawn primarily from three sources outside of the U.S. Constitution: state constitutional law, natural law, and common law."). For example, "[t]he early common law . . . treated the carrying away (asportation) of chattels and the dispossession of land as paradigmatic takings of private property." Richard A. Epstein, *Takings: Private Property and the Power of Eminent Domain* 35 (1985). This court described the relation between torts and takings stating "the historical origin and application of the basic principles of takings jurisprudence reveal that there is no clear cut distinction between torts and takings. The best that can be said is that not all torts are takings, but that all takings by physical invasion have their origin in tort law and are types of governmental nuisances or, at times, trespass." *Hansen*, 65 Fed. Cl. at 80; *see also* James S. Burling et al., *Takings and Torts: The Role of Intention and Foreseeability in Assessing Takings Damages*, SS035 ALI-ABA 773 (Am. L. Inst. 2011). In *Caquelin II*, Judge Taranto wrote: "It is a fundamental principle of takings law that a government action is not a taking of property if, even in the absence of the challenged government action, the plaintiff would not have possessed the allegedly taken property interest. *Caquelin II*, 959 F.3d at 1371 (citing *St. Bernard Parish Gov't v. United States*, 887 F.3d 1354, 1359–60, 1362 (Fed Cir. 2018)); *see United States v. Archer*, 241 U.S. 119, 132 (1916). It reflects a causation principle hardly unique to takings law." *Caquelin II*, 959 F.3d at 1371 (citing *Babb v. Wilkie*, 140 S. Ct. 1168, 1177–78 (2020) (explaining general but-for rule governing damages and certain other result-altering relief)).

On appeal from the Court of International Trade, the Federal Circuit considered the tort doctrine of multiple sufficient causes in *SL Serv., Inc.*, 357 F.3d 1358. *SL Serv. Inc.* involved a customs law assessing a duty for expenses of repairs, including "dry-docking." *Id.* at 1359. SL argued since the dry-docking was caused by both dutiable repairs and non-dutiable repairs, the dutiable repairs were not a "but for" cause, and no additional duty should be due. *Id.* The Federal Circuit found the "but for" test requires "special treatment…when independently sufficient acts combine to cause harm." *Id.* at 1361. The Federal Circuit continued, "a literal and simple version of the but-for test holds that neither defendant's act is a cause of the harm." *Id.* (quoting Dan B. Dobbs, The Law of Torts § 171, at 414 (2000)). "Such a result, however, has been universally condemned as 'violating both an intuitive sense of causation and good legal policy.'" *Id.* (citing Dobbs § 171, at 415).

While the Court does not rely on multiple sufficient causes for its analysis, the torts concept further supports its reasoning. There are several ways to view the two causes—the NITU and the historic preservation condition—under tort law. An act is a "factual cause of harm when the harm would not have occurred absent the conduct." Restatement (Third) of Torts: Apportionment of Liability § 26 (Am. L. Inst. 2010). If the NITU and historic preservation condition are considered to be "multiple sufficient causes," the Restatement (Third) of Torts dictates "[i]f multiple acts occur, each of which…alone would have been a factual cause of the

physical harm at the same time in the absence of the other act(s), each act is regarded as a factual cause of the harm." *Id.* § 27.  The classic example of multiple sufficient causes is when two individual campers forget to extinguish their campfires for the night, and both begin a forest fire. *Id*. § 27 cmt. a.  Either campfire alone would have caused the forest fire. *Id.*  Under § 27, both campers' negligence is a factual cause of the forest fire.  The Restatement explains "[t]his section applies in a case of multiple sufficient causes, regardless of whether the competing cause involves tortious conduct or consists only of innocent conduct.  So long as each of the competing causes was sufficient to produce the same harm as the defendant's tortious conduct, this Section [27] is applicable." *Id.* § 27 cmt. d.  This is illustrated by changing the facts in the above example where one fire is caused by a camper's negligence and the other is caused by a lightning strike. *See* Restatement (Second) of Torts § 432 cmt. d (Am. L. Inst. 1965).  Under this scenario, the defendant's tortious actions are still considered the factual cause of the harm.  Restatement (Third) of Torts § 27 cmt. d.  Here, the NITU is to the campfire as the NHPA historic preservation condition is to the lightning strike.  Despite the existence of the historic preservation condition, the NITU is still a factual cause of the delayed abandonment and the delay of plaintiffs' reversionary interests.

### C.    Conclusion on Causation

The Court concludes the NITU caused a taking, requiring compensation under the Fifth Amendment.  This holding is consistent with prior caselaw finding a taking when a trail use agreement is reached, *Caldwell*, 391 F.3d at 1228, when no trail use agreement is reached, *Ladd*, 630 F.3d at 1025, and when abandonment is consummated. *Caquelin II*, 959 F.3d at 1373.  Even more on point, this court has previously found a taking where a historic preservation condition is present for at least part of the NITU period. *See Balagna*, 145 Fed. Cl. at 443–44; *Blevins*, 158 Fed. Cl. at 312.  A concurrent NHPA historic preservation condition cannot extinguish what would otherwise be a taking.[7]

## VI.    Conclusion

For the foregoing reasons, the Court **GRANTS** plaintiffs' motion for summary judgment and **DENIES** the government's cross-motion for summary judgment.

### IT IS SO ORDERED.

s/ Ryan T. Holte
RYAN T. HOLTE
Judge

---

[7] In the recent *Memmer* opinion, Nos. 2021-2133, 2021-2220, 2022 WL 4488903 (Fed. Cir. Sept. 28, 2022), the Federal Circuit addressed the duration of a taking. *Id.* at *8 (finding the taking ended when the "United States was no longer responsible for mandating the continuation of the easement").  While there is currently no argument between the parties as to the when the taking would have occurred, *Memmer* is likely instructive in answering a future duration question in this case.