# In the United States Court of Federal Claims

No. 18-1070
(Filed: 22 August 2024)

*********************************************

JOHN HIPPELY, *et al.*,                  \*
                                        \*
        Plaintiffs,   \*
                                        \*
v.                                       \*
                                        \*
THE UNITED STATES,                       \*
                                        \*
        Defendant.    \*
                                        \*

*********************************************

    *Thomas S. Stewart*, with whom were *Reed W. Ripley*, *Steven M. Wald*, and *Michael J. Smith*, of Stewart Wald & Smith LLC, all of Kansas City, Missouri, for plaintiffs.

    *Brian Herman*, Trial Attorney, U.S. Department of Justice, Environment and Natural Resources Division, Natural Resources Section, with whom was *Todd Kim*, Assistant Attorney General, all of Washington, DC, for defendant.

## OPINION AND ORDER

**HOLTE, Judge.**

    In his 1861 address to Congress, President Abraham Lincoln advocated for the creation of this court's predecessor, explaining "[i]t is as much the duty of the government to render prompt justice against itself, in favor of its citizens, as it is to administer the same between private individuals." President Abraham Lincoln, First Annual Address (Dec. 3, 1861) ("Lincoln's First Annual Address"). Since the 1860s, this court has "rend[ered] money judgments in suits brought for that relief against the United States." *See United States v. Sherwood*, 312 U.S. 584, 588 (1941). With this waiver of sovereign immunity, however, it is incumbent upon the Court and government counsel before it—who work for the American taxpayer—to exercise sound prudence in that administration, especially when government liability may result in the additional payment of plaintiffs' attorneys' fees. In the words of President Thomas Jefferson five decades before Lincoln's address: "The same prudence which in private life would forbid our paying our own money for unexplained projects, forbids it in the dispensation of the public monies." Letter from President Thomas Jefferson to Skelton Gilliam (Jun. 19, 1808) (on file with The United States National Archives and Records Administration). In sum, the Court must not pay public money except as necessary to "render prompt justice" against the United States, and—relatedly—government counsel, like private attorneys accountable to clients, must balance the benefits of winning each case or issue with the eventual

public taxpayer costs associated therewith.  With these considerations in mind, the Court turns to the matter before it.

In July 2018, plaintiffs—ten individuals who own land along an Ohio railroad corridor—sued alleging a Surface Transportation Board ("STB") Notice of Interim Trail Use ("NITU") took their property in violation of the Fifth Amendment Takings Clause.  Following summary judgment briefing, the Court held the government liable for this taking on 18 October 2022.  On 5 June 2023, after extensive settlement talks, the parties stipulated to the entry of partial judgment in favor of plaintiffs in the amount of $1,869.09 with interest.  Having rendered justice against the government for its violation of the Fifth Amendment, *see supra* Lincoln's First Annual Address, the only remaining issue is now attorney compensation.

Under the Uniform Relocation Assistance and Real Property Act ("URA"), Congress recognized the importance of defending constitutionally protected property rights by providing for fees reimbursement, enabling citizens "with small takings claims to vindicate their rights with the assistance of competent counsel," *Bywaters v. United States*, 684 F.3d 1295, 1296 (Fed. Cir. 2012).  Here, plaintiffs' counsel requests reimbursement in the amount of $396,312 in fees and $22,643.47 in costs for their work recovering $1,869.09 for their clients.  Although this fee-to-client recovery ratio (~$212 to $1) may seem staggering, the government has recently paid more than $1,000,000 in fees in cases with similarly low recoveries.  *See Caquelin v. United States*, 959 F.3d 1360, 1362 (Fed. Cir. 2020) (noting the "parties stipulated to compensation of $900"); Pls.' Reply at 10, ECF No. 101 (explaining "[t]he government paid $1,000,000 in legal fees in *Caquelin* when $900 of damages were at issue"); *Memmer v. United States*, 50 F.4th 136 (Fed. Cir. 2022); Pls.' Reply at 10 ("[T]he government has agreed to a settlement of $1.7 million in fees and costs in *Memmer*[] when $29,000 in damages were at issue.").  In considering this request, the Court, as other judges have done, heeds the URA's call to "award . . . [to] plaintiff . . . [the] sum as [] in the opinion of the court . . . [is] his *reasonable* costs . . . including *reasonable* attorney" fees, *see* 42 U.S.C. § 4654(c) (emphasis added), keeping in mind the above-quoted wisdom of President Jefferson.  As explained in detail *infra*, the Court, exercising the discretion afforded by the URA, declines to reimburse plaintiffs' counsel to the extent such requests for payment are improper or unreasonable.  *See* 42 U.S.C. § 4654(c).  In addition, the Court reminds government counsel once more that it—in working for the American people and their tax dollars—must practice similar restraint when it comes to litigation decisions in these cases.  As the Seventh Circuit cautioned to counsel in *Montanez v. Simon*, there is risk of "cases . . . spiraling out of control" when there is a "lack[ of] private incentives."  755 F.3d 547, 552 (7th Cir. 2014).  Government counsel should always factor in the cost of fees when litigating, much as would a private litigator representing a private client—weighing the costs of each pyrrhic victory with the benefits of quickly and efficiently resolving each case.

For the reasons detailed in this Opinion and the Court's hourly billing spreadsheet notes, Exhibits A and B,[1] the Court grants in part and denies in part plaintiffs' Motion for Reasonable Attorneys' Fees and Costs.

---

[1] The Court will issue a separate Order immediately following this Order attaching Exhibit A—an Excel sheet totaling the hours and rates at which the Court reimburses plaintiffs—and Exhibit B—an Excel sheet totaling the costs for which the Court reimburses plaintiffs—to provide a thorough explanation of each decision made in this

## I.     Factual Background

The Court recounted this case's background in its October 2022 order:

> At issue is an easement for railroad purposes across plaintiffs' land owned by CSX Transportation, Inc. ("CSXT" or "the railroad"). . . .   The rail line runs approximately 13.9 miles in Trumbull County, Ohio. . . .  On 10 May 2018, CSXT filed a request for exemption from the STB to abandon the rail line, stating "no local rail traffic has moved over the [l]ine during the past 2 years."  . . .  CSXT proposed to consummate abandonment on 29 June 2018, . . . and on 30 May 2018 the STB approved the formal request for abandonment and the suggested abandonment date. . . .  On 31 May 2018, the Trumbull County Commissioners filed a Trail Use Request and requested a NITU be issued. . . .  The STB issued the NITU on 6 July 2018 along with a public use condition. . . .  The [National Historic Preservation Act, or] NHPA[,] historic preservation condition extended past the NITU and public use conditions until its removal on 26 June 2019. . . .  From 5 January 2019 to 26 June 2019, only the historic preservation condition prevented the railroad from abandoning the line.  *Id.* ¶¶ 19, 22.  The negotiations for interim trail use and railbanking were unsuccessful, and CSXT consummated the abandonment of the railway on 9 July 2019.  . . . Plaintiffs owned one or more parcels of real property abutting the railroad line at the time of the NITU.

*Hippely v. United States*, 162 Fed. Cl. 414, 417 (2022).

## II.    Procedural History

The early procedural history in this case is as follows:

> This case began in 2018 while the NITU was still in effect.  . . . After an initial period of discovery, briefings on partial summary judgment were stayed due to additional stipulations and pending the Federal Circuit's decision in *Caquelin v. United States* (*Caquelin II*), 959 F.3d 1360, 1372 (Fed. Cir. 2020).  *See* Orders, ECF Nos. 26, 31, 33.  This case was reassigned to [Judge Holte] during the stay.  *See* Order, EFC No. 27.  The Court lifted the stay after the Federal Circuit issued *Caquelin II*, Order, ECF No. 35, but briefing remained suspended while the parties engaged in settlement discussions.  *See* Orders, ECF Nos. 35, 37, 39, 41.  The Court then dismissed plaintiff Brian Neuman's claims without prejudice for failure to prosecute pursuant to Rule 41(b) of the Rules of the Court of Federal Claims ("RCFC").  *See* Order, ECF No. 58.  The parties informed the Court on 26 October

Opinion.  The Court adopted the government's Exhibits A and F, *see* Gov't's Exs. A; F, and altered the sheets in accordance with the hours, rates, and costs at which the Court found reasonable for reimbursement under the URA.  As stated in the Court's conclusion, *see infra*, the Court includes these Exhibits for the parties to review.  Where a reduction has been made, the Court cites the relevant portion of this Opinion for ease of reference.  To the extent the Court makes any calculation or consistency mistakes, the parties should raise these issues, noting the specific entry and any argument (and response from opposing counsel) thereon, to the Court in their 29 August 2024 joint status report (JSR) for the Court's review prior to issuing a final award.

2021 the settlement discussions had failed.[2]  *See* Joint Status Report, ECF No. 60. The Court then ordered briefing on the parties' summary judgment motions regarding liability.  *See* Order, ECF No. 61.

The court held a status conference on 31 March 2022 to discuss various issues.  *See* Order, ECF No. 69.  One issue raised was whether delay caused by a NHPA historic preservation condition is a taking. Status Conference Tr. at 36:22–38:4, ECF No. 75.  The government argued plaintiffs did not allege this issue in their complaint, *id.* at 37:2–4, but plaintiffs argue they did not have to because the NHPA is part of the "regulatory process of what is triggered when the NITU is issued." *Id.* at 39:4–8. When asked whether there was a case confirming or denying delay caused by the NHPA historic preservation condition as a taking, neither the government nor plaintiffs could point to a case which raised the issue.  *Id.* at 33:17–20, 37:19–20. Oral argument was held on 7 June 2022.

*Hippely v. United States*, 162 Fed. Cl. 414, 417–18 (2022).  On 18 October 2022, the Court issued an order granting plaintiffs' Motion for Summary Judgment and denying the government's Cross-Motion for Summary Judgment.  *See id.*; Reported Op., ECF No. 80.

On 16 December 2022, the parties submitted a joint status report ("JSR") informing the Court "the [p]arties have tentatively agreed to a settlement of land values and interest for a temporary taking" but "were unable to agree on attorneys' fees and costs as part of the tentative settlement," ECF No. 81.  Also on 16 December 2022, the Court issued an Order staying the case and directing the parties to file a JSR on or before 31 January 2023, ECF No. 82.  On 31 January 2023, the parties filed a JSR informing the Court "the United States has submitted the parties'

---

[2] At oral argument, the government provided insight into the parties' decision not to settle:  "There was *Caquelin* briefing after fall of 2021. . . .  The case was stayed pending *Caquelin* until about fall of 2020.  The parties then reported to the Court that they were engaging in settlement talks.  And this lasted for around a year.  And the parties had reached the tentative settlement of just compensation before spending several more months discussing the URA. And when a comprehensive agreement was not reached, the parties proceeded with *Caquelin* briefing."  Tr. at 35:23–36:7; *see also* Tr. at 39:3–16 ("[GOVERNMENT]:  As we reported in the status report, once the parties couldn't reach a comprehensive settlement agreement, the United States determined it should address the liability question since the parties were not settling.").  Plaintiffs at oral argument responded they were open to settlement during this time period, and it was the government who refused to settle.  Tr. at 40:16–41:12 ("[PLAINTIFFS]: . . . We contacted [the government] . . . and tried to resolve attorneys' fees after we reached the tentative agreement on settlement.  We even specifically said we would agree to that amount and submit briefing on the attorneys' fees issue at that point.  And instead of agreeing to do that, [the government] responded by saying, 'No.  Not only are we not going to agree to negotiate on attorneys' fees, we're going to require you to brief liability.'  This is a classic example of . . . the [g]overnment basically talking out of both sides of their mouth when it comes to litigation risk. Any normal lawyer, as you would expect, would look at the totality of the case and try to resolve it looking at all of the issues that come up, land value based on liability, interest and attorneys' fees.  And the [g]overnment refused to do that here.  They refused to do it in *Caquelin*.  They refused to do it in *Memmer*.  *Caquelin* paid over a million dollars in attorneys' fees, over $900,000.").  The government replied the failure to settle here was "two-sided."  Tr. at 60:3–12 ("[GOVERNMENT]:  The failure to reach settlement, Your Honor, is two-sided. . . .  The railroad here abandoned in July of 2019.  By the time the *Caquelin* stay lifted in 2020, everybody well knew there was no permanent taking, that, if anything, it was going to be temporary.  So I think the calculus could just as equally be on the other side that we should take less attorneys' fees and settle and resolve this case rather than keep going with the litigation.").  Government counsel also noted "I did not enter my appearance in this case until after oral argument on summary judgment. . . . And once the parties could not reach a comprehensive settlement, the United States was able to litigate its defenses."  Tr. at 42:1–9.

tentative settlement of principal just compensation and interest to the Attorney General's authorized representative," and the "review process is still ongoing," ECF No. 83.  On 17 May 2023, the parties filed a JSR informing the Court "[t]he United States has received approval from the Attorney General's authorized representative for the parties' agreement to resolve the just compensation component of [p]laintiffs' claims (including interest)," and requesting the Court lift the stay "to allow the parties to complete the necessary documents and for the Court to enter judgment," ECF No. 87.  On 22 May 2023, the Court lifted the stay and directed the parties to file a joint stipulation for entry of judgment or a JSR informing the Court on the status of the settlement discussions on or before 22 June 2023, ECF No. 88.

On 5 June 2023, the parties requested the entry of "partial judgment, under Rule 54(b) of the [RCFC] . . . against the United States and in favor of Plaintiffs, in the amount of $1,869.09, for just compensation, including interest through" 31 December 2022, ECF No. 89.  On 7 June 2023, in accordance with the Joint Stipulation, the Court directed the clerk to enter partial summary judgment pursuant to RCFC 54(b) in favor of plaintiffs in the amount of $1,869.09 with additional interest of $0.16 per day, ECF No. 90.  On 8 August 2023, the government filed a notice of appeal as to the judgment entered, ECF No. 95.  The government then voluntarily withdrew its appeal after the Solicitor General declined to authorize it, *see* 21 May 2024 Oral Arg. Tr. ("Tr.") at 39:21–40:2, ECF No. 111, and the Federal Circuit issued its Mandate dismissing the appeal on 2 October 2023, ECF No. 96.

On 12 October 2023, plaintiffs filed their Motion and Memorandum for an Award of Reasonable Attorneys' Fees and Costs.[3]  Pls.' Mot., ECF No. 97.  Plaintiffs included a number of exhibits in support of their Motion; specifically, Exhibits A–G.  Pls.' Ex. A, ECF No. 97-1 (summary of hours billed at Stewart Wald Smith's (SWS) from January 2017 through October 2023); Pls.' Ex. B, ECF No. 97-2 (SWS expense report from January 2017 through May 2023); Pls.' Ex. B-1, ECF No. 97-3 (appraisal invoice of $6,000 paid to appraiser David Matthews for his calculation of damages and corresponding report on December 30, 2020); Pls.' Ex. C, ECF No. 97-4 (declaration of Thomas S. Stewart in support of plaintiffs' motion); Pls.' Ex. D, ECF No. 97-5 (affidavit of Barret J. Vahle regarding hourly attorney rates); Pls.' Ex. E, ECF No. 97-6 (affidavit of Richard E. McLeod regarding hourly attorney rates); Pls.' Ex. F, ECF No. 97-7 (affidavit of Robert Thompson regarding hourly attorney rates in Kansas City and St. Louis); Pls.' Ex. G, ECF No. 97-8 (affidavit of Mark Levison).  On 9 November 2023, the government filed its Response.  Gov't's Resp., ECF No. 99.  The government included a number of exhibits in support of its Response; specifically, Exhibits A–F.  Gov't's Ex. A, ECF No. 99-1 (government objections to plaintiffs' requests for attorney fees); Gov't's Ex. B, ECF No. 99-2 (first article from Missouri Lawyers on Missouri billing rates in 2022); Gov't's Ex. C, ECF No.

---

[3] Plaintiffs noted 9 October 2023 is the cutoff date counsel used for the attorneys' fees detailed in the Motion.  *See* Tr. at 9:13–17.  At oral argument, plaintiffs explained they would file an additional motion for attorneys' fees to account for those hours and costs billed after 9 October 2023.  *See* Tr. at 212:3–6.  Plaintiffs noted Stewart Wald Smith (SWS) has incurred approximately $70,000 in additional fees since 9 October 2023.  Tr. at 33:12–34:9 ("THE COURT: . . . [Y]ou said you're going to file a motion in a couple of weeks related to what we were referring to fees on fees. Roughly where is the running total in that going? . . . [PLAINTIFFS]: [I]t's $69,985.").  The government agreed plaintiffs are permitted to file an additional motion for those entries logged after 9 October 2023.  Tr. at 12:2–12.  On 4 June 2024, plaintiffs filed their Supplemental Motion and Memorandum for An Award of Reasonable Attorneys' Fees and Costs requesting the supplemental payment of $95,917.50 for attorneys' fees and $2,220.93 in costs, *see* Pls.' Suppl. Mot., ECF No. 112, which the Court stayed, ECF No. 113.

99-3 (second article from Missouri Lawyers on Missouri billing rates in 2022); Gov't Ex. D, ECF No. 99-4 (bar chart comparing attorney rates from St. Louis, Kansas City, the state of Missouri, outstate Missouri, and staff); Gov't Ex. E, ECF No. 99-5 (chart comparing the highest billing rates in Missouri); Gov't Ex. F, ECF No. 99-6 ("United States' Objections to Plaintiffs' Claimed URA Expenses").  On 22 November 2023, the plaintiffs filed their Reply, attaching an exhibit related to a Freedom of Information Act (FOIA) request.  Pls.' Reply, ECF No. 101; Pls.' FOIA Ex., ECF No. 101-1.

On 7 March 2024, the Court held a status conference in advance of oral argument, *see* ECF No. 102.  At the status conference, the parties agreed they voluntarily dismissed the merits appeal of this case at the Federal Circuit, and the only remaining issue is the pending motion for attorneys' fees.  7 Mar. 2024 Status Conference Transcript ("7 Mar. 2024 SC Tr.") at 3:18–4:5 ("THE COURT: . . . [T]he parties did voluntarily dismiss the appeal of the merits decision at the Federal Circuit, correct, and the [] only remaining issue is the pending motion for attorneys' fees. Is that correct . . . ? [PLAINTIFFS]: Yes . . . . [GOVERNMENT]: Yes . . ."), ECF No. 107.  On 26 April 2024, the government filed a Motion for Leave to File Supplemental Authority, ECF No. 108, to alert the Court of a recent Court of Federal Claims decision—*Banks v. United States*, 171 Fed. Cl. 142 (2024) (J. Somers).  On 27 April 2024, the Court denied this Motion explaining "[t]he Court will discuss the many U.S. Court of Federal Claims cases related to the parties' issues at oral argument," ECF No. 109.  The Court held oral argument on plaintiffs' Motion for Attorneys' Fees in St. Louis, Missouri on 21 May 2024.  *See* Order, ECF No. 105.

On 4 June 2024, plaintiffs filed their Supplemental Motion and Memorandum for an Award of Reasonable Attorneys' Fees and Costs requesting payment of an additional $95,917.50 for attorneys' fees and $2,220.93 in costs.  Pls.' Suppl. Mot., ECF No. 112.  At the 21 May 2024 oral argument, plaintiffs stated they anticipated filing this Supplemental Motion to account for those hours billed past 9 October 2023, the cutoff date described in plaintiffs' instant Motion for Attorney Fees.  *See* Pls.' Mot. at 6 n.10.  The government did not object to plaintiffs' filing of this motion.  *See* Tr. at 12:2–12 ("[GOVERNMENT]: As far as procedurally future motion, we wouldn't think that would be improper as long as it's filed timely.").  On 6 June 2024, the Court stayed briefing on this Supplemental Motion.  *See* ECF No. 113.  On 14 August 2024, plaintiffs filed their Motion for Leave to File a Supplemental Authority noting "Judge Bonilla entered an Order interpreting and applying the URA, and specifically Plaintiffs' counsel's standard billing rates, in *Behrens v. United States*, Case No. 15-[421]L," which the Court denied on 17 August 2024.  Pls.' Mot. for Leave to File at 1, ECF No. 114; *see also* Order, ECF No. 115.

## III.  Parties' Arguments

As described *infra* Sections V–VIII, the parties make multiple arguments regarding:  (1) the legal standard governing the payment of attorney' fees under the URA; (2) the types of tasks plaintiffs' counsel is permitted to be reimbursed for; and (3) the appropriate rate at which to reimburse plaintiffs' counsel.  As to the legal standard, the parties agree the lodestar method, which calculates fees by multiplying the "the number of hours reasonably expended on the litigation [] by a reasonable hourly rate," *see* Pls.' Mot. at 4 (citing *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983)), is "the 'guiding light of [] fee-shifting jurisprudence," *Bywaters v. United States*, 670 F.3d 1221, 1228–29 (Fed. Cir. 2012).  Pls.' Reply at 2; Gov't Resp. at 11.  They

disagree as to when a fee is incurred for purposes of URA reimbursement.  *See* Pls.' Reply at 3–6; Gov't Resp. at 12–13.  The parties also disagree as to whether a second step, considering "the 'results obtained' . . . [and whether they warrant an] adjust[ment to] the lodestar fee upward or downward"  based on disproportionality, is required as part of the lodestar analysis.  Gov't Resp. at 26; *see* Pls.' Reply at 14–16.

Turning to the parties' disputes related to plaintiffs' counsel's specific billing entries, plaintiffs request the Court to order reimbursement for 829.40 hours billed.[4]  Pls.' Mot. at 9. Plaintiffs argue the Court should, in reviewing the reasonableness of the hours expended, assess whether plaintiffs submitted "'adequate evidence supporting the amount of hours worked and rates charged.'"  *Id.* at 5 (quoting *Hensley*, 461 U.S. at 433).  The government responds "[p]laintiffs' fee request contains hours that were not reasonably expended and that are not proper . . . under the URA" because the URA specifies "reimburse[ment] . . . [can only be] for . . . reasonable costs, disbursements, and expenses . . . actually incurred *because of such proceeding*."  Gov't Resp. at 14–15 (referencing 42 U.S.C. § 4654(c)).  Specifically, the government complains plaintiffs' counsel should not be reimbursed for work performed before this case was filed, *see* Gov't Resp. at 16–17; or for entries that are duplicative or excessive, *see id.* at 20; or related to clients who withdrew from the case prior to settlement, *see id.* at 25. The government relatedly requests a 25% deduction in reimbursements for entries alleged to be vague, *id.* Ex. A at 2, 7, 8, 18.  The government also requests reductions in plaintiffs' reimbursement ranging from 50% to 100% for administrative and clerical tasks, *see* Gov't Resp. at 18–19, and for time spent travelling.  *Id.* at 19.  In response, plaintiffs argue their "lodestar calculation of attorneys' fees at $396,312" is "reasonable under the URA and [] fully supported," meaning the Court should "grant [p]laintiffs' [M]otion."  Pls.' Reply at 24.

The parties similarly disagree regarding plaintiffs' counsels' entitlement to reimbursement for costs and expenses.  Plaintiffs seek a reimbursement of $22,643.47 in costs[5]—(1) Travel Related Expenses; (2) Expert Expenses; and (3) Miscellaneous—"because all of the expenses are detailed and are reasonable costs actually incurred in connection with this case."  Pls.' Mot. at 19.  Although conceding plaintiffs are entitled to the $6,000 paid to their expert appraiser, the government argues the Court "should reject most of [p]laintiffs' claimed expenses as unsupported" because, besides the appraisal, plaintiffs have submitted no supporting documentation for these costs as required by the URA.  Gov't Resp. at 39 (citing *Arnold v. United States*, 163 Fed. Cl. 13, 41 (2022); then citing *Hardy v. United States*, 157 Fed. Cl. 464, 470, 482 (2021); and then citing *Bratcher v. United States*, 136 Fed. Cl. 786, 801 (2018)).

Finally, regarding the reasonableness of plaintiffs' counsel's hourly rates, the government cites surveys of Missouri attorneys, Missouri caselaw, the dearth of Court of Federal Claims decisions approving plaintiffs' requested rates, and the alleged inadequacy of plaintiffs' declarations to argue "[i]f the Court renders an award based on a lodestar calculation, it should use hourly rates less than those [p]laintiffs seek."  Gov't Resp. at 32.  Plaintiffs, on the other hand, cite affidavits from Thomas Stewart and various attorneys in the Missouri legal market, in

---

[4] Plaintiffs requested 829.40 hours in their initial Motion and an additional 169.80 in their Supplemental Motion. *See* Pls.' Mot.; Pls.' Suppl. Mot.
[5] Plaintiffs request an additional $2,220.93 in costs in their Supplemental Motion.  Pls.' Suppl. Mot. at 3.

addition to market data, to allege their requested hourly rates are reasonable. *See* Pls.' Mot. at 11–18.

## IV.   Relevant Law

The Uniform Relocation Assistance and Real Property Act of 1970 (URA), set out by 42 U.S.C. § 4654(c), states the method for recovery for successful Fifth Amendment takings claims under the Tucker Act:

> The court rendering a judgment for the plaintiff in a proceeding brought under section 1346(a)(2) or 1491 of Title 28, awarding compensation for the taking of property by a Federal agency, or the Attorney General effecting a settlement of any such proceeding, shall determine and award or allow to such plaintiff, as a party of such judgment or settlement, such sum as will in the opinion of the court or the Attorney General reimburse such plaintiff for his reasonable costs, disbursements, and expenses, including reasonable attorney . . . fees, actually incurred because of such proceeding.

42 U.S.C. § 4654(c).  "[T]he primary purpose" of the URA is to "render[] property owners whole." *Haggart v. Woodley*, 809 F.3d 1336, 1359 (Fed. Cir. 2016).  The URA thus requires "the Government to assume the litigation expenses of counsel" upon a successful takings claim. *See id.* at 1357.  The Federal Circuit stated "[t]he fee-shifting provisions of the . . . URA . . . allow for recovery of attorneys' fees adequate to permit people with small takings claims to vindicate their rights with the assistance of competent counsel." *Bywaters v. United States*, 684 F.3d 1295, 1296 (Fed. Cir. 2012).  The URA also allows for reimbursement of costs.  *See* 42 U.S.C. § 4654(c).

"[I]n determining the reasonable number of hours expended and the reasonable hourly rate, the  . . . court should consider the 'amount involved' in the case as well as other factors bearing on reasonableness, such as the fact that litigation of these types of disputes serves a greater purpose (vindicating constitutionally protected property rights)." *Bywaters*, 684 F.3d at 1295–96.  This court must also consider "the degree of success obtained." *Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983) (stating "the most critical factor is the degree of success obtained").  The Supreme Court explained "the fee applicant bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates." *Id.* at 437.  The Federal Circuit has held this court "is afforded considerable discretion" in determining the reasonable amount of attorneys' fees and other expenses awarded under the URA.  *See Bywaters v. United States*, 670 F.3d 1221, 1228 (Fed. Cir. 2012).

In assessing attorneys' reasonable rates, the court looks to the rates of the "relevant community." *See Avera v. Sec'y of HHS*, 515 F.3d 1343, 1348–49 (Fed. Cir. 2008).  In a case "where the bulk of [an attorney's] work is done outside the jurisdiction of the court and where there is a very significant difference in compensation," the court should elect to assess the attorneys' reasonable rates using the community in which the bulk of the work was done. *Id.* at 1349 (citing *Davis County Solid Waste Mgmt. & Energy Recovery Special Serv. Dist. v. EPA*, 169 F.3d 755 (D.C. Cir. 1999)).

## V.    Whether Plaintiffs Meet the URA and Whether the Lodestar Calculation Method Is Appropriate

Plaintiffs argue the lodestar calculation method—which is "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate"—"is the preferred means for calculating attorneys' fees under a fee-shifting statute such as the URA because[, as established by the Federal Circuit,] . . . the lodestar method is a simple calculation" that "presumpti[vely] . . . produces a reasonable attorneys' fee." Pls.' Mot. at 4 (first citing *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983); and then citing *Bywaters v. United States*, 670 F.3d 1221, 1228–29 (Fed. Cir. 2012); and then citing *Blum v. Stenson*, 465 U.S. 886, 888 (1984)). Plaintiffs explain "the court may only deviate from the lodestar figure in 'rare' and 'exceptional' cases" "based on factors other than those already taken into consideration in the lodestar calculation." *Id.* (citing *Bywaters*, 670 F.3d at 1229). Plaintiffs reason the party seeking reasonable attorneys' fees must submit "adequate evidence" and such "evidence . . . must provide 'sufficient detail upon which the Court can determine the reasonableness of the hours, fees, and expenses for each individual for whom they seek reimbursement.'" *Id.* at 5 (citing *Hensley*, 461 U.S. at 433; and *Preseault v. United States*, 52 Fed. Cl. 667, 669 (2002)). Plaintiffs explain they submitted "detailed statements of all professional services rendered and expenses incurred on this matter" as required by *Hensley*. *Id.* at 5–6 (citing its Pls.' Exs. A and B). Using the lodestar method, plaintiffs' counsel requests $396,312.00 in fees. *Id.* at 6 (citing Pls' Exs. A and B).

The government responds, "[p]laintiffs must demonstrate that they have actually incurred an obligation for . . . [what] they seek" under the URA, but plaintiffs have not and, therefore, are "not entitled to reimbursement." Gov't's Resp. at 4, 12–13 (citing 42 U.S.C. § 4654(c)). The government explains the URA "refer[s] to those costs and expenses for which the plaintiff has really become liable," meaning "courts can only award those sums the plaintiff is . . . obligated to pay." *Id.* at 5. The government argues: "the URA . . . cannot be read to require payment by the United States of amounts a plaintiff is under no duty to pay his attorney." *Id.* at 7. The government argues "[c]ourts have recognized this limitation on URA reimbursement." *Id.* at 7–10 (citing *United States v. 122.00 Acres of Land, More or Less, Located in Koochiching Cnty., Minn.*, 856 F.2d 56, 57 (8th Cir. 1988); then citing *Washington Metropolitan Area Transit Authority v. United States* ("*WMATA*"), 57 Fed. Cl. 148, 149 (2003); then citing *Raney v. Fed. Bureau of Prisons*, 222 F.3d 927 (Fed. Cir. 2000) (en banc)). The government asserts "[c]ourts encountering the phrase 'actually incurred' in other statutes have viewed the language in the same manner." *Id.* at 10–11 (first citing *Sta-Home Home Health Agency, Inc. v. Shalala*, 34 F.3d 305 (5th Cir. 1994); then citing *Abraham Lincoln Mem'l Hosp. v. Sebelius*, 698 F.3d 536, 549, 551 (7th Cir. 2012); then citing *Marre v. United States*, 38 F.3d 823, 828–29 (5th Cir. 1994); and then citing *Skillforce, Inc. v. Hafer*, 509 B.R. 523, 533–34 (E.D. Va. 2014)). The government argues, while the Supreme Court's lodestar method is a "guiding light," the Supreme Court has not addressed "a statute with different language that adopts a different approach," such as the URA. *Id.* at 11–12. The government notes "lodestar remains a guidepost by which to assess reasonableness . . . under the URA," "[b]ut the URA provides for the 'reimburse[ment] . . . [of] costs, disbursements, and expenses . . . actually incurred.'" *Id.* at 12 (citing 42 U.S.C. § 4654(c)). With this background, the government argues "[p]laintiffs [have failed to] . . .

demonstrate that they have actually incurred the costs and expenses they seek" because they "do not include with their motion any retainer or other agreements with counsel reflecting an obligation to counsel . . . [n]or do they include any affidavits or declarations supporting an agreement to pay [p]laintiffs' counsel the amounts sought." *Id.* at 13. The government argues "[a]bsent too from [p]laintiffs' motion are invoices or proof of payment that show [p]laintiffs have been billed or have paid the fees for which [p]laintiffs seek reimbursement." *Id.*

Plaintiffs reply "[e]very rails-to-trails case since the CFC decided *Preseault* in 2002 has rejected" the government's "actually incurred" argument. Pls.' Reply at 2 (citing *Preseault v. United States*, 52 Fed. Cl. 667, 675 (Fed. Cl. 2002)). Further, per plaintiffs, "[a]uthority from the Federal Circuit also clearly shows that the terms 'incurred' or 'actually incurred' within the meaning of a fee-shifting statute like the URA simply mean[] any express or implied agreement that the fee award will be paid over to the landowners' counsel." *Id.* at 2–3 (citing *Raney*, 222 F.3d at 933 n.4); *see Bywaters*, 670 F.3d at 1228 ("Nothing in the language or legislative history of the URA suggests that it should receive a different construction than other fee-shifting statutes."). Plaintiffs note other Court of Federal Claims judges have affirmed the *Bywaters* approach. *Id.* at 3–4 (first citing *Arnold v. United States*, 163 Fed. Cl. 13, 24 (2022); and then citing *Bradley v. United States*, 164 Fed. Cl. 236, 247–48 (2023)).

The Federal Circuit stated in *Bywaters* "the Supreme Court has consistently upheld the lodestar calculation as the 'guiding light of [its] fee-shifting jurisprudence.'" *Bywaters*, 670 F.3d at 1228–29 (citing *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542 (2010) (quoting *Gisbrecht v. Barnhart*, 535 U.S. 789, 801 (2002)). The Federal Circuit also explained "[t]here is a 'strong presumption' that the lodestar figure represents a 'reasonable' attorney fee." *Id.* at 1229 (quoting *City of Burlington v. Dague*, 505 U.S. 557, 562 (1992)). The Federal Circuit reasoned "the Supreme Court has advised that all federal fee-shifting statutes calling for an award of 'reasonable' attorneys' fees should be construed 'uniformly,'" *id.* at 1228 (quoting *Dague*, 505 U.S. at 562), and "[n]othing in the language or legislative history of the URA suggests that it should receive a different construction than other fee-shifting statutes." *Id.* "[I]n determining the amount of reasonable attorneys' fees to award under federal fee-shifting statutes, th[is] . . . court is afforded considerable discretion." *Id.* (first citing *Hensley*, 461 U.S. at 437; and then citing 42 U.S.C. § 4654(c)).

First, the Court must determine whether plaintiffs must show they "actually incurred" costs in obtaining reimbursement under the URA. 42 U.S.C. § 4654(c) (stating "the court . . . [must] reimburse . . . plaintiff[s] for . . . reasonable costs, disbursements, and expenses [upon a successful Fifth Amending takings claim] . . . including reasonable attorney . . . fees, actually incurred because of such proceeding"). Under the URA, this court has repeatedly held plaintiffs need not establish they "actually incurred" costs to obtain reimbursement under the URA. Plaintiffs echoed this principle at oral argument, stating the relevant caselaw does not require submission of contingency fee agreements ("CFAs") and deeming the government's argument related to such "frivolous." Tr. at 28:19–23 ("[PLAINTIFFS:] [T]here's no case that's really required [submission of client agreements] over the years . . ."); Tr. at 47:7–14 ("[PLAINTIFFS:] [T]his is a well-settled area of the law in our opinion, and this entire argument by the Government is frivolous."). For example, in *Preseault*, Judge Miller held "actually incurred" does not mean "actually paid or owed"; rather, "fees are '"incurred" within the meaning of a fee

shifting statute' when there is 'an express or implied agreement that the fee award will be paid over to the legal representative.'" *Preseault*, 52 Fed. Cl. at 675 (first citing *Phillips v. GSA*, 924 F.2d 1577, 182–83, n.4 (1991); then citing *Raney*, 222 F.3d at 934–35; and then citing *id.* at 942 (Rader, J., dissenting)).  In *Bradley*, Judge Sweeney similarly held "[w]hile a fee agreement may provide evidence of the fees actually incurred by a plaintiff, the court is not bound or constrained by the fee agreement's provisions." *Bradley*, 164 Fed. Cl. at 247.  Judge Sweeney explained, "if the court adopted [the suggested] construction of § 4654(c), such that it would be required to award a plaintiff an amount specified in a fee agreement, the court would be deprived of the discretion granted by the statute, rendering the phrase 'will in the opinion of the court' meaningless." *Id.*  In *Arnold*, Judge Bonilla likewise explained:  "the phrase 'actually incurred' in the URA context . . . allows for the recovery of reasonable attorney's fees . . . for reasonable hours expended at reasonable rates; "[t]he modification of 'incurred' by the term 'actually' does not limit recovery under the URA fee-shifting provision to attorney's fees actually billed to, paid by, or owed by the plaintiffs." *Arnold*, 163 Fed. Cl. at 24.

The government conceded at oral argument there is no case supporting the proposition plaintiffs' failure to submit fee agreements is a total barrier to reimbursement.  *See* Tr. at 29:19–30:2 ("[GOVERNMENT:]  I'm not aware of any case in which no fee agreements or other proof of an obligation was provided in the fee motion, and the United States made this threshold argument").[6]  In its Response, the government cites to a handful of cases in arguing plaintiffs must prove they "actually incurred" fees and costs for reimbursement, but many of these cases are not binding on the Court and each is distinguishable from this court's precedent surrounding reimbursement for attorneys' fees.  Gov't's Resp. at 7–10 (first citing *Koochiching County*, 856 F.2d at 57; then citing *WMATA*, 57 Fed. Cl. at 149; then citing *Raney*, 222 F.3d 927; and then citing *Shalala*, 34 F.3d 305).[7]  Further, to the extent the government encourages the Court to

---

[6] Although the government argued the Court should look to Judge Somer's decision in *Banks v. United States* in assessing whether plaintiffs' counsel must "actually incur" their fees and costs, *see* Tr. at 49:5–21 ("[GOVERNMENT]: . . . [*Banks*] explicitly says that the statute is about reimbursing what a landowner has actually incurred."); *supra* Section II (discussing the government's motion for leave to file *Banks* as supplemental authority), the government conceded *Banks* "certainly doesn't say" plaintiffs' counsel should receive *no* fee award for failing to attach the contingency agreements or receipts. Tr. at 50:24–51:2; *see Banks v. United States*, 171 Fed. Cl. 142 (2024).  The government therefore admitted its argument plaintiffs *must* illustrate the actual incursion of fees and costs via engagement contracts and receipts is incorrect, at least with respect to Judge Somer's analysis in *Banks*. *Compare* Tr. at 50:7–16, *with* Tr. at 50:24–51:2.

[7] For example, in *122.00 Acres of Land*, the Eighth Circuit in 1988 held the plaintiffs were not entitled to attorneys' fees under their retainer agreement because plaintiffs did not recover a money judgment. *122.00 Acres of Land*, 856 F.2d at 57.  Here, plaintiffs recovered a money judgment, so the Eighth Circuit's thirty-six-year-old rationale is not persuasive.  *WMATA* provides language supportive of the government's interpretation of "actually incurred," but, there, Judge Allegra only discussed reimbursement regarding representation *by in-house counsel* and, thus, the reasoning is not applicable in this case, where plaintiffs employed outside counsel. *WMATA*, 57 Fed. Cl. at 152 ("Under the standards of section 4654(c), which controls this case, plaintiff cannot receive an award based on market rates, but instead is restricted to a reimbursement of the costs 'actually incurred' *as the result of the service of its in-house counsel*.") (emphasis added).  In *Shalala*, an out-of-court decision from 1994, the Fifth Circuit was interpreting the Social Security Act, not the URA, and so the case's reasoning is not applicable here. *Shalala*, 34 F.3d 305.  Finally, in its attempt to persuade the Court against adopting other judges' interpretations of "actually incurred," the government suggests "*Preseault . . .* and *Bradley . . .* [] are . . . inconsistent with *Raney* and the URA and should not be given persuasive weight [because they] . . . rendered 'actually incurred' and 'reimburse' without meaning, contrary to the requirements of statutory construction." Gov't's Resp. at 10 n.5.  The Federal Circuit in

ignore the Federal Circuit's directly applicable statement in *Bywaters* that "[n]othing in the language or legislative history of the URA suggests that it should receive a different construction than other fee-shifting statutes," *id.* at 12 n.6; *see Bywaters*, 670 F.3d at 1228, the government does not cite to any precedent to support this suggested deviation.  *See* Gov't's Resp. at 12 n.6.

Thus, as explained by various judges of this court and suggested by the Federal Circuit in *Bywaters,* plaintiffs need not "actually incur" costs (meaning prove a debt using a retainer or other agreements reflecting an obligation) in order to be reimbursed.[8]  Rather, plaintiffs need only show "there is an express or implied agreement that the fee award will be paid over to the legal representative." *Preseault*, 52 Fed. Cl. at 675 (quoting *Phillips*, 924 F.2d at 1583) (internal quotations omitted); *see also Raney*, 222 F.3d at 933 n.4.  Here, plaintiffs have shown "there is an express or implied agreement that the fee award will be paid over to" counsel by virtue of the existing attorney-client relationship, plaintiffs' successful takings claim, and the submission of billing entries.  *See, e.g.*, Pls.' Mot.; *Preseault*, 52 Fed. Cl. at 675.  Plaintiffs have therefore satisfied their burden to show they "actually incurred [fees and costs] because of [these] proceeding[s]."  42 U.S.C. § 4654(c); *Bywaters*, 670 F.3d at 1228 (explaining "the Supreme Court has advised that all federal fee-shifting statutes calling for an award of 'reasonable' attorneys' fee should be construed 'uniformly'" and "[n]othing in the language or legislative history of the URA suggests that it should receive a different construction than other fee-shifting statutes").

Turning to the related issue of whether the lodestar method—"multiplying the number of hours reasonably expended by a reasonable hourly rate"—is the appropriate method for awarding fees in this case, *see Bywaters*, 670 F.3d at 1225–26, the government agrees the lodestar method is "the 'guiding light' of [] attorneys' fees case law."  *See* Gov't's Resp. at 11–12 (citing *Bywaters*, 670 F.3d at 1228–29); 7 Mar. 2024 SC Tr. at 14:15–25 ("[GOVERNMENT]: Your Honor, we don't dispute that the lodestar is the guiding light.").  The government further agreed the Court should use a lodestar calculation if it ultimately does award attorneys' fees.  7 Mar. 2024 SC Tr. at 18:12–19:9 ("[GOVERNMENT]:  If . . . the Court concludes[] that there is an obligation and attorneys' fees are owed here, lodestar would be an accurate interpretation of reasonable.").

Under Supreme Court and Federal Circuit precedent, "the lodestar calculation is the 'guiding light of . . . fee-shifting jurisprudence'" and "[n]othing in the language or legislative history of the URA suggests that it should receive a different construction than other fee-shifting statutes."  *Bywaters*, 670 F.3d at 1228–29.  The Federal Circuit has stated "[t]here is a 'strong presumption' that the lodestar figure represents a 'reasonable' attorney fee."  *Id.* at 1229.  As the parties agree the lodestar method is a "guiding light" within federal fee-shifting jurisprudence,

---

*Raney*, however, explained attorneys' fees are incurred "pursuant to the express or implied agreement between the" client and counsel.  *Raney v. Fed. Bureau of Prisons*, 222 F.3d 927, 933 n.4 (Fed. Cir. 2000) (en banc).

[8] The Court notes plaintiffs in this case did submit their CFAs, *see* Tr. at 5:19–6:11, however, plaintiffs first did so via PowerPoint at oral argument, which the Court cannot rely on as such submission is beyond the scope of the parties' briefing.  *See id.*  Plaintiffs ultimately resubmitted their CFAs to the Court as an attachment to their 4 June 2024 Supplemental Motion for Attorneys' Fees, *see* Pls.' Suppl. Mot., ECF No. 112-3.  Despite the government's objections this 4 June CFA submission is untimely, *see* Tr. at 51:4–13, the Court notes the CFAs are now properly in the record.  The Court, however, does not rely on these CFAs in its decision.

*see* 7 Mar. 2024 SC Tr. at 14:15–25, the URA is part of this jurisprudence, and "[t]here is a 'strong presumption'" that the lodestar figure represents a 'reasonable' attorney fee," the lodestar method is the appropriate method for awarding fees in this case. *See Bywaters*, 670 F.3d at 1225–26, 1228–29.

## VI.   Whether Plaintiffs' Hours Expended are Reasonable

Plaintiffs argue the Court should reimburse plaintiffs' counsel for 829.40 hours billed toward this case in SWS' St. Louis and Kansas City offices. Pls.' Mot. at 9. Specifically, plaintiffs explain, "[t]he lodestar calculation . . . covers the fees and costs from May 17, 2018 through October 9, 2023." *Id.* at 6. Plaintiffs note: "[t]he primary responsibility was first . . . in SW[S]'s St. Louis office and later . . . [shifted to] SW[S]'s Kansas City office." *Id.* at 10. Plaintiffs reason plaintiffs' counsel's hours fall into three broad categories: (1) "General pleadings, case investigation and verification of individual claims, including title work, deed research, and stipulations"; (2) "[e]xtensive summary judgment briefing in May of 2019 and then again from December of 2021 through March of 2022"; and (3) "[e]xtensive oral argument, first on March 31, 2022 during a preliminary status conference and then again on June 7, 2022 in Washington, D.C." *Id.* Plaintiffs argue "[t]he hours in this case . . . are reasonable and necessary on their face," particularly given this case has run for over five years. *Id.* The government responds, "[p]laintiffs' fee request contains hours that were not reasonably expended and that are not proper . . . under the URA." Gov't Resp. at 14. Specifically: "[H]ours that are excessive, redundant, or otherwise unnecessary' should not be part of a reasonable fee award." *Id.* (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983)). Further, according to the government, "[h]ours that are not properly billed to one's client also are not properly billed to one's adversary pursuant to statutory authority." *Id.* (citation and internal quotation marks omitted). The government makes more tailored arguments for each of plaintiffs' entries, *see infra*. Plaintiffs respond "the government's attempted deductions are both contrary to the Federal Circuit's guidance . . . and totally unsupported because the government has offered no specific evidence justifying any deductions that could lead to the Court's detailed findings of fact." Pls.' Reply at 6.

"The fee applicant bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates." *Hensley*, 461 U.S. at 437. "[I]n determining the amount of reasonable attorneys' fees to award under federal fee-shifting statutes, th[is] . . . court is afforded considerable discretion." *Bywaters v. United States*, 670 F.3d 1221, 1228 (Fed. Cir. 2012) (citations omitted).

### A.   Whether Hours Logged Prior to the Complaint Filed are Reasonable

The government argues "the Court should exclude the 87.4 hours [p]laintiffs' counsel logged before [p]laintiffs sued or, at a minimum, exclude the 84.8 hours [p]laintiffs' counsel logged before the STB issued the NITU." Gov't Resp. at 18. The government explains "the hours (and expenses) . . . for the period before [p]laintiffs sued are not reimbursable" because the "URA excludes pre-litigation costs and expenses." *Id.* at 14–16 (first citing *Emeny v. United States*, 526 F.2d 1121, 1124 (Ct. Cl. 1975); then citing *Yancey v. United States*, 915 F.2d 1534, 1543 (Fed. Cir. 1990); then citing *Otay Mesa Prop., LP v. United States*, 124 Fed. Cl. 141, 147 (2015); and then citing *Preseault v. United States*, 52 Fed. Cl. 667, 670–71 (2002)). The

government reasons "[m]uch of [p]laintiffs' counsel's time before the filing of the complaint was client development work . . . [which] is not properly billed to the United States." *Id.* at 17. The government also argues, at the very least, the 84.8 "hours logged before the STB issued the NITU on July 6, 2018 should be excluded" because "before the NITU—before any claim has accrued—the United States has taken nothing from [p]laintiffs and, more importantly, counsel's work cannot be because of a Tucker Act proceeding." *Id.* At oral argument, plaintiffs suggested the Court use either 30 May 2018—the date SWS engaged Mr. Hippely—or 5 June 2018—the date Mr. Hippley signed SWS' CFA—as a cutoff date for hours logged prior to the Complaint. *See* Tr. at 121:7–21. Plaintiffs cite this court's decision in *Campbell* and argue they are "entitled to reasonable fees in relationship to the proceeding," and—according to plaintiffs—the entries logged after these dates qualify as those hours related to this case. *See* Tr. at 120:5–22 ("[PLAINTIFFS:] *Campbell* had a similar issue where the Court did not allow time spent by paralegals prior to the first engagement, which is . . . the  . . . appropriate standard, which is one of the reasons why we attached the CFAs to show that the first client was engaged . . . on May 30th [2018] and signed on June 5 [2018] . . . . The statute says that we were entitled to reasonable fees in relationship to the proceeding."); *see also* Tr. at 121:7–21 ("[PLAINTIFFS:] [I]t should be either May 30 when Mr. Hippely talked to our attorneys or on June 5th when he formally signed a CFA . . . And so I don't concur that the NITU is the cutoff date. [a]nd I frankly agree with Judge Sweeney's interpretation in *Bradley* that there is only a small subset, at best, of the time entries prior to either May 30 or June 5th that should be deducted at all."); *Campbell v. United States*, 138 Fed. Cl. 65 (2018).

The Federal Circuit held in *Yancey*, "[w]hile pre-litigation expenses are precluded from reimbursement under 42 U.S.C. § 4654(c) . . . , 'the significant effort expended' in 'the filing of the petition' may be compensable under the statute if proper documentation [is] provided." *Yancey*, 915 F.2d at 1543 (first citing *Emeny*, 526 F.2d at 1124; and then citing *Cloverport Sand & Gravel Co. v. United States*, 10 Ct. Cl. 121, 124 (1986)); *see also Preseault*, 52 Fed. Cl. at 671 ("Section 4654(c) does not provide for the reimbursement of expenses incurred by plaintiffs before their decision to file suit in the Court of Federal Claims."). Judges of this court have held similarly. *See e.g., Bradley v. United States*, 164 Fed. Cl. 236, 249 (2023) (explaining "work performed in preparation for filing a complaint[, including client development,] necessarily occurs before filing suit [so it is generally not reimbursable], [but] it may nevertheless qualify as work performed 'because of' the suit" if, for example, it is (1) "the prelitigation costs of 'work investigating plaintiffs' claims [and] establishing the facts necessary to file a case on behalf of a class"; (2) "prepar[ation of] the complaint"; or (3) "'significant effort expended' in 'the filing of the petition' . . . if proper documentation [is] provided."); *Campbell*, 138 Fed. Cl. at 71 (not fully reimbursing "client solicitation").

Here, although plaintiffs' counsel logged hours beginning on 17 May 2018, SWS did not actually retain a client (Mr. Hippely) until 5 June 2018. *See* Pls.' Ex. A at 1, Ex. B at 1. Plaintiffs' counsel, logged 52.80 hours before 5 June 2018. Pls.' Ex. A at 1–2; *see also* Court's Ex. A (filed separate from this Order). Upon retaining Mr. Hippely on 5 June 2018, SWS began performing work "'because of' the suit." *Bradley*, 164 Fed. Cl. at 250, 263 ("[W]ork more properly classified as client development cannot be reimbursed."). Before retaining Mr. Hippely, plaintiffs' counsel was largely engaged in "client solicitation," *cf. Campbell*, 138 Fed. Cl. at 71, and similar work related to a prospective case, particularly as the NITU did not issue until 6 July

2018. *Hippely v. United States*, 162 Fed. Cl. 414, 417 (2022). As the Federal Circuit stated in *Yancey*, pre-litigation expenses are generally "precluded from reimbursement," *see* 915 F.2d at 1543, and plaintiff agreed at oral argument entries involving the engagement of clients prior to the first CFA being signed are not reimbursable, *see* Tr. at 126:14–127:3 ("THE COURT: . . . [G]oing back to these early May entries or correspondences with respect to CFAs, that seems like firm engagement process[es]. That's not contemplated under the URA language. [PLAINTIFFS]: I don't disagree . . . that purely work performed in signing a CFA and returning to the client is necessarily billable. I don't object to that."), the Court will not reimburse plaintiffs for the 52.80 hours logged prior to 5 June 2018. *Bradley*, 164 Fed. Cl. at 250; *Yancey*, 915 F.2d at 1543 (explaining pre-litigation expenses are generally "precluded from reimbursement"); *Bywaters*, 670 F.3d at 1228 ("[I]n determining the amount of reasonable attorneys' fees to award under federal fee-shifting statutes, th[is] . . . court is afforded considerable discretion.") (additional citations omitted).

Turning to the 34.60 hours logged between 5 June 2018 and 19 July 2018, prior to when plaintiffs filed their Complaint, at oral argument, the government argued all hours logged prior to the Complaint being filed should not be reimbursable and even stated those hours spent drafting the Complaint are "right on the line" of reasonableness. *See* Tr. at 129:24–130:6 ("[GOVERNMENT]: I would say [preparing the complaint is] right on the line, Your Honor. Here, I would say certainly on the facts of this case, we did not exclude the hours on July 20th relating to drafting a complaint. We think drafting the complaint itself is because of the proceeding."). In its Response, the government relies on *Emeny*, *Yancey*, *Otay Mesa*, and *Preseault* to argue the URA excludes pre-litigation expenses. Gov't's Resp. at 15 (first citing *Emeny*, 526 F.2d at 1124; then citing *Yancey*, 915 F.2d at 1543; and then citing *Otay Mesa Prop., LP*, 124 Fed. Cl. at 147). Each of these cases, however, states hours billed prior to the complaint being filed *may* be reimbursable if the entry relates to the filing or work needed to file the complaint.[9] The government ultimately agreed the standard is that plaintiffs' entries must relate to the proceeding to be reimbursed, even if those hours are logged prior to the complaint being filed. Tr. at 127:17–25 ("[GOVERNMENT]: Your Honor, we don't believe that's a strict reading of the [URA]. It says, 'because of such proceeding,' so it has to relate to the proceeding. . . . it needs to be in furtherance of the Tucker Act litigation."). Given the Court may reimburse plaintiffs for the hours "incurred because of such proceeding," 42 U.S.C. § 4654(c), plaintiffs may be reimbursed for "'the significant effort expended' in 'the filing of the petition' . . . if proper documentation [is] provided." *Yancey*, 915 F.2d at 1543 (citations omitted).

---

[9] For example in *Emeny*, the Claims Court held "the plain language of 42 U.S.C. [] 4654(c) precludes the court from including in its award to the plaintiffs any reimbursement for expenses incurred by the plaintiffs before they decided to file suit in the Court of Claims under 28 U.S.C. [] 1491." *Emeny*, 526 F.2d at 1124. In *Yancy*, the Federal Circuit similarly held "[w]hile pre-litigation expenses are precluded from reimbursement under 42 U.S.C. § 4654(c) . . . , 'the significant effort expended' in 'the filing of the petition' may be compensable under the statute if proper documentation were provided." *Yancey*, 915 F.2d at 1543 (first citing *Emeny*, 526 F.2d at 1124; and then citing *Cloverport*, 10 Ct. Cl. 121, 124). In *Otay Mesa Prop., LP*, Judge Wheeler thus explained "expenses associated with filing a Fifth Amendment takings claim are reimbursable; expenses incurred prior and not directly related to the filing itself are not." *Otay Mesa Prop., L.P.*, 124 Fed. Cl. at 147 (first citing *Preseault*, 52 Fed. Cl. at 671; and then citing *Emeny*, 208 Ct. Cl. at 527). In *Preseault*, Judge Miller likewise explained "Section 4654(c) does not provide for the reimbursement of expenses incurred by plaintiffs before their decision to file suit in the Court of Federal Claims." *Preseault*, 52 Fed. Cl. at 671 (citing *Yancey*, 915 F.2d at 1543).

- 15 -

Plaintiffs argue the vast majority of the hours logged after 5 June 2018 but prior to the Complaint being filed are reimbursable because they are specifically related to the filing of the Complaint and similar litigation preparation. Tr. at 127:2–9 ("[PLAINTIFFS:] [T]he . . . time entries here about preparing maps, getting deeds, getting original source domain deeds, getting stuff from the county assessor's office . . . [are] completely billable."). On the other hand, plaintiffs note they could have been clearer in logging certain hours to tie them directly to the Complaint thereby making them more clearly reimbursable under the URA. Tr. at 126:1–13 ("[PLAINTIFFS:] [W]orking on the complaint is an ongoing process from the first time the first CFA is received. THE COURT: Then . . . why is that not logged in detail? [PLAINTIFFS]: We should have probably."). The Court identified a number of vague entries in plaintiffs' hourly log sheet (Exhibit A) that are accordingly not reimbursable under the URA. For example, the 18 July 2018 entry related to calling a client appears to be "client development" work, which judges of this court have repeatedly stated "cannot be reimbursed." Pls.' Ex. A at 2 ("Telephone call with client."); *Bradley*, 164 Fed. Cl. at 263. Further, "[c]onduct[ing] client meetings and travel[ing] from Warren, OH to Cleveland; [and] review[ing] new client claims," from 27 June 2018 appears to relate to SWS client development. Pls.' Ex. A at 2. The Court will not reimburse plaintiffs for these vague entries related to client development work, and those other vague entries identified in the Court's Exhibit A. *Hensley*, 461 U.S. at 433 ("The party seeking an award of fees should submit evidence supporting the hours worked and rates claimed. Where the documentation of hours is inadequate, the district court may reduce the award accordingly."); *Hardy*, 157 Fed. Cl. at 476 ("Above all, the court must consider whether the disputed entries 'provide a sufficient level of detail to allow [the court] to effectively review the reasonableness of the claimed hours." (quoting *McCarty v. United States*, 142 Fed. Cl. 616, 629 (2019)); *Preseault*, 52 Fed. Cl. at 679 ("Without sufficient detail, a court is unable to determine whether the hours, fees, and expenses are reasonable for any individual item invoiced.").

A handful of entries logged between 5 June 2018 to 19 July 2018 contain sufficient detail to indicate they relate to the filing of the Complaint. Pls.' Ex. A at 1–2; *see* Court's Ex. A (filed separate from this Order). For example, plaintiffs' entries logged on 11 and 17 July 2018 involve "review[ing] STB filing." Pls.' Ex. A at 1. "Review[ing] the STB filing" sufficiently relates to the filing of the Complaint because it is necessary to review the NITU in order to draft the Complaint. Further, plaintiffs' entries logged on 5, 19, and 20 June 2018 relate to substantive work performed in anticipation of filing the complaint; specifically, "work[ing] on [a] mapping project"; "[r]eview[ing] notes from client meetings; review[ing] mapping in preparation for follow-up meetings; review[ing] and analyz[ing] STB filings relating to [this] case"; and "[r]eview[ing] History Assoc. Invoice for map and val schedule research." Pls.' Ex. A at 1–2. Each of these entries demonstrates work done in anticipation of filing the Complaint; plaintiffs could not file the Complaint without first performing work related to mapping of the land where the taking took place or reviewing client meeting notes establishing the claims to be filed. *See Yancey*, 915 F.2d at 1543; *Bradley*, 164 Fed. Cl. at 249 (citations omitted). Further, plaintiffs provide "proper documentation" of the hours expended by way of their Motion and Exhibits. *See* Pls.' Ex. A; *Yancey*, 915 F.2d at 1543. Thus, using the lodestar method—multiplying the reduced hours by plaintiffs' requested rates—plaintiffs should be reimbursed $836.00 for these two hours. *See Bywaters*, 670 F.3d at 1228; *see* Court's Ex. A (filed separate from this Order).

## B.    Whether Hours Logged for Administrative Tasks are Reasonable

The government next argues plaintiffs' hours billed for administrative work—including "'assembling documents, calendaring, filing, mailing, photocopying, proofreading, and reviewing and managing client data'"— are not reimbursable.  Gov't Resp. at 18 (quoting *Arnold*, 163 Fed. Cl. at 37).  Specifically, the government explains, "[p]laintiffs' billing records include an October 1, 2018 entry that describes preparing a check and cover letter to Mahoning County for a deed, entries on October 2 and 3, 2018, for transcribing deeds, and a March 21, 2019 entry for preparing a request to Trumbull County."  *Id.* (citing Pls.' Ex. A at 3–4).  The government explains its Exhibit A "identifie[s] non-compensable clerical hours with the designation 'URA Inapplicable' and has removed them . . . [and] [t]he Court should exclude such hours from any award."  *Id.* (suggesting a 100% reduction for those hours labeled as "URA Inapplicable").  The government also identifies a number of other "Administrative" entries and proposes a reduction of 50% to pay plaintiffs' counsel only for reimbursable work.[10]  Gov't Resp. at 18–19; *see* Gov't Ex. A.  The government also explains it "applied a 25% deduction" to block billed entries—in which multiple tasks are listed without clear indication as to which was performed for what period of time—and, specifically for those "block-billed entries contain[ing] improper clerical work, the [government] . . . applied a 50% reduction to the hours sought"; the government requests "the Court reduce any award accordingly."  Gov't Resp. at 18–19; *see also id.* at 19 n.8 (discussing vague entries and those entries that should have been done by a paralegal, rather than an attorney, receiving a 50% reduction rather than a 100% reduction).  The government reasons plaintiffs' block billed entries are "on [their] . . . own . . . improper and grounds for a deduction."  *Id.* (first citing *Hardy*, 157 Fed. Cl. at 476; and then citing *Arnold*, 163 Fed. Cl. at 38–39).

Plaintiffs reply "none of the time entries identified by the government as administrative are, in fact, non-compensable administrative tasks—the collection of title documents is necessary to establish liability, the preparation of the Claims Books is necessary discovery in every rails-to-trails case, and the management of client information and client data presented to the government as part of the discovery and liability phase of any litigation proceeding is necessary and appropriate and therefore not administrative in nature."  Pls.' Reply at 8, n.17 (citing *Hardy*, 157 Fed. Cl. at 475–76).  Plaintiffs concede "certain types of paralegal work are considered administrative and non-compensable, but [clarify] that is only because they are first deemed administrative costs more appropriately charged to overhead."  *Id.*  Plaintiffs assert "the government attempts to double dip the deductions by first incorrectly asserting that certain time

---

[10] As discussed, *infra*, the government labels the following examples by paralegal Jackie Tebbe as "URA Inapplicable (100%)" and suggests a reduction of 100%: "[t]ranscribe source deeds" and "[t]ranscribe condemnation deeds."  Gov't Ex. A at 2.  The government labels the following examples by paralegal Jackie Tebbe as "Administrative + Reduction (55%)" and suggests a reduction of 55%:  "Review and analyze condemnation deeds; prepare check and prepare cover letter to Mahoning County for deed request" and "Prepare request to Trumbull County regarding chain of title and plat for reply to US Claims Book objections."  Gov't Ex. A at 2–3.  When asked at oral argument to distinguish between these two methods of labeling, the government explained those entries with a suggested 50% reduction contain *some* reimbursable work, whereas those entries labeled as "URA Inapplicable (100%)" are not reimbursable entries at all as they are purely clerical.  *See* Tr. at 148:12–19 ("[GOVERNMENT:]  [W]e didn't actually propose a 100 percent deduction, because there is here, combined, actually was arguably reimbursable with unreimbursable.  So that first entry, 'review and analyze condemnation deeds,' that seems a reimbursable component.  But 'to prepare check and cover letter to Mahoning County for deed request,' that's clerical; that's not reimbursable.");  *see also* Tr. at 149:3–21.  The Court notes the government could have used a more precise, straightforward labeling methodology in its Exhibit A.

entries are administrative and then applying a 50% reduction solely because appropriate time entries are lumped together in the same time entry." *Id.* at 9. Plaintiffs also reply, "combining multiple tasks into a single time entry . . . without identifying the time spent on the particular task is not inappropriate" and "[d]eductions are only warranted if some portion of the entry is not appropriate paralegal work." *Id.* at 8. Plaintiffs conclude by emphasizing "the government's 25% and 50% deductions are arbitrary, facially excessive, and . . . demonstrate the government's penchant for favoring style over substance." *Id.* at 9.

### 1. "URA Inapplicable" Entries[11]

The Court first will address the government's arguments and entries related to those administrative tasks the government labels as "URA Inapplicable," to which the government suggests a deduction of 100%. Gov't Resp. at 18–19; *see* Gov't Ex. A. The URA permits this court to reimburse plaintiffs "for [their] reasonable costs, disbursements and expenses, including *reasonable* attorney[s']" fees. 42 U.S.C. § 4654(c) (emphasis added). Thus, although judges of this court have taken variable approaches in reimbursing plaintiffs for administrative and clerical tasks, *see infra*, all have been guided by the URA's mandate to award only those expenses that, "in the opinion of the court," are reasonable. *See* 42 U.S.C. § 4654(c). In *Arnold*, for example, Judge Bonilla explained: "[h]ours expended on administrative, secretarial, and clerical tasks—regardless of whether these assignments are billed by attorneys or professional support staff—are generally not recoverable under the URA fee-shifting statute." *Arnold*, 163 Fed. Cl. at 37 (citations omitted). According to *Arnold*, such "non-compensable tasks include assembling documents, calendaring, filing, mailing, photocopying, proofreading, reviewing and managing client data." *Id.* (citing *Bratcher*, 136 Fed. Cl. at 796). In *Hardy*, Judge Sweeney similarly explained:

> Because administrative costs "are more appropriately charged to overhead," they should generally be included in an attorney's hourly rate and not compensated separately . . . Examples of such administrative or secretarial work include proofreading, assembling, photocopying, and mailing.

*Hardy*, 157 Fed. Cl. at 475 (citations omitted). Judge Sweeney noted, however, in "rails-to-trails proceedings, [] courts have approved reimbursement at paralegal rates for tasks such as managing client data . . . and inputting parcel information into a software program." *Id.* Judge Sweeney ultimately "agree[d] that some of the paralegal tasks . . . [in *Hardy*] [we]re more accurately characterized as administrative work" and, finding the government's requested 50% reduction to be "excessive," reduced plaintiffs' requested paralegal fees by 5%. *Id.* at 475–76. Judge Sweeney then reduced the plaintiff's payment for administrative tasks performed by attorneys by 50% given the "work could easily have been completed by paralegals." *Id.*; *see also Bratcher*, 136 Fed. Cl. at 796 (reducing fees because "[p]laintiffs . . . failed to establish that [] tasks [including reviewing and managing client data and working on landowner access to pleadings] were not largely clerical or secretarial in nature").

---

[11] Several of the entries the government labeled "URA Inapplicable" relate to the withdrawal of Mr. Neuman, *see infra* Section VI.E, and not administrative work performed by plaintiffs. The Court will discuss the "URA Inapplicable" entries related to the withdrawal of Mr. Neuman in the "Whether Certain Hours are 'Inappropriate Entries'" Section, *infra*.

At oral argument, in discussing the different approaches this court has taken to reduce reimbursement requests for administrative tasks, the government confirmed the Court has discretion to adjust reimbursements pursuant to the URA.  Tr. at 150:17–20 ("[THE COURT:] So why 25 percent there [for block billing in *McCarty*]?  Why 10 percent in *Arnold*?  Why 5 percent in *Hardy*?  Is it just all the Court's discretion?  [GOVERNMENT]:  It is, Your Honor.  There is plenty of discretion for the Court on these matters.").  Plaintiffs likewise agreed the Court has discretion to cut certain "Administrative" entries if they are vague.  Tr. at 145:5–10 ("THE COURT:  . . . [I]f the Court agrees that the entries are vague, should the Court trim a percentage or trim hours?  [PLAINTIFFS]:  . . . I would probably trim hours if it's not adequately described or if it's vague as to what they did.").

Pursuant to the URA and considering the reasoning of the judges of this court, the Court accordingly establishes the following matrix for the reimbursement of clerical and administrative tasks.  *See Bywaters*, 670 F.3d at 1228 (noting trial courts have "considerable discretion" to "award [fees] under federal fee-shifting statutes").  First, subject to other reductions discussed elsewhere in this Opinion, the Court will fully reimburse attorneys for legal work performed on behalf of their clients.  *See* 42 U.S.C. § 4654(c).  The Court will similarly reimburse paralegals at 100% of their requested rate, subject to deductions for other purposes as explained elsewhere in this Opinion, for "duties [performed] related to the practice of law."  *See Paralegal*, BLACK'S LAW DICTIONARY (12th ed. 2024).  For administrative tasks, meaning those related to the "manage[ment] . . . [of] a business or organization," *Administer*, BLACK'S LAW DICTIONARY (12th ed. 2024), such as the preparation of expense reports and reviewing and editing correspondence, the Court finds a reduction of 50% reasonable when performed by paralegals, *see Hardy*, 157 Fed. Cl. at 475–76; *Bratcher*, 136 Fed. Cl. at 796, and a reduction of 100% reasonable when performed by attorneys as the "work could easily have been completed by" timekeepers with significantly lower hourly rates, *Hardy*, 157 Fed. Cl. at 475–76.  *See* 42 U.S.C. § 4654(c) (authorizing the Court to use discretion in reimbursing reasonable expenses and fees); *see also Hopi Tribe v. United States*, 55 Fed. Cl. 81, 99 (2002) ("If a task can easily be performed by a higher paid and a lower paid employee, the court thinks it unreasonable to choose the former." (quoting *Hines v. Sec'y of Health & Hum. Servs.*, 22 Ct. Cl. 750, 756 (1991))).  Finally, the Court agrees with other judges that "[h]ours expended on . . . secretarial[] and clerical tasks—regardless of whether these assignments are billed by attorneys or professional support staff—are generally not recoverable under the URA fee-shifting statute" as they are more appropriately deemed overhead.  *Arnold*, 163 Fed. Cl. at 37; *see* 42 U.S.C. § 4654(c).  The Court accordingly will not reimburse plaintiffs for clerical tasks, such as researching and updating client identifying information, as these matters are not reasonably billed to a client, 42 U.S.C. § 4654(c).  *See Bywaters*, 670 F.3d at 1228.

Turning now to specific examples identified by the government as "URA Inapplicable (100%)" in its Response—

| Work Date | Time Keeper | Fee Description | Suggested Reduction | Hours |
|---|---|---|---|---|

| 10/02/2018 | Jackie Tebbe | Transcribe source deeds. | URA Inapplicable (100%) | 2.10 |
| 10/03/2018 | Jackie Tebbe | Transcribe condemnation deeds. | URA Inapplicable (100%) | 0.60 |

—each of these example entries involves work performed by paralegal Jackie Tebbe. *See* Gov't Resp. at 18; Gov't Ex. A at 2. At oral argument, plaintiffs explained why they believe transcribing deeds is substantive: "The[] [paralegals] take a deed [from the 1880s or 1890s] and . . . look at it under a magnifying glass . . . to try to ascertain . . . what every word of that deed says so that we can make an interpretation as to whether . . . [the] deed conveyed a deed or easement to the railroad. That's a very substantive process that the paralegals go through." Tr. at 146:15–147:12. The Court agrees with plaintiff "transcrib[ing] condemnation deeds" is more than mere clerical work because, unlike drafting expense reports or tracking down client phone numbers, it involves "duties related to the practice of law." *See Paralegal*, BLACK'S LAW DICTIONARY (12th ed. 2024). Another such example improperly labeled by the government as "URA Inapplicable (100%)" is the 24 May 2023 entry from Grant Houske for "[d]raft[ing] and prepar[ing] additional disclosure statements to be provided to claimants and requesting SSN information; finaliz[ing the] same and prepar[ing] for mailing." *See, e.g.,* Gov't Ex. A at 17. Although this entry includes a task—"request[] [social security number] information"—perhaps more aptly deemed administrative or clerical, the entry as a whole involves drafting documents for use in this litigation, which is inherently "related to the practice of law." *See Paralegal*, BLACK'S LAW DICTIONARY (12th ed. 2024). The Court, in its discretion as granted by the URA, will accordingly fully reimburse plaintiffs for these and similar entries as further detailed in the Court's Exhibit A. *See* 42 U.S.C. § 4654(c) (authorizing the Court to use discretion in reimbursing reasonable expenses and fees); Court's Ex. A (filed separate from this Order).

In contrast, several "URA Inapplicable (100%)" entries identified by the government in its Exhibit A are administrative in nature, including a 23 September 2020 entry by Jackie Tebbe for "[r]eview[ing] and edit[ing] client status letter" and a 17 February 2021 entry by Heather Armas for "[p]repar[ing] client correspondence."[12] *See, e.g.,* Gov't Ex. A at 5, 6. As such tasks are more related to the "manage[ment] . . . [of] a business or organization," *Administer*, BLACK'S LAW DICTIONARY (12th ed. 2024), than to the practice of law, the Court will reimburse these entries at 50%. *See* 42 U.S.C. § 4654(c) (authorizing the Court to use discretion in reimbursing reasonable expenses and fees); *cf. Arnold*, 163 Fed. Cl. at 37; *Hardy*, 157 Fed. Cl. at 475.

Finally, as explained *supra*, to the extent plaintiffs request reimbursement for purely clerical tasks, such as participating in a "[t]elephone call with client[s] to obtain Tax ID" information, *see* Court's Ex. A (filed separate from this Order), the Court declines to award payment as "secretarial[] and clerical tasks—regardless of whether these assignments are billed

---

[12] Specifically, at oral argument, plaintiffs agreed the 17 February 2021 entry by Heather Armas related to preparing client correspondence is vague and, therefore, the Court has discretion to cut those hours. Tr. at 147:16–23 ("THE COURT: . . . The entry is 'Prepare client correspondence.' Is that not vague? . . . [W]ould a monthly paying client pay that? [From] February 2021, [the] 17th. [PLAINTIFFS:] That is vague.").

by attorneys or professional support staff—are generally not recoverable under the URA fee-shifting statute" as they are more appropriately deemed overhead.  *Arnold*, 163 Fed. Cl. at 37; *see* 42 U.S.C. § 4654(c).

The Court thus agrees a reduction for certain hours is warranted for this category and fully details its reimbursement for those hours identified by the government as "URA Inapplicable (100%)" in its Exhibit A.[13]  *See Bywaters*, 670 F.3d at 1228; 42 U.S.C. § 4654(c).

## 2. "Administrative" Entries

The Court next addresses the government's arguments and examples related to those tasks labeled as "Administrative," which the government states should be reduced at 50% (or 55% if the task was performed prior to 27 September 2021).  Gov't's Resp. at 18–19; *see* Gov't's Ex. A.  The Court applies the same reimbursement matrix detailed *supra* to these entries.

The government labels plaintiffs' 1 October 2018 and 21 March 2019 entries by paralegal Jackie Tebbe—"Review and analyze condemnation deeds; prepare check and prepare cover letter to Mahoning County for deed request" and "Prepare request to Trumbull County regarding chain of title and plat for reply to US Claims Book objections" —as "Administrative" and suggests a reduction of 50%—plus an additional 5% reduction as these entries occurred while was Mr. Neuman was a client:

| Work Date | Time Keeper | Fee Description | Suggested Reduction | Hours |
|---|---|---|---|---|
| 10/01/2018 | Jackie Tebbe | Review and analyze condemnation deeds; prepare check and prepare cover letter to Mahoning County for deed request. | Administrative + Reduction (55%) | 2.50 |
| 03/21/2019 | Jackie Tebbe | Prepare request to Trumbull County regarding chain of title and plat for reply to US Claims | Administrative + Reduction (55%) | 0.80 |

---

[13] Two "URA Inapplicable" entries from Thomas Stewart and Rose Allen discuss Freedom of Information Act (FOIA) requests:

- 7/10/2023 Entry from Rose Allen for "Research recipient of FOIA requests; prepare request for attorney review; revise and forward same; continue attempting to contact non responsive property owners for SSN/TIN information."; and
- 9/11/2023 Entry from Thomas Stewart for "Review draft docketing statement and filing of same; receipt and review of FOIA response and conference with RWR concerning same; receipt and review of the government's docketing statement."

Gov't's Ex. A at 18–19.  Plaintiffs explain in their Reply SWS filed a FOIA request seeking, among other things, "[a]ll records related to time-billing and/or time-entry records and time-logs for each and every DOJ attorney, paralegal, legal secretary, and other DOJ employee participating in this litigation."  *See* Pls.' FOIA Ex.; *see also* Pls.' Reply at 10 n.24.  Plaintiffs explain they sought this request to show "the government's hours basically match Plaintiffs' counsel's hours."  Pls.' Reply at 10 n.24.  It was unnecessary, excessive, and unreasonable, *see* 42 U.S.C. § 4654(c), for plaintiffs to seek a FOIA request merely to argue "the government's hours basically match Plaintiffs' counsel's hours," *id.*  The Court will therefore not reimburse plaintiffs for this unreasonable expenditure of time. *See* Court's Ex. A (filed separate from this Order).  The Court notes, however, plaintiffs' and the government's hours are largely the same.  *See* Pls.' Reply at 10 n.24.

| | | Book objections. | | |
|---|---|---|---|---|

Gov't's Ex. A at 2–3; *see* Gov't's Resp. at 18.  Plaintiffs aver, "the collection of title documents is necessary to establish liability, the preparation of the Claims Books is necessary discovery in every rails-to-trails case, and the management of client information and client data presented to the government as part of the discovery and liability phase of any litigation proceeding is necessary and appropriate and therefore not administrative in nature."  Pls.' Reply at 8.  These entries serve as good examples of the application of the Court's reimbursement matrix, *supra*.  Beginning with the 1 October 2018 entry related to reviewing and analyzing condemnation deeds and preparing deed requests, such tasks straddle the line between quintessentially paralegal work "related to the practice of law," *see Paralegal*, BLACK'S LAW DICTIONARY (12th ed. 2024), and actions more appropriately deemed administrative for relating to the "manage[ment] . . . [of] a business," *Administer*, BLACK'S LAW DICTIONARY (12th ed. 2024).  Indeed, reviewing and analyzing a deed is certainly related to legal practice, while preparing a check and letter are at most administrative (or perhaps clerical) tasks.  The Court, to balance the need to compensate plaintiffs fully for law-related work performed by a paralegal with the URA's requirement to only reimburse *reasonable* expenses, will accordingly reimburse this entry at 50%.  *See Bywaters*, 670 F.3d at 1228 (noting trial courts have "considerable discretion" to "award [fees] under federal fee-shifting statutes"); 42 U.S.C. § 4654(c).  Regarding the 21 March 2019 entry for preparing substantive requests from Trumbull County, the Court deems such work directly "related to the practice of law," *see Paralegal*, BLACK'S LAW DICTIONARY (12th ed. 2024), so will reimburse this fully as such a task is reasonably performed by a paralegal.  *Bywaters*, 670 F.3d at 1228; 42 U.S.C. § 4654(c).

The Court agrees a reduction for certain hours is warranted for this category and fully details its reimbursement for those hours identified as "Administrative" in its Exhibit A.[14]  *See Bywaters*, 670 F.3d at 1228; *see* 42 U.S.C. § 4654(c).

### 3.    "Block-billed" Entries

Next, the Court will address the government's arguments related to plaintiffs' block-billed entries.  *Hardy*, 157 Fed. Cl. at 476 (citation omitted) (describing block billing as "lumping tasks together in time entries rather than making such entries task-by-task").  As

---

[14] As discussed *supra* n.13, plaintiffs explain in their Reply SWS filed a FOIA request.  *See* Pls.' FOIA Ex.; *see also* Pls.' Reply at 10 n.24.  A number of "Administrative" entries involve work related to this FOIA request, specifically:

- 7/10/2023 Entry from Thomas Stewart for "Review e-mail from Brian Herman concerning URA fees and costs and reply; research concerning 'disproportionality' argument and conference with RWR concerning same; review and edit draft FOIA request for fees, conferences with RMA concerning same, and filing of same";
- 7/11/2023 Entry from Thomas Stewart for "Receipt and review of e-mail from Charles Smiroldo acknowledging FOIA filing; research 'disproportionality' cases cited by Brian Herman."; and
- 7/13/2023 Entry from Thomas Stewart for "Receipt and review of e-mail from FOIA office concerning status and reply; research concerning disproportionality argument by the government pertaining to the amount of URA fees in relation to the recovery."

Gov't's Ex. A at 18.  Given it was unnecessary, excessive, and unreasonable, *see* 42 U.S.C. § 4654(c), for plaintiffs to seek a FOIA request, *supra*, the Court will not reimburse plaintiffs for any FOIA-related entries.  *See* Court's Ex. A (filed separate from this Order).

discussed *supra*, the government suggests a 25% reduction to block-billed entries as, in its view "[b]lock billing on its own is improper and grounds for reduction." Gov't's Resp. at 18. Further, for those "block-billed entries contain[ing] improper clerical work, the [government] use[d] the designation 'administrative' and . . . applied a 50% reduction to the hours sought." *Id.* at 19; *see* Gov't's Ex. A.

The URA permits the Court to award attorneys' fees to reimburse what it deems "reasonable costs . . . including reasonable attorney" fees. 42 U.S.C. § 4654(c). In exercising this discretion, judges of this court have applied varying, though small, reductions for block billing. In *Hardy*, for example, Judge Sweeney applied a 5% reduction to plaintiffs' hours, rather than the 50% reduction requested by the government, noting "[a]bove all, the court must consider whether the disputed entries 'provide a sufficient level of detail to allow [the court] to effectively review the reasonableness of the claimed hours.'" *Hardy*, 157 Fed. Cl. at 476 (quoting *McCarty*, 142 Fed. Cl. at 629). In *Arnold*, Judge Bonilla similarly found "an additional 10% reduction to the adjusted hours warranted to account for the vague or block-billed entries submitted, despite the Court's express directive, due to plaintiffs' failure to meet their burden to demonstrate reasonableness." *Arnold*, 163 Fed. Cl. at 39.

When asked about the government's proposed 25% reduction for block billed entries at oral argument, the government did not elucidate where this arbitrary percentage came from; rather, the government reiterated it is a "deduction for block billing in general because we cannot assess the individual hours and their reasonableness." Tr. at 149:3–21. For those entries receiving a 50% reduction, the government emphasized the greater proposed reduction is warranted as those "block-billed entries contain improper clerical work." Gov't's Resp. at 19; *id.* n.8. In the government's Response, it highlights the same 1 October 2018 example discussed *supra*:

| Work Date | Time Keeper | Fee Description | Suggested Reduction | Hours |
|-----------|-------------|-----------------|---------------------|-------|
| 10/01/2018 | Jackie Tebbe | Review and analyze condemnation deeds; prepare check and prepare cover letter to Mahoning County for deed request. | Administrative + Reduction (55%) | 2.50 |

Gov't's Ex. A at 2. Pursuant to the URA, this court has discretion to reimburse costs and fees when reasonable; there is thus no statutory basis for the Court to decline to award payment simply because of the manner in which hours are billed. *Compare* 42 U.S.C. § 4654(c), *with* Gov't's Resp. at 18–19. Rather, the Court is statutorily empowered to reject fee requests when they are unreasonable and, as other judges of this court have similarly determined, billed hours *may*—but need not always—be deemed unreasonable if they are vague. *See Hardy*, 157 Fed. Cl. at 476 ("[A]bove all, the court must consider whether the disputed entries 'provide a sufficient level of detail to allow [the court] to effectively review the reasonableness of the claimed hours." (quoting *McCarty*, 142 Fed. Cl. at 629)); *Arnold*, 163 Fed. Cl. at 39. The vast majority of block billed entries here are not vague, however, including the 1 October 2018 entry from Jackie Tebbe, given they describe specific, detailed tasks—such as "[r]eview[ing] and analyz[ing] condemnation deeds; prepar[ing] check and prepare cover letter to Mahoning County for deed

request."[15]  Gov't Ex. A at 2.  The Court is able to "effectively review the reasonableness of the claimed hours" given this level of detail.  *Hardy*, 157 Fed. Cl. at 476 (first citing *McCarty*, 142 Fed. Cl. at 629); and then citing 42 U.S.C. § 4654(c)).  Other examples of specific block-billed entries include:

- 3/14/2019 Entry from Michael Smith for "Email with DOJ re extension; receipt and consider motion for extension; receipt and consider order regarding extension";
- 3/29/2019 Entry from Michael Smith for "Review and analyze disclosures; research pertinent case law regarding interest acquired by condemnation in Ohio"; and
- 4/4/2019 Entry from Michael Smith for "Receipt and consider email from DOJ regarding JSR and respond; prepare draft JSR."

Gov't Ex. A at 2, 3.  The Court readily understands the tasks within these detailed block-billed entries and, therefore, will reimburse plaintiffs for the reasonable work logged therein.  42 U.S.C. § 4654(c); *see Hardy*, 157 Fed. Cl. at 476; *Arnold*, 163 Fed. Cl. at 39.  On the other hand, the Court declines to reimburse plaintiffs for vague entries from which the Court cannot assess reasonableness as required by the URA, *see* 42 U.S.C. § 4654(c):

- 10/30/2018 Entry from Michael Smith for "Work on initial disclosures; receipt and consider initial disclosures"; and
- 6/19/2019 Entry from Steven Wald for "Worked on draft filing for the court, relating to stipulations; internal discussion re same."

Gov't Ex. A at 2, 4.  These entries do not provide detailed descriptions of the work performed; they merely note "work[ing]" and do not provide clear detail as to the subject matter or purpose of the work—only mentioning vague "disclosures" and "filing[s]."  *Id.*  In sum, the Court only reimburses plaintiffs' block-billed entries to the clearly articulated hours the Court deems reasonable under the URA, 42 U.S.C. § 4654(c), as identified in the Court's Exhibit A.[16]  *Hensley*, 461 U.S. at 437 ("[T]he fee applicant bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates."); *id.* at 434 (noting "court[s] . . .  should exclude . . . hours that were not 'reasonably expended.'"); *cf. Hardy*, 157 Fed. Cl. at 476; *Arnold*, 163 Fed. Cl. at 39.

### C.    Whether Hours Logged for Travel Time are Reasonable

---

[15] The Court notes it will not fully reimburse plaintiffs for this entry for those reasons described in Section VI.B.2, *see supra*.  *See* Court's Ex. A (filed separate from this Order).

[16] As discussed *supra* n.13 and n.14, the Court declines to reimburse plaintiffs for their unreasonable FOIA request, including the following  "Block Billing" entries related thereto:

- 7/5/2023 Entry from Thomas Stewart for "Receipt and review of e-mail from Brian Herman concerning briefing schedule on fees, conference with GEH concerning status and settlement, and reply to Brian Herman concerning draft JSR; receipt and review of draft JSR and reply to Brian Herman approving same; review and work on FOIA request; review filed JSR"; and
- 7/6/2023 Entry from Thomas Stewart "Review settlement correspondence and settlement history in Flying S, reply to Brian Herman concerning settlement, conference with GEH and RMA concerning certified letters to Plaintiffs concerning production of SSN's, work on draft FOIA request, and review and edit draft letter to remaining Plaintiffs concerning SSN's."

Gov't Ex. A at 18.

The government argues "counsel should bill only 50% of the time spent traveling unless they can demonstrate that they were actively performing legal work for the case while traveling." Gov't Resp. at 19 (first citing *Hardy*, 157 Fed. Cl. at 477; and then citing *Bratcher*, 136 Fed. Cl. at 795–96). Specifically, the government points out "[p]laintiffs' billing records contain several travel entries without any indication of work en route." *Id.* (citing Pls.' Ex. A at 21). In its Exhibit A, the government "identified these hours by a 'Travel' designation . . . and applied a 50% reduction to the claimed hours." *Id.* at 19. Plaintiffs reply, "travel time is necessary in a national practice before a national court, and meetings with [p]laintiffs and trail inspections are essential in any rails-to-trails litigation," so "not only is the government's blanket deduction unreasonable, but also the 50% deduction is clearly excessive." Pls.' Reply at 9.

As noted, *supra*, the URA permits the Court to reimburse counsel's costs and fees when, in the opinion of the Court, such are reasonable. *See* 42 U.S.C. § 4654(c). In *Hardy*, Judge Sweeney considered the reasonableness of awarding fees billed during case travel and explained: "plaintiffs' counsel should bill only 50% of the hours spent [actively] traveling [and] . . . if plaintiffs' counsel can demonstrate that they were 'render[ing] legal services en route,'" then counsel may be reimbursed in full for those entries. *Hardy*, 157 Fed. Cl. at 477 (first citing *McCarty*, 142 Fed. Cl. at 627; and then citing *Blissett v. Casey*, 969 F. Supp. 118, 134 (N.D.N.Y. 1997)). In *Bratcher*, on the other hand, Judge Kaplan advised, "[w]hen a lawyer travels for one client he incurs an opportunity cost that is equal to the fee he would have charged that or another client if he had not been traveling." *Bratcher*, 136 Fed. Cl. at 795 (quoting *Crumbaker v. Merit Sys. Prot. Bd.*, 781 F.2d 191, 193 (Fed. Cir. 1986)). Judge Kaplan therefore reimbursed automobile travel in full given "it would not have been possible to also perform case-related work during these trips" but reduced airline travel by 20% as some entries "did not indicate that [counsel] performed work on this case while on the plane." *Id.* at 795–96; *see also Campbell*, 138 Fed. Cl. at 72 (noting "[t]ravel time for this case is time that plaintiffs' counsel were not available to work on other cases").

Here, the government challenges plaintiffs' counsel's travel entries which generally do not contain detail regarding the work performed en route. Tr. at 151:7–10 ("[GOVERNMENT]: Yes, Your Honor, for those travel entries that don't indicate work en route, we propose the 50 percent [reduction] in line with *Hardy* and *Bratcher*."). The government requests the Court reduce all travel hours billed by 50% because plaintiffs' counsel did not work while en route (or 55% if the entry was before 27 September 2021 on account of Mr. Neuman). In its Response, the government points to the following entries from 8 June 2022 as examples:

| Work Date | Time Keeper | Fee Description | Suggested Reduction | Hours |
|-----------|-------------|-----------------|---------------------|-------|
| 6/8/2022 | Elizabeth McCulley | Travel to KC following oral argument; work en route. | Unallowable (100%) | 3.00 |
| 6/8/2022 | Reed Ripley | Travel from Washington D.C. to Kansas City following | Travel (50%) | 3.00 |

| | | oral argument on causation and duration. | | |
|---|---|---|---|---|
| 6/8/2022 | Thomas Stewart | Return travel from Washington, D.C. to Kansas City following oral argument (split with Memmer). | Travel (50%) | 3.00 |

Gov't's Resp. at 19; Gov't's Resp. at 19 n. 9; Gov't's Ex. A at 15.  Although plaintiffs explained it is SWS' policy to work while traveling, *see* Tr. at 153:1–3 ("THE COURT: So are you working while traveling?  [PLAINTIFFS]:  Almost always, Your Honor."), Mr. Ripley's and Mr. Stewart's entries *do not* mention work, but rather only describe the travel itself.  Gov't's Resp. at 19; Gov't's Ex. A at 15.  Indeed, except for Ms. McCulley's travel time, which the Court declines to reimburse for a separate issue, *see infra*, all but one entry identified by the government do not describe work performed en route.[17, 18]  Gov't's Ex. A.  As plaintiffs have therefore failed to meet their burden to adequately document hours spent working, *Hensley*, 461 U.S. at 434, 437, the Court declines to award plaintiffs fees for these travel-only entries.  *See* 42 U.S.C. § 4654(c) (granting the Court discretion to award reasonable expenses and fees).

### D.    Whether Certain Hours Logged are Duplicative or Excessive

The government next argues "[p]laintiffs' counsel's billing records contain duplication and excessive and redundant hours" which "should be excluded" pursuant to *Hensley*.  Gov't's Resp. at 20 (citing 461 U.S. at 434).  The government categorized a variety of suggested reductions together under the umbrella of "duplicative and/or excessive."  Gov't's Resp. at 20– 25.  Specifically, the government challenges certain entries as:  "Exact Duplicate (100%)"; "Duplicative (50%)"; "Unreasonable/Excessive (50%)"; "Unreasonable/Excessive (75%)"; or "Unallowable (100%)."  *Id.*; *see* Gov't's Ex. A.  Plaintiffs reply:  (1) "the hours expended by task that the government identifies as being excessive, duplicative, or unnecessary are completely incorrect"; and (2) "the government's attempt to reduce the hours expended by 50% for the hours identified are also clearly excessive."  Pls.' Reply at 9 (citing *Hardy*, 157 Fed. Cl. at 478).  Plaintiffs explain:  "[t]his is . . . not a situation where there was any duplication of hours or unnecessary hours because it was the government's aggressive litigation strategy that necessitated the hours being billed."  *Id.* at 10.  Indeed, plaintiffs allege the government's arguments are "laughable."  *See id.*

---

[17] For example, the following entries do not describe work performed while traveling:
- 7/25/2018 Entry from Michael Smith, "Travel to Ohio for client meetings, inspection of trail, and conduct client meetings."; and
- 7/27/2018 Entry from Michael Smith, "Travel from Cleveland to St. Louis following client meetings." Gov't's Resp., Ex. A.

[18] Only Michael's Smith's 26 July 2018 entry for "[c]onduct[ing] client meetings; meetings with clients and inspection of trail, and drive to Cleveland" evidences work performed while travelling.  The Court will accordingly reimburse plaintiffs for 50% of this entry, as the final portion—"drive to Cleveland"—still fails to explain whether Mr. Smith worked en route.  42 U.S.C. § 4654(c).

In *Hensley*, the Supreme Court held: "court[s] . . . should exclude . . . hours that were not 'reasonably expended.' . . . Cases may be overstaffed, and the skill and experience of lawyers vary widely.  Counsel for the prevailing party should make a good faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary."  *Hensley*, 461 U.S. 434.  To that end, in *Hopi Tribe*, this court stated: "[i]f a task can easily be performed by a higher paid and a lower paid employee, the court thinks it unreasonable to choose the former." *Hopi Tribe*, 55 Fed. Cl. at 99.  On the other hand, this court noted in *Hardy* "[p]articipation of more than one attorney does not necessarily amount to unnecessary duplication of effort." *Hardy*, 157 Fed. Cl. at 478 (citing *Democratic Party of Wash. State v. Reed*, 388 F.3d 1281, 1286 (9th Cir. 2004)).  The Court next turns to the government's various duplicative and excessive allegations mindful of *Hensley*'s reminder that reasonableness is the touchstone of the Court's fee analysis.  *See Hensley*, 461 U.S. at 434; 42 U.S.C. § 4654(c).

### 1.      "Exact Duplicate" Entry Example

The government first argues "there are two entries, two days apart [from 19 and 21 November 2018], by Jackie Tebbe for 'Prepare Claims Book'. . . suggesting the second 'Prepare Claims Book' is a duplicative entry."  Gov't's Resp. at 20 (citing Pls.' Ex. A at 3).  The government likewise calls out "two [allegedly duplicative] entries [by Ms. Tebbe from 21 and 22 March 2019] for preparing a request to Trumbull County for a chain of title."  *Id.* (citing Pls.' Ex. A at 4).  In response, plaintiffs allege the "entries by Jackie Tebbe" "on a particular project on different days" are not duplicative but rather entailed a continuation of work.  *See* Pls.' Reply at 10.  Although the government agreed at oral argument "attorney[s] regularly enter hourly entries over multiple days," Tr. at 159:8–23, however, the government contends timekeepers should "indicate [the fact that similar entries involve] different work" such as by use of the phrase "continu[ing to] work on."  Tr. at 161:1–7.

 Despite the government's allegations, the government proffered no evidence indicating the flagged entries are duplicates other than Ms. Tebbe's uses of similar language to describe related tasks.  *See* Gov't's Resp. at 20.  Without such evidence, the Court is unable to conclude Ms. Tebbe's entries are improperly duplicative.  Rather, plaintiffs have merely presented the Court with entries clearly explaining the work performed.  Plaintiffs have therefore met their burden to demonstrate the entries labeled by the government as "Exact Duplicate (100%)" are reasonable.  *Hensley*, 461 U.S. at 437 ("[T]he fee applicant bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates."); 42 U.S.C. § 4654(c).  The Court accordingly does not reduce these hours for being duplicative or excessive and awards them in full, for a total of 1.1 hours (for the entries marked as "Exact Duplicate" only), subject to other reductions explained elsewhere in this Opinion.  *See* Court's Ex. A (filed separate from this Order).

### 2.      "Unreasonable/Excessive" Entries – Example Related to Finalizing the Amended Complaint

The government next challenges examples allegedly involving more timekeepers than necessary, arguing a reduction of either 50% or 75% is warranted.[19]  First, the government argues:  "[t]wo partners working on an amended complaint [in October 2018] to add two paragraphs is excessive," referring to Steven Wald and Michael Smith logging hours to finalize the amended complaint.  Gov't Resp. at 20 (suggesting a deduction of 50%).  SWS' business model is unique in that it consists of three partners and one associate, which SWS argues is reasonable to optimize the level of expertise provided to clients in each rails-to-trails case.  Tr. at 163:8–17 ("THE COURT:  Is it your firm's business model to have multiple partners working on one matter? [PLAINTIFFS]:  Sure. Yes, Your Honor.  THE COURT:  Is that reasonable? [PLAINTIFFS]:  Yes.  It's required . . . because of our travel and the nature of our business . . . And we require that there be at least two people assigned to every file.");  Tr. at 99:19–100:9 ("[PLAINTIFFS:]  [W]e generally try to have two lawyers involved in it for a variety of reasons . . . . [This is] a very unique and specialized area of the law that require[s] . . . expertise."); *see also* Tr. at 98:10–16; Pls.' Reply at 9–12 (explaining "it is not uncommon [for] . . . two lawyers . . . [to] review a pleading").  While this model may provide SWS' clients with the most expertise possible, it is not clear it is economically efficient.  For example, returning to the October 2018 entries involving two partners reviewing the amended Complaint, SWS could achieve similar results at a lower rate by having one partner and one associate draft and review the amended complaint, rather than two partners.  *See* Gov't Resp. at 20; *Hopi Tribe*, 55 Fed. Cl. at 99 ("If a task can easily be performed by a higher paid and a lower paid employee, the court thinks it unreasonable to choose the former.").  As it is the Court's mandate pursuant to the URA to reimburse *reasonable* costs, including *reasonable* attorneys' fees, *see* 42 U.S.C. § 4654(c), the Court accordingly declines to award plaintiffs all requested fees in instances of overstaffing by partners where the "task[s] [could be] easily be performed by . . . a lower paid employee."[20] *Hopi Tribe*, 55 Fed. Cl. at 99; *Hensley*, 461 U.S. at 434 ("Cases may be overstaffed, and the skill and experience of lawyers vary widely.  Counsel for the prevailing party should make a good faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary.").  Rather, the Court will only award plaintiffs' counsel's fees billed by the more senior partner, thereby ensuring counsel is sufficiently compensated while also avoiding the imprudent dispensation of government's funds due to inefficient actions on the part of plaintiffs' counsel,[21] *see* Letter from Thomas Jefferson to Skelton Gilliam (Jun. 19, 1808) (on file with The

---

[19] The government included an additional suggested 5% reduction to certain entries logged before 27 September 2021, the date Mr. Neuman withdrew from this case, in this category of "Unreasonable/Excessive."  Gov't Resp. at 25.  As the Court will not deduct an additional 5% from those, *see* Section VI.E, the Court will address entries as being reduced by 50% or 75%–rather than 55% or 80%.

[20] The Court notes SWS had two partners and one associate present at oral argument.  One partner, Mr. Smith, left after a break in the oral argument, immediately following the Court's discussion of overbilling and SWS' business structure.  *See* Tr. at 107:7–16.

[21] The 29 October 2018 entries at issue here are as follows:

- 10/29/2018 Entry from Michael Smith for "Finalize amended complaint; review valuation schedules, and confirm applicable valuation parcels; work on initial disclosures" for 1.7 hours; and
- 10/29/2018 Entry from Steven Wald for "Worked on Amended Complaint" for 3 hours.

Gov't Ex. A at 2.  The government suggested a "Block Billing + Reduction (30%)" and "Unreasonable/Excessive + Reduction (55%)" for these entries, respectively.  *See id.*  As discussed *supra*, the Court finds two partners working on an amended complaint for a total of 4.7 hours to be an example of overstaffing.  Given the Court finds three hours is a reasonable amount of time for one partner to work on an amended complaint, the Court will only reimburse plaintiffs for Mr. Wald's 29 October 2018 three-hour entry, not Mr. Smith's 1.7-hour entry from the same

United States National Archives and Records Administration).  Court's Ex. A (filed separate from this Order); 42 U.S.C. § 4654(c) (granting the Court discretion in identifying and reimbursing reasonable costs).

### 3. "Unreasonable/Excessive" Entries – Initial Summary Judgment Motion Example

The government next challenges plaintiffs' initial summary judgment motions.  Gov't Resp. at 20.  The government labels the following entries as excessive:

> For Plaintiffs' initial summary judgment motion, partner Michael Smith logged 0.8 hours on May 13, 2019 for "adjustments to exhibits." . . .  That same day, paralegal Jackie Tebbe also logged 1.2 hours for "Prepare Exhibits for Motion for Partial Summary Judgment." . . . Mr. Smith then logged another 0.5 hours the next day for "working on summary judgment docs" and another 1.5 hours the day after that included "continue working on . . . exhibits." . . . Then, on May 17, Ms. Tebbe logged 2.4 hours for editing the motion and memorandum in support, preparing the table of authorities, table of contents, and an affidavit, and filing the motion.  . . . Yet that same day, Mr. Smith also logged 2.8 hours for "Check all exhibits and TOC and TOA and finalize motion and memorandum." . . . Mr. Smith's excessive work on the exhibits and tables, despite Ms. Tebbe's work on the same, was redundant and unnecessary.

Gov't Resp. at 20–21.  The government suggests a 50% reduction to these "Unreasonable/ Excessive" entries, as well as a 75% "to a May 17 entry by Mr. Wald for 2.5 hours for 'finalizing summary judgment brief.'"  *Id.*; *id.* at 21 n.10 (noting a reduction of 75%); *see also* Gov't Ex. A at 4 (noting a reduction of 75% plus an additional 5% to account for Mr. Neuman, *see infra*).  According to plaintiffs, however, these entries are not excessive as "the government is in absolutely no position to second guess . . . a paralegal preparing exhibits . . . [and it is] required that an attorney review the [paralegal's] work."  Pls.' Reply at 11.

Although plaintiffs are correct it is not excessive to have a paralegal prepare summary judgment exhibits, *see Hopi Tribe*, 55 Fed. Cl. at 99 (explaining attorneys should staff each task with the timekeeper best suited based on, among other things, skillset and hourly rate), the URA mandates the Court only reimburse those fees which, in its opinion, are reasonable.  42 U.S.C. § 4654(c).  Here, Mr. Smith—a partner—logged upwards of 2.5 hours related to preparing and adjusting the same summary judgment exhibits Ms. Tebbe prepared.  *See* Gov't Resp. at 20–21.  Then, the same week, Mr. Wald—*another partner*—logged 2.5 hours "finalizing" this brief.  *See* Court's Ex. A (filed separate from this Order).  As explained *supra*, although SWS' business model may maximize expertise, it does not adequately balance economic efficiency or reasonability.  Indeed, instead of having Ms. Tebbe prepare the exhibits, Mr. Smith adjust and review them, and Mr. Wald finalize the brief, SWS could have provided a similar quality of service at a more reasonable price by substituting an associate for Mr. Smith.  *See Hopi Tribe*, 55 Fed. Cl. at 99 ("If a task can easily be performed by a higher paid and a lower paid employee, the

---

day.  *See* Court's Ex. A (filed separate from this Order).  This total reduction is reflected the Court's final calculations, *see id.*

court thinks it unreasonable to choose the former."). Given the Court must only reimburse plaintiffs for those fees it deems reasonable, *see* 42 U.S.C. § 4654(c), and the Court finds it unreasonable to task two senior partners and a paralegal with drafting a summary judgment brief, particularly where one partner is spending two or more hours adjusting exhibits, the Court declines to reimburse plaintiffs for all requested fees related to the 2019 summary judgment briefing. *Hensley*, 461 U.S. at 434 ("Cases may be overstaffed, and the skill and experience of lawyers vary widely. Counsel for the prevailing party should make a good faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary."). Instead, the Court will only reimburse: (1) Ms. Tebbe's work as it is appropriate in both length and skill for a paralegal; and (2) Mr. Wald's work as a senior partner reviewing and finalizing a summary judgment brief, *supra*. *See* Court's Ex. A (filed separate from this Order); 42 U.S.C. § 4654(c).

### 4.    "Unreasonable/Excessive" Entries – Excessive Research Example

Turning next to the government's challenged example related to plaintiffs' hours for their 2021 summary judgment motion, the government argues:

> [I]n late 2021, Plaintiffs' counsel spent significant time researching abandonment under Ohio law. Plaintiffs' counsel billed 25.5 hours in entries dedicated in whole or in part to this research [22]. . . . But Mr. Wald and Mr. Smith had researched and addressed the same in their 2019 summary judgment briefing. . . . And in Plaintiffs' 2021 summary judgment brief, to which these hours purportedly relate, Plaintiffs made no direct argument based on Ohio law. . . . Rather, Plaintiffs' discussion of Ohio law consisted of a paragraph with three citations in a footnote . . . And Plaintiffs discussed one of those cases in their 2019 motion. . . . As a result, the Court should reduce the hours Plaintiffs request for research on Ohio abandonment law in 2021.

Gov't Resp. at 21–22. The government labeled these entries as "Unreasonable/Excessive" and applied a 50% reduction; the government applied a 75% to those Unreasonable/Excessive category where an entry is block-billed. *Id.* at 22; *see also id.* n.11 ("The United States has applied a 75% reduction under its Unreasonable/Excessive category where such time is within a block-billed entry."). While plaintiff argues its "work product researching Ohio law [] became an integral part of the case based on the Federal Circuit's Opinion in *Caquelin* and based on this Court's ruling on Plaintiffs' summary judgment motion," Pls.' Reply at 11, two SWS partners logged nine entries totaling more than 23 hours in some way referencing research of Ohio state law to ultimately "discuss[] . . . Ohio law . . . [in] a paragraph with three citations in a footnote."[23] *See* Gov't Resp. at 21–22; Court's Ex. A (filed separate from this Order). Although it is standard practice for attorneys to conduct legal research, such extensive research into these state law questions cannot be deemed reasonable, *see* 42 U.S.C. § 4654(c), particularly

---

[22] The government did not identify which of the 25.5 hours were directly related to the excessive research in its Exhibit A. *See* Gov't Ex. A. The government could have used a more precise labeling method in its spreadsheet. *See id.*

[23] The Court's Exhibit A only labels three entries as being reduced per Section VI.D.4 in its Exhibit A. *See* Court's Ex. A (filed separate from this Order). The other entries are more appropriately addressed for those reasons discussed in Section VI.D.7 related to Ms. McCulley's excessive work on this matter. *Id.*; *See infra.*

given plaintiffs' counsel's prior research on this topic in 2019 and significant expertise in this area, *see* Tr. at 172:3–9 (plaintiffs' counsel describing himself as "the one person in the United States who can write a brief like that").  Plaintiffs therefore should have made more of "a good faith effort to exclude from [the] fee request [these] hours that are excessive."  *Hensley*, 461 U.S. at 434.  The Court accordingly reduces these hours in its discretion.  42 U.S.C. § 4654(c).

### 5.  "Unallowable" Entry[24] – Example Hours Billed During the Stay

Turning next to the government's challenged example related to plaintiffs' hours billed in the period after Judge Lettow stayed this case in 2019, the government specifically takes issue with a 24 June 2019 entry where Mr. Smith logged 1.5 hours for "[c]ontinue[d] review of pertinent case law concerning temporary takings cases and physical vs regulatory takings; review and analyze SC Knicks opinion."  Gov't's Resp. at 22 (citing Pls.' Ex. A at 6).  The government labels this entry as "Unallowable" and suggests a 100% reduction.  Gov't's Ex. A at 5.  As explained *supra*, legal research is neither excessive nor unreasonable on its face; however, it can become so in context.  While the Court does not fault Mr. Smith for continuing to stay up to date on developments in his area of expertise, the Court agrees with the government it is unreasonable to charge such continuing legal education to a client, particularly one whose case is stayed.  *See* 42 U.S.C. § 4654(c).  SWS accordingly should have taken more care to exclude this entry from its fee request.  *Hensley*, 461 U.S. at 434.  The Court will therefore not reimburse plaintiffs for these 1.5 hours unreasonably charged to the *Hippely* clients.  42 U.S.C. § 4654(c).

### 6.  "Unreasonable/Excessive" Entries – Transfer of Case Example

Turning next to the government's challenged example related to transferring the case from the SWS St. Louis office to its Kansas City, Missouri office, Gov't's Resp. at 22–23, the government argues this transfer was unnecessary and inefficient given the "Kansas City office had no familiarity with this case, while [SWS'] St. Louis office had been handling the matter for more than three years."  *Id.* at 22.  The government therefore "applied . . . a 50% deduction to [] entries" related to new SWS "staff . . . learning about the case."  *Id.* at 23.  Plaintiffs reply "the end result of the staffing change, based on the knowledge and experience of SWS'[] lawyers in the Kansas City office, actually reduced the overall hours that would have otherwise been necessary."  Pls.' Reply at 11.  Indeed, according to plaintiffs' counsel, "the issues associated with the case were similar to the arguments made, briefed, and argued by SWS' lawyers in their Kansas City office in *Caquelin*, *Memmer*, and other related cases."  *Id.*  While the end goal may have been efficiency, after years of case litigation, transitioning new attorneys on a case is not reasonably charged to a client.  *See* 42 U.S.C. § 4654(c) (stating "the court  . . . [must] reimburse . . . plaintiff[s] for . . . *reasonable* costs, disbursements, and expenses . . . including *reasonable* attorney . . . fees, actually incurred because of such proceeding") (emphasis added).  SWS should therefore not be reimbursed for hours logged related to the transfer of the case from one office to another—specifically for tasks such as reading documents, learning about the STB proceedings, and reviewing the procedural history of the case.  *See, e.g.*, Gov't's Ex. A at 8 (10/26/2021 entry from Thomas Stewart for "Telephone conference call with SMW and MJS concerning status,

---

[24] The Court only addresses one of the five entries labeled as "Unallowable (100%)" in this Section.  *See* Gov't's Ex. A.  The Court will address the other "Unallowable (100%)" in Section VI.D.7 in its discussion of Ms. McCulley's work on this case, *see infra*.

JSR, and briefing schedule; review STB documents and review filed JSR."; 11/2/2021 entry
from Thomas Stewart for "Review STB notebook and work on procedural timeline."). 
Taxpayer dollars should not be used to reimburse plaintiffs for an internal staffing decision
creating excessive or redundant hours billed to learn the facts of a given case.  *Hensley*, 461 U.S.
at 434.  The Court accordingly reduces these hours.  *See* Court's Ex. A (filed separate from this
Order).

### 7.    "Unreasonable/Excessive" Entries – Overstaffing Example

The government finally challenges SWS' overstaffing by arguing Elizabeth McCulley's
work on this matter is excessive as she was the fourth partner to bill on this case and logged
duplicative hours.  Gov't's Resp. at 23–24.  The government specifically challenges the
following:

> Ms. McCulley logged significant, unnecessary, and redundant hours from late 2021
> onward.  For example, on November 10, 2021, Mr. Stewart recorded 1.7 hours for,
> among other things, "research concerning abandonment under Ohio law." . . . That
> same day, Ms. McCulley logged 2.9 hours for "[r]esearch regarding state law
> abandonment in Ohio." . . . On November 11, Mr. Stewart recorded time for
> "[r]eview research files concerning causation and abandonment under Ohio law,
> work on outline for Section V pertaining to causation . . . ." . . . Ms. McCulley then
> logged hours that same day for those same tasks:  "Review research files regarding
> state law abandonment in Ohio . . . and preparation for motion and memorandum
> for summary judgment on causation."  Throughout November and December 2021,
> Ms. McCulley's entries overlap with Mr. Stewart's. . . .  Their duplication also
> extended to work on the response and reply briefs.  . . . And, although Mr. Stewart,
> the partner that Plaintiffs allege has expertise on *Caquelin* issues, presented oral
> argument on Plaintiffs' behalf, Ms. McCulley and Reed Ripley, another attorney in
> counsel's office, traveled to attend the argument.  . . . Neither Ms. McCulley nor
> Mr. Ripley argued.  Indeed, Ms. McCulley's billing entry in this case for her June
> 2022 travel states "Travel to DC for oral argument at the Federal Circuit."  . . .
> There was no Federal Circuit oral argument in this case. But there was Federal
> Circuit oral argument the day before in *Memmer*.  . . . Ms. McCulley's travel was
> neither related to nor necessary for this case.

Gov't's Resp. at 23–24.

Ms. McCulley was the fourth partner on this case and repeatedly logged time entries
mirroring those of her colleagues.  For example, on 22 November 2021, Thomas Stewart billed
time for "[r]eview[ing], editing and proofreading Plaintiffs' motion for partial summary
judgment on liability, research concerning state law abandonment, and conference with RWR
concerning same."  Gov't's Ex. A at 9.  The very next day, Elizabeth McCulley billed for
"[r]eview[ing], edit[ing] and proofread[ing] draft motion for partial summary judgment on
causation and conference with TSS regarding same."  *Id.*  Further, throughout this time period,
all four SWS partners and one associate assisted with summary judgment briefing—underscoring
the point that Ms. McCulley's work was duplicative and excessive.  For example, Thomas

Stewart's entry from 15 November 2021 appears to discuss conferring with partners Stewart Wald, Michael Smith, and Elizabeth McCulley and associate Reed Ripley—*every attorney at SWS*—on plaintiffs' summary judgment brief.  Gov't Ex. A at 9 (11/15/2021 Entry from Thomas Stewart for "[r]eview[ing], editing and proofreading of motion and memorandum for partial summary judgment on liability pertaining to causation, e-mails to and from SMW [a]nd MJS concerning same, e-mails to EGM and RWR concerning same, and final review and editing of status report letter to all Plaintiffs.").  As discussed *supra*, it is incumbent upon attorneys to strike a reasonable balance between expertise and cost.  42 U.S.C. § 4654(c).  SWS' partner-heavy model failed to do so in this case.  The Court accordingly finds it unreasonable for a fourth partner, Elizabeth McCulley, to bill largely duplicative time entries.  *Hensley*, 461 U.S. at 434 ("[C]ourt[s] . . . should exclude . . . hours that were not 'reasonably expended.' . . . Cases may be overstaffed, and the skill and experience of lawyers vary widely.").  The Court, in its discretion, therefore declines to reimburse plaintiffs' counsel for Ms. McCulley's time entries.[25]

### E.    Whether Certain Hours are "Inappropriate Entries"

The government challenges several other "inappropriate entries";[26] specifically, the government objects to reimbursing "[p]laintiffs' counsel [for] . . . their work in withdrawing from . . . represent[ing] . . . Mr. Neuman," who withdrew from this case, given plaintiffs could not have billed Mr. Neuman for this work.  Gov't Resp. at 25 (noting the government applied a 100% reduction to these entries, and a 50% reduction where those entries contain other work).  The government further argues Mr. Neuman was not a prevailing plaintiff, so "[t]he Court should therefore apply a [general 5%] deduction to all hours before September 27, 2021," the date of his withdrawal, to account for unspecified work related to Mr. Neuman possibly incorporated into other time entries.  *Id.* at 25 (citing *Bratcher*, 136 Fed. Cl. at 793).  Although plaintiffs "agree to a deduction for the specific time entries pertaining to Mr. Neuman's dismissal," plaintiffs oppose the general 5% cut and explain "none of the hours expended in support of [p]laintiffs who were paid are separable from the work expended on behalf of Mr. Neuman."  Pls.' Reply at 12–13.

As plaintiffs agreed to a deduction for the specific time entries pertaining to Mr. Neuman's dismissal, *see* Pls.' Reply at 12, and identified 13.5 hours pertaining directly to Mr. Neuman, *see* Tr. at 186:22–187:5, the Court accordingly declines to reimburse plaintiffs' counsel for the below-identified 13.5 hours:

| Work Date | Time Keeper | Fee Description | Suggested Reduction | Hours |
|-----------|-------------|-----------------|---------------------|-------|

---

[25] This includes Ms. McCulley's 19.60 hours billed for her attendance at the June 2022 oral argument which, according to plaintiffs' counsel, was for "training purposes," namely so Ms. McCulley could train an associate.  Tr. at 183:3–12 ("THE COURT: How about the oral argument in Washington, D.C. in 2022?  [PLAINITFFS]:  That's the irony of ironies here.  But they're attacking Liz McCulley's hours when Reed Ripley was new to it and primarily had assisted with us, but it was primarily for training purposes to see those things, even though he had done the research.").

[26] The government explains "13.7" hours as being directly related to Mr. Neuman but does not directly identify those entries specifically.  Gov't Resp. at 25.  Plaintiffs identified 13.5 hours as being directly related to Mr. Neuman.  Tr. at 186:22–187:5.  Regardless of this discrepancy, the Court identified 15.7 hours related to Mr. Neuman, which is more than both plaintiffs and the government identified, and will not reimburse plaintiffs for those hours.

| 3/22/2021 | Michael Smith | Work on motion to drop client. | URA Inapplicable (100%) | 0.30 Hrs. |
|---|---|---|---|---|
| 3/22/2021 | Steven Wald | Worked on motion to withdraw. | URA Inapplicable (100%) | 1.00 Hrs. |
| 3/23/2021 | Michael Smith | Work on motion to drop client. | URA Inapplicable (100%) | 0.20 Hrs. |
| 3/24/2021 | Michael Smith | Receipt and consider order denying motion to withdraw. | URA Inapplicable (100%) | 0.10 Hrs. |
| 3/25/2021 | Michael Smith | Work on follow-up motion to withdraw. | URA Inapplicable (100%) | 0.60 Hrs. |
| 3/25/2021 | Steven Wald | Review and analyze court order re motion to withdraw. | URA Inapplicable (100%) | 0.50 Hrs. |
| 3/26/2021 | Steven Wald | Begin work on second motion to withdraw. | URA Inapplicable (100%) | 0.20 Hrs. |
| 3/31/2021 | Heather Armas | Work on motion, and exhibits and file pleading. | URA Inapplicable (100%) | 5.00 Hrs. |
| 3/31/2021 | Michael Smith | Work on motion to withdraw and exhibits and email with government counsel re same. | URA Inapplicable (100%) | 3.40 Hrs. |
| 3/31/2021 | Steven Wald | Work on second motion to withdraw. | URA Inapplicable (100%) | 1.20 Hrs. |
| 4/5/2021 | Heather Armas | Research contact information for client. | URA Inapplicable (100%) | 1.00 Hrs. |

Gov't's Ex. A at 6.  In reviewing plaintiffs' counsel's hours, the Court identified additional entries pertaining directly to Mr. Neuman:

| Work Date | Time Keeper | Fee Description | Suggested Reduction | Hours |
|---|---|---|---|---|
| 3/8/2021 | Steven Wald | Worked on motion to withdraw; worked on communications with clients. | Administrative + Reduction (55%) | 1.90 Hrs. |
| 4/7/2021 | Michael Smith | Receipt and consider order re motion to withdraw. | URA Inapplicable (100%) | 0.20 Hrs. |

| 9/27/2021 | Michael Smith | Receipt and consider order dismissing client.[27] | URA Inapplicable (100%) | 0.10 Hrs. |

Pls.' Ex. A at 9, 11.  As plaintiff agreed in its Reply to a deduction for the specific time entries related to Mr. Neuman's withdrawal, the Court accordingly will not reimburse plaintiff for these 2.2 hours, *see id*.  *See* Pls.' Reply at 13.

Turning next to the government's suggested 5% reduction for all entries logged prior to 27 September 2021, at oral argument, plaintiffs noted time was spent on Mr. Neuman's deed early in the litigation but clarified such time was "de minimis."  Tr. at 188:17–189:17 ("THE COURT:  How can the Court accommodate that specific time devoted to [Mr. Neuman]?  [PLAINTIFFS]:  [The Court d]oesn't need to accommodate it because I don't believe it's particularly important to make a deduction, because it's not really separable or distinct from the other work that was done.  Or if it would be, it would be very minor. . . . [T]his is a de minimis issue.").  Indeed, although plaintiffs explained they would not object to the Court reducing the hours between 12 July 2018 and 20 July 2018 related to Mr. Neuman by 5% given Mr. Neuman signed his fee agreement on 12 July 2018, Tr. at 190:24–191:3, for those hours logged after the Complaint was filed, plaintiff reiterated hours spent on Neuman alone are "de minimis[,] incapable of separation, and . . . not distinct in all respects as a[n un]successful claim."  Tr. at 191:4–10.  In response, however, the government emphasized plaintiffs' counsel logged hours *after* the filing of the Complaint when Mr. Neuman remained a client that must be accounted for and reduced.  *See* Tr. at 190:12–22 ("THE COURT:  But the only ones that would be applicable to Mr. Neuman are related to his deed which, as [plaintiffs] describe[], is at some point between signing the CFA and filing the complaint.  [GOVERNMENT]: There are claims book hours after the complaint. . . . He was a part of the claims book.  He had a claim.  He had claimed documentation in it.").

The only case cited by the government for reducing all fees prior to 27 September 2021 is *Bratcher*.  In *Bratcher*, exercising the discretion afforded under the URA, Judge Kaplan stated, "[i]n the context of fee-shifting statutes . . . , hours spent on unsuccessful claims should be excluded from the lodestar amount where the claim or claims on which a plaintiff failed to prevail is 'distinct in all respects from his successful claims.'"  *Bratcher*, 136 Fed. Cl. at 793 (quoting *Hensley*, 461 U.S. at 440).  Contrary to the government's argument, however, *Bratcher* does not stand for the principle courts must apply a global reduction to all hours reimbursed when, despite plaintiffs' general success, plaintiffs have some unsuccessful claims or claimants.  Indeed, to the extent *Bratcher* suggests courts may decline to reimburse counsel for work performed on unsuccessful claims, Judge Kaplan—quoting the Supreme Court in *Hensley*— caveated such claims generally must be "'*distinct in all respects* from his successful claims.'"  *Id.* (emphasis added).  Here, plaintiffs prevailed on all claims; Mr. Neuman withdrew from the

---

[27] The government discussed this entry in its Response:  "The United States has also applied a 100% reduction to a September 27, 2021 entry Mr. Smith logged for reviewing the Court's order dismissing Mr. Neuman."  Gov't's Resp. at 25 (citing Pls.' Ex. A at 11).  Plaintiffs did not include this entry in their 13.5 hours discussed at oral argument or in their PowerPoint submitted to the Court before oral argument.  As discussed *supra*, to the extent the Court makes any calculation or consistency mistakes, the parties should note this in their upcoming 29 August 2024 JSR.

case for reasons unrelated to the merits of his claim.  *See* Tr. at 191:15– 16.  There is no
indication that, had Mr. Neuman remained in this case, the outcome would have been different.
The Court accordingly finds it reasonable to reimburse plaintiffs in full for their work conducted
on behalf of all clients "before September 27, 2021," the date of Mr. Neuman's withdrawal.  *See*
42 U.S.C. § 4654(c) (granting the Court discretion to award reasonable expenses and fees); *see*
*Bratcher*, 136 Fed. Cl. at 793; *Bywaters*, 670 F.3d at 1228 (holding this court "is afforded
considerable discretion" in determining the reasonable amount of attorneys' fees and other
expenses awarded under the URA).

### F.      Whether Certain Vague Entries Should be Reimbursed

The government in its Exhibit A applied a 25% reduction to four entries labeled "Vague":

- 10/1/2018 Entry from Michael Smith for "Review issues in the case for further
  discovery";
- 5/17/2021 Entry from Heather Armas for "Phone call with client";
- 9/28/2021 Entry from Michael Smith for "Receipt and consider update re client"; and
- 7/11/2023 Entry from Thomas Stewart for "Follow-up e-mails to DT LLC, 522
  Innovation, and NWB Wesmar and e-mails to and from GEH concerning Aloha Car
  Wash and EBS Group; review e-mail from RWR concerning SLH Woodinville."

Gov't Ex. A at 2, 7, 8, 18.  As plaintiffs agreed at oral argument the 11 July 2023 entry was
related to an entirely different case, *see* Tr. at 194:13–22, the Court will not reimburse plaintiff
for this entry, *see infra*.  Turning to the remaining three allegedly vague entries, the Court agrees
they contain unspecific descriptions and use generic language such as "review issues," "phone
call with client," and "[r]eceiv[e] . . . update."  Gov't Ex. A at 2, 7, 8.  Without more clarity,
the Court cannot discern whether these hours are reasonable, *see* 42 U.S.C. § 4654(c) (granting
the Court discretion to award reasonable expenses and fees), meaning plaintiffs have not met
their burden to establish they are entitled to reimbursement.  *Hensley*, 461 U.S. at 437 ("[T]he
fee applicant bears the burden of establishing entitlement to an award and documenting the
appropriate hours expended and hourly rates."); Tr. at 193:16–24 ("[PLAINTIFFS]:  I think the
Court has discretion . . .  THE COURT: And, [government], you agree with that assessment?
[GOVERNMENT]:  The general assessment about discretion[, yes].").  The Court accordingly
declines to reimburse plaintiffs' counsel for these vague hours.  *Hensley*, 461 U.S. at 437.

### VII.    Whether the Court Should Reduce the Lodestar Calculation Based on Degree of
         Success

Turning away from specific line items, the government finally contends the Court must
conduct a second step as part of the lodestar analysis—considering "the 'results obtained' . . . [in
determining whether] to adjust the lodestar fee upward or downward."  Gov't Resp. at 26
(quoting *Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983)).  The government explains, "[t]he
Federal Circuit has reversed the Court of Federal Claims where it failed to engage in this second
step of the analysis to consider whether the results obtained warranted a downward adjustment to
the fee award."  *Id.* (citing *Hubbard v. United States*, 480 F.3d 1327, 1333, 1334–35 (Fed. Cir.
2007)).  The government cites to various Court of Federal Claims cases to argue judges must

consider "the results obtained" in the lodestar analysis. *Id.* at 27–28 (first citing *Adde v. United States*, 98 Fed. Cl. 517, 526 (2011); then citing *Campbell v. United States*, 138 Fed. Cl. 65, 70 (2018); then citing *Hardy v. United States*, 159 Fed. Cl. 124, 131–32 (2022); and then citing *Arnold v. United States*, 166 Fed. Cl. 267, 287 (2023)). The government explains, "the Court issued judgment for [p]laintiffs in the amount of $1,869.09 . . . [making] [p]laintiffs' individual recoveries range from $19.07 to $378.67." *Id.* at 29. Specifically, the government argues plaintiffs' request "the Court [] order the United States to reimburse [p]laintiffs $218.46 in fees and costs for every $1 recovered" is "grossly disproportionate and unreasonable on its face." *Id.* at 29–30. The government ultimately seeks to reduce plaintiffs' requested reimbursement to $50,000. *Id.* at 31 (first discussing a reimbursement of $194,551 under a lodestar approach; then, after a consideration of disproportionateness and unreasonableness, suggests a reimbursement of $50,000).

Plaintiffs reply: "[i]n *Bywaters*, the Federal Circuit substantially narrowed *Hensley* . . . , stating that . . . adjust[ing the] lodestar figure is limited to 'rare' and 'exceptional' circumstances, and that while the 'amount involved and results obtained remains a factor to be considered in determining a reasonable attorney fee, it cannot be a basis for reducing the lodestar figure where it could have been taken into account in calculating the lodestar figure in the first instance.'" Pls.' Reply at 14 (quoting *Hensley*, 461 U.S. at 434–36) (first citing *Perdue v. Kenney Mfg. Co.*, 559 U.S. 542 (2010); and then citing *Blum v. Stenson*, 465 U.S. 886, 897–900 (1984)). Plaintiffs reason, "while the Federal Circuit . . . indicated . . . a court may consider the 'amount involved' . . . , the Federal Circuit [] also instructed that courts should . . . consider 'the fact that litigation of [this nature] . . . vindicate[s] constitutionally protected property rights.'" *Id.* at 16 (first citing *Bywaters v. United States*, 684 F.3d 1295, 1295–96 (Fed. Cir. 2012); then citing *Whispell Foreign Cars, Inc. v. United States*, 139 Fed. Cl. 386, 393 (2018) (citation omitted)). Plaintiffs further argue the Federal Circuit in *Hensley* "agree[d] [with plaintiffs' view:] 'Where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee.'" *Id.* at 18 (citing *Hensley*, 461 U.S. at 435). Plaintiffs finally distinguish this case from *Hubbard*, a contract dispute; *Adde*, a Back Pay Act claim in which the Federal Circuit "reduced the attorney fee award" due to "plaintiff's clear failure to secure relief[;]" and *Arnold*, which involved nearly 2,000 hours billed, 34 timekeepers, a variety of novel legal issues, and a dismissal of a portion of the claims at issue. *See id.* at 18–20 (first citing *Hubbard*, 480 F.3d at 1333; then citing *Adde*, 98 Fed. Cl. at 529, and then citing *Arnold*, 163 Fed. Cl. at 41–40).

In *Hensley*, the Supreme Court explained:

The product of reasonable hours times a reasonable rate does not end the inquiry. There remain other considerations that may lead the district court to adjust the fee upward or downward, including the important factor of the "results obtained." This factor is particularly crucial where a plaintiff is deemed "prevailing" even though he succeeded on only some of his claims for relief. In this situation two questions must be addressed. First, did the plaintiff fail to prevail on claims that were unrelated to the claims on which he succeeded? Second, did the plaintiff achieve a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award? . . . Where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee. . . . If, on the other hand, a

> plaintiff has achieved only partial or limited success, the product of hours reasonably expended on the litigation as a whole times a reasonable hourly rate may be an excessive amount. . . . Again, the most critical factor is the degree of success obtained. . . . There is no precise rule or formula for making these determinations. The district court may attempt to identify specific hours that should be eliminated, or it may simply reduce the award to account for the limited success.

*Hensley*, 461 U.S. at 434–40. Further, in *Bywaters*, the Federal Circuit stated: "the Supreme Court has recognized [this] court's discretion to adjust the lodestar figure 'upward or downward' based upon other considerations . . . [but] adjustments to the lodestar figure 'are proper only in certain "rare" and "exceptional" cases, supported by both "specific evidence" on the record and detailed findings by the lower courts.'" *Bywaters v. United States*, 670 F.3d 1221, 1229 (Fed. Cir. 2012) (first citing *Pa. v. Del. Valley Citizen's Council for Clean Air*, 478 U.S. 546, 564 (1986); and then citing *Perdue*, 559 U.S. at 552–53). The Federal Circuit specified "[a]djustments are warranted only where the lodestar figure fails to take into account a relevant consideration." *Id.* The *Bywaters* court explained specifically "while the 'amount involved and results obtained' remains a factor to be considered in determining a reasonable attorney fee, *it cannot be a basis for reducing the lodestar figure* where it could have been taken into account in calculating the lodestar figure in the first instance." *Id.* at 1230 (emphasis added). "The lodestar figure is 'presumed' to be reasonable." *Id.* (citing *Blum*, 465 U.S. at 897).

Here, the government seeks to reduce plaintiffs' requested fee reimbursement to $50,000 based on the alleged disproportionality of the landowners' recovery to the requested reimbursement. Gov't's Resp. at 31. Plaintiffs' counsel requests more than 200 times the aggregate recovery of the plaintiffs. *See* Tr. at 71:25–72:10 ("THE COURT: . . . [D]o you agree . . . the ratio here is more than 200 times plaintiffs' aggregate recovery? [PLAINTIFFS:] It sounds correct."). While the government challenges this ratio as unreasonable and disproportionate, reducing a requested fee reimbursement "where a plaintiff has obtained excellent results" is inappropriate. *See Hensley*, 461 U.S. at 435. Here, plaintiffs' counsel was 100% successful in obtaining recovery for their clients as a result of the taking, so an additional reduction based on the results obtained is not warranted. *Id.* ("Where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee"); *see Hippely v. United States*, 162 Fed. Cl. 414, 417 (2022). Considering the results obtained is only "crucial where a plaintiff . . . succeeded on only *some* of his claims for relief," the Court need not make an additional reduction where plaintiffs prevailed on all claims. *See Hensley*, 461 U.S. at 434 (emphasis added).

Further, although the government conceded the Court need not always adjust the fee upward or downward based on degree of success, Tr. at 54:23–55:6 ("[THE COURT:] [T]he Court does not always have to adjust the fees upward or downward; correct? [GOVERNMENT]: Certainly, no . . . But . . . *Hubbard* is clear that courts needs [sic] to look at this and . . . reason through it."), the government argues this case is one of the "rare and exceptional" cases where the Court should make a downward adjustment based on disproportionality. *See* Tr. at 65:3 ("[GOVERNMENT:] It is a rare and exceptional instance.") (discussing *Bywaters*, 670 F.3d at 1229); Tr. at 64:10–22 ("[GOVERNMENT]: . . . Judge Bonilla in *Arnold* looked at this exact issue. . . . The Court could take Judge Bonilla's approach

[in *Arnold*] and adjust hours before the lodestar calculus is made."). Specifically, at oral argument the government argued the ratio of the recovery to fees requested is unreasonable because the fees are about 218 times the recovery. Tr. at 64:23–65:7 ([GOVERNMENT:] The point of *Bywaters* . . . is, simply, there is limited success here and it does need to be taken into account, whether it's reducing hours or reducing the lodestar, there is very small recovery here, and the reimbursement asked for is exceptional. It is a rare and exceptional instance. [Here,] [i]t's about 218 times the just compensation. That's approaching the number in *Hubbard* which was 275 times. It's well beyond the ratios in Judge Bonilla's *Dawson* and *Arnold* decisions."). The government agrees, however, *Arnold* is an outlier for having engaged in a reduction based on the ratio of recovery to fees requested. Tr. at 71:16–24 ("THE COURT: . . . Would you not agree that *Arnold* is an outlier? [GOVERNMENT]: It probably is, Your Honor, in that Judge Bonilla himself says, 'This case falls into a rare and exceptional cases category.' He was unable to find other cases with the discrepancies between recovery and fees claimed. And in that sense, it is an outlier."). Indeed, despite the government's suggestion to "take Judge Bonilla's approach," *see* Tr. at 64:10–22, the government struggled to articulate the method by which Judge Bonilla reduced the overall fee request in *Arnold*—stating his approach is "not clear." Tr. at 70:5–22 ("THE COURT: Where did 20 percent come from [in *Arnold I*]? [GOVERNMENT]: Judge Bonilla doesn't explicitly explain the 20 percent hours adjustment . . . . It's not clear."). The government agreed the Court should not take a mechanical approach to reducing the fee award based on degree of success but insisted the Court should consider the ratio in its analysis. Tr. at 69:17–24 ("[GOVERNMENT]: . . . [The adjustment] [s]houldn't be strictly mechanical. I agree . . . the cases do not stand for strictly mechanical, but . . . that is part of the discussion why the ratios are in *Hubbard*, or *Campbell*, or *Arnold*. They do matter. It's part of the analysis. It shouldn't be that it should be 'X' every time, . . . but the ratio does matter."); Tr. at 71:3–7 ("[THE GOVERNMENT]: I don't think [the lodestar step two reduction] is mechanical. It shouldn't be just a set amount. Judge Bonilla determined 20 percent. I don't think there is one number that this Court uses here. But it has to be considered and there should be a reduction.").

Despite the government's arguments related to the ratio of recovery to fees, plaintiffs in this case were wholly successful on their claims; this case is therefore not a "rare and exceptional" circumstance warranting additional reduction. *Bywaters*, 670 F.3d at 1230–31 (finding no need for an additional adjustment because the "case d[id] not present the sort of 'rare' and 'exceptional' circumstance where the factor of 'amount involved and results obtained' should [have] be[en] considered as a basis for departure from the lodestar figure" and explaining "[t]he mere fact that the recovery is small in amount is not a circumstance justifying a reduced fee award."). Plaintiffs' counsel is therefore entitled to payment for the hours worked, reduced only for the reasons discussed *supra*.

## VIII.   Whether Plaintiffs' Counsel Rates are Reasonable

In addition to the total hours billed, the parties dispute the reasonableness of plaintiffs' counsel's rates. Plaintiffs argue "[t]he reasonable hourly rate is 'calculated according to the prevailing market rate in the relevant community.'" Pls.' Mot. at 11 (quoting *Blum v. Stenson*, 465 U.S. 886, 895 (1984)). Plaintiffs explain, "there are different rates for SW[S]'s timekeepers

. . . , first covering the period of time from May of 2018 through 2020, and then using SW[S]'s updated and current billing rates from January of 2021 through October of 2023," *id.*:

**Combined Timekeeper Summary 3 in Exhibit A:**

| Timekeeper | Hours | Rate | Total |
|---|---|---|---|
| Thomas S. Stewart | 219.90 hours | $695/hr | $152,830.50 |
| Steven Wald | 27.30 hours | $545/hr | $ 14,878.50 |
| Steven Wald | 7.90 hours | $645/hr | $  5,095.50 |
| Elizabeth McCulley | 79.80 hours | $595/hr | $ 47,481.00 |
| Michael Smith | 216.30 hours | $445/hr | $ 96,253.50 |
| Michael Smith | 44.80 hours | $595/hr | $ 26,656.00 |
| Reed Ripley | 45.60 hours | $400/hr | $ 18,920.00 |
| Jackie Tebbe | 107.60 hours | $175/hr | $ 18,830.00 |
| Jackie Tebbe | 5.60 hours | $200/hr | $  1,120.00 |
| Grant Houske | 24.80 hours | $200/hr | $  4,960.00 |
| Rosemarie Allen | 14.30 hours | $200/hr | $  2,960.00 |
| Heather Armas | 33.30 hours | $190/hr | $  6,327.00 |
| **Total** | **829.40 hours** | | **$396,312.00** |

*Id.* at 17–18 (listing all hours worked by each timekeeper).

The government responds, "the Court . . . should use hourly rates less than those [p]laintiffs seek." Gov't's Resp. at 32. In discussing the three legal markets of relevance in this case—Kansas City, St. Louis, and Washington, DC—the government notes plaintiffs are using Kansas City rates as only the oral argument took place in Washington DC. *Id.* at 32–33.

Under the lodestar method, reasonable hourly rates are "calculated according to prevailing market rates in [the] relevant community." *Blum*, 465 U.S. at 895. The prevailing market rate is the rate "prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." *Id.* at 895 n.11. As agreed by both parties at oral argument, the Davis County exception, which applies when "the bulk of the work is done outside of the [forum] in a legal market where the prevailing attorneys' rates are substantially lower" and mandates the Court use "the prevailing attorneys' rates in that latter [cheaper] legal market," applies in this case because plaintiffs' counsel performed the vast majority of their work in Missouri rather than Washington, DC. *See* Gov't's Resp. at 32 (citing *Bywaters*, 670 F.3d at 1233); Tr. at 78:20–79:15 ("THE COURT: . . . [Government, do] you agree the Davis County exception comes from the Federal Circuit in the *Avera* [and *Bywaters*] cases? [GOVERNMENT]: Yes, Your Honor. . . . THE COURT: [Plaintiffs], [d]o you agree that the Davis County exception applies, that the Court should apply Missouri rates? [PLAINTIFFS]: Yes, Your Honor."); *see also Bywaters*, 670 F.3d at 1233; *Avera v. Sec'y of Health & Hum. Servs.*, 515 F.3d 1343, 1349 (Fed. Cir. 2008). The Court will accordingly "calculate[ plaintiffs'

proper payment] according to [the] prevailing market rates in [the] relevant community"—Missouri.  *Blum*, 465 U.S. at 895.

### A.      Whether the Rates from May of 2018 through 2020 are Reasonable

Plaintiffs, explaining Steven Wald billed at $545 per hour, Michael Smith at $445 an hour, and Jackie Tebbe at $175 an hour since 2015, request reimbursement at these rates for entries billed between May 2018 and December 2020.  Pls.' Mot. at 11–12.  Plaintiffs note other judges of this court have approved these rates.  *Id.* at 12–14 (first citing *Haggart v. United States*, 149 Fed. Cl. 651 (2020) (Lettow, J.); then citing *Stimson Lumber Co. v. United States*, 154 Fed. Cl. 694 (2021) (Firestone, J.); and then citing *Hardy v. United States*, 157 Fed. Cl. 464 (2021) (Sweeney, J.)).

In response, and first addressing the St. Louis market, the government states "[p]laintiffs' motion fails to support the[] rates," partly because "[p]laintiffs' declarations do not address the billing rates for the period 2018 through December 2020."  Gov't's Resp. at 34.  Rather, according to the government, the declarations only address billing in "complex federal litigation" generally, *see id.*, which is problematic, according to the government, because "the declarants' understanding (or lack thereof) of the work in rail-trail litigation provides the basis for their assessment of counsel's rates."  *Id.*  The government concedes, however, "[p]laintiffs identify some cases from the Court of Federal Claims approving the rates [p]laintiffs' counsel seek for May 2018 through December 2020" but highlights "other judges on the Court of Federal Claims have rejected similarly high hourly rates requested by other rail-trail practitioners."  *Id.* at 35 (first citing *Whispell Foreign Cars, Inc. v. United States*, 139 Fed. Cl. 386, 397–401 (2018); and then citing  *Bratcher v. United States*, 136 Fed. Cl. 786, 797–800 (2018)).  The government further asserts SWS' rates conflict with a recent survey of Missouri legal rates and Missouri caselaw.  *Id.* at 36–37 (first citing *Starks v. St. Louis Co.*, No. 4:21-CV-435, 2023 WL 2682003, at *2–*3 (E.D. Mo. Mar. 29, 2023); then citing *Anderson v. Creve Coeur Urgent Care, LLC*, No. 4:16CV2136, 2022 WL 4598524, at *2–*3 (E.D. Mo. Sept. 29, 2022); *Robinson v. City of St. Louis*, No. 4:17-CV-156, 2020 WL 4673823, at *3–*5 (E.D. Mo. Aug. 12, 2020); and then citing *Drake v. Steak N Shake Operations, Inc.*, No. 4:14-cv-01535, 2019 WL 2075895, at *2–*3 (E.D. Mo. May 10, 2019)).  Based on this evidence, the government argues "the Court should award Mr. Wald $475 per hour, Mr. Smith $350 per hour, and [paralegals] Ms. Tebbe and Ms. Armas $150 per hour, for all hours logged."  *Id.* at 37.

Here, plaintiffs request Steven Wald be reimbursed at $545 per hour, Michael Smith at $445 an hour, and Jackie Tebbe at $175 an hour from the outset of the case, in May 2018, through December 2020, after which SWS increased their rates.  Pls.' Mot. at 11–12.  At oral argument, Mr. Wald emphasized his nearly five decades of law firm experience to both justify his hourly rate and underscore his knowledge of law firm economics and rate setting.  *See, e.g.*, Tr. at 80:17–19 ("I have been practicing law for 45 years.  I was the managing partner of a large Missouri firm for 17 years.").  Plaintiffs also noted SWS' offices are within the city limits of Kansas City and St. Louis, and their attorneys are in the office "[d]aily."  Tr. at 82:16–24

Plaintiffs point to prior opinions from judges on this court affirming SWS rates in support of their argument, specifically Judge Lettow in *Haggart*, Judge Firestone in *Stimson Lumber*, and

Judge Sweeney in *Hardy*.  Pls. Mot. at 12–14; *see Haggart*, 149 Fed. Cl. 651; *Stimson Lumber Co.*, 154 Fed. Cl. 694; *Hardy*, 157 Fed. Cl. 464.  Although not binding, these cases (with consideration of public affidavits testifying directly to the reasonableness of SWS' rates) are persuasive.  In *Haggart*, a 2020 case, Judge Lettow affirmed "$175 per hour for [SWS] paralegals [and] between $445 and $595 per hour for partners," *Haggart*, 149 Fed. Cl. at 665, because the government failed to rebut the "affidavits testifying specifically to the reasonableness of Stewart Wald's rates which are informed by first-hand experience." *Id.*  In *Stimson Lumber*, Judge Firestone likewise affirmed Mr. Stewart's rate of "$595 hourly rate . . . and a $495 hourly rate for Ms. McCulley." *Stimson Lumber Co.*, 154 Fed. Cl. at 702.  Judge Firestone reasoned:

> [The] requested hourly rates for Mr. Stewart and Ms. McCulley are reasonable. The requested rates are well-supported by Mr. Stewart's own declaration documenting the experience and qualifications of Mr. Stewart and Ms. McCulley . . . as well as the declarations submitted by the three local practitioners, including a former federal magistrate judge who is now in private practice. . . . The prevailing market rates identified by the local practitioners ranged from about $400 to over $900 per hour for partners. . . . The local practitioners conclude that Stimson Lumber's requested rates are in line with these prevailing rates.  . . . In fact, Mr. Stewart and Ms. McCulley's rates fall on the low end of the range identified by the local practitioners as the prevailing market rates for partners.

*Id.* at 702–03.  In *Hardy*, Judge Sweeney similarly affirmed SWS' rates from 2015 through 2020. *Hardy*, 157 Fed. Cl. at 471–72.  Judge Sweeney reasoned:

> This court finds that plaintiffs have provided sufficient evidence that the requested rates for both time periods are reasonable, satisfying their evidentiary burden.  Both Mr. Stewart and Ms. McCulley have significant litigation experience, specifically in the area of rails-to-trails cases, which justify their rates.  Mr. Stewart is the Senior Attorney at Stewart, Wald & McCulley LLC with approximately forty-two years of litigation experience and has litigated or is litigating around forty rails-to-trails cases in this court.  . . . Ms. McCulley is a founding member of Stewart, Wald & McCulley, LLC with over twenty years of litigation experience and has also worked on a large number of rails-to-trails cases in this court. . . . This type of specialized experience in such a niche area of law weighs in favor of plaintiffs' counsel's hourly rates.

*Id.* at 472.

The government, in addressing these cases, agreed "the court could" look to the rates and affidavits from the 2015 to 2020 caselaw given they are "matters of public record."  7 Mar. 2024 SC Tr. at 27:14–19 ("THE COURT: . . . [C]an the Court not look to St. Louis rates in an affidavit in another case prior to 2021?  [THE GOVERNMENT]:  I think the Court could.  Those affidavits are matters of public record.  They're on the docket in other cases and courts have looked to those.").  Plaintiffs noted its "rates from 2015 to 2020 [are] well settled," which is why they did not submit additional affidavits with their initial Motion here.  7 Mar. 2024 Tr. at 25:20–

23 ("[PLAINTIFFS:]  I believe those rates from 2015 through 2020 were well settled and have been agreed upon by the Government in dozens and dozens of cases over many years.  And so we did not refile the affidavits.").  In arguing against plaintiffs' rates, however, the government points to a variety of Missouri district court decisions.  In contrast to plaintiffs' cited Court of Federal Claims fee decisions, however, none of the Missouri caselaw proffered by the government involves rail-to-trails litigation or addresses reimbursement under the URA.  *See, e.g.*, Gov't Resp. at 36–37 (first citing *Starks*, 2023 WL 2682003, at *2–*3; then citing *Anderson,* 2022 WL 4598524, at *2–*3; then citing *Robinson*, 2020 WL 4673823, at *3–*5; and then citing *Drake*, 2019 WL 2075895, at *2–*3).  When asked why the Court should rely on Missouri caselaw as opposed to decisions of this court directly addressing SWS rates during the relevant time period, the government cited to *Whispell* and *Bratcher* in arguing "there is counter[vailing] evidence" from this court.  Tr. at 83:21–84:10; *see Whispell Foreign Cars, Inc.*, 139 Fed. Cl. 386; *Bratcher*, 136 Fed. Cl. 786.  Although the judges in *Whispell Foreign Cars* and *Bratcher* relied on Missouri Lawyers Weekly, a local publication, in awarding attorneys' fees below the requested rate, these cases—unlike those cited by plaintiffs—involved firms other than SWS and so are less analogous to the instant case.  *See Whispell Foreign Cars, Inc*, 139 Fed. Cl. at 402; *Bratcher v. United States*, 136 Fed. Cl. at 800.

The government's only remaining rebuttal is the Court should look to "countering evidence," namely the Missouri Lawyers Weekly publication.  Tr. at 83:21–84:10.  At oral argument, however, the government agreed Missouri Lawyers Weekly does not have statistical significance and, rather, is merely an "overview" survey providing median ranges without accounting for attorney experience.  Tr. at 94:10–21 ("[GOVERNMENT]:  . . . [I]f we're talking statistically a significance factor, I don't believe we're able to calculate that from that survey. . . . It's still certainly collating data that's been [put] forward by attorneys in court documents."); Tr. at 111:14 – 112:9 ("[GOVERNMENT]:  Missouri Lawyers Weekly doesn't give enough information to make a call from that alone as to what specifically would be the rate for someone with Mr. Stewart's experience precisely . . . . It's more of an overview survey giving ranges, median ranges. . . . THE COURT:  . . . [I]f we just look at the Missouri Lawyers Weekly data, how does that account for someone with Mr. Stewart's experience to be at that $500 an hour rate?  [GOVERNMENT]:  I don't think you can look at that in isolation and say that supports $500 for Mr. Stewart's experience.").  *see also* Tr. at 113:13–16.  The government recommended the Court "couple" Missouri Lawyers Weekly with recent Court of Federal Claims caselaw to reimburse SWS at the lower rates the government suggests for this time period.  Tr. at 112:2–9 ([GOVERNMENT:]  [Missouri Lawyers Weekly has] practitioners of many different years of experience, and that's why it has the range. . . . [W]e're coupling that not just with this in isolation, but this coupled with multiple decisions here in CFC that do take into account the experience.").  In this regard, the government struggled to articulate a precise reimbursement method for the Court—encouraging the Court to look to Missouri Lawyers Weekly for some SWS attorney rates and caselaw for others.  Tr. at 115:4–16 ("THE COURT:  . . . [W]hat adjustment should the Court make?  [GOVERNMENT]:  The standard is the . . . reasonable hourly rate prevailing in the relevant community.  And our view is based on the data we're seeing plus the cases over a multi-year period that [$500] is a reasonable rate in the market.  The Court could choose an actual rate and peg it to inflation from a year that it starts, but we believe $500 per hour does reflect . . . a reasonable rate within the market for the entire time period at which we're looking."); Tr. at 117:5–9 ("[GOVERNMENT]:  [The Court should set rates b]ased

on prior cases in this Court, local cases, and the fact that plaintiffs themselves had asked for a lower rate [in the past] . . . THE COURT: But that doesn't sound [like a] very objective [ ] process[?] [GOVERNMENT]: . . . it is based on the cases that we've seen . . . in this Court and the Eastern and Western Districts [of Missouri].").  When asked about why judges, like Judge Sweeney in *Hardy*, have rejected Missouri Lawyers Weekly, the government further agreed Missouri Lawyers Weekly "is [not] intended to provide a precise single number" for a given attorney as it does not account for individual experience.  Tr. at 112:10–19 ("THE COURT: . . . [I]s this what Judge Sweeney was referring to in *Hardy*, that Missouri Lawyers Weekly failed to account for plaintiffs' counsel's experience and practice area and found the affidavits more persuasive?  [GOVERNMENT]:  I don't think that this is intended to provide a precise single number that you can look at mathematically to say X years equals this rate.").

    In discussing whether the Court should rely on Missouri Lawyers Weekly in reimbursing plaintiffs' counsel, plaintiffs remarked Missouri Lawyers Weekly is "a joke."  Tr. at 80:13 – 14 ("[PLAINTIFFS]: . . . I think that study is a joke.").  Plaintiffs argue they meet their burden by virtue of their affidavits testifying to SWS' rates being reasonable and that the Court need not rely upon sources such as Missouri Lawyers Weekly in making its reimbursement decision.  Tr. at 100:18–25 ("[PLAINTIFFS]:  Well, the law is that we have to meet our burden, and more than my affidavit is required.  In every case that I'm aware of where affidavits of this type have been provided, the Court has rejected the Missouri Lawyers Weekly and specifically rejected survey data in favor of firsthand experience.  And I think that's exactly what the Court should do here as well.").  The Court agrees.  The detailed affidavits found in *Haggart, Stimson*, and *Hardy* account for the SWS attorneys' experience and expertise in rail-to-trails cases in explaining the reasonability of plaintiffs' counsel's rates; the Court sees no reason to disagree with those affidavits for *these* Missouri attorneys in comparison to a non-empirical periodical survey of *different* Missouri attorneys.  *See, e.g.*, Motion for Attorney Fees, ECF No. 355, Exs. C (Aff. Richard Ralston), D (Decl. Barrett J. Vahle), E (Aff. Robert Thompson), F (Decl. Seth Waxman), *Haggart v. United States*, No. 09-103 (Fed. Cl. 2 Mar. 2020); Motion for Attorney's Fees, ECF No. 52, Ex. C (Decl. Thomas S. Stewart), *Stimson Lumber Co. v. United States*, No. 18-983 (Fed. Cl. 7 Apr. 2021); Motion for Attorney Fees, *Hardy v. United States*, No. 14-388 (Fed. Cl. 28 Jan. 2021).

    Based on the detailed affidavits found in *Haggart, Stimson*, and *Hardy*, and the persuasive reasons from Judges Lettow, Firestone, and Sweeney finding SWS' rates from this time period reasonable, the Court will reimburse the following rates for pre-January 2021 work performed in St. Louis:  Steven Wald at $545 per hour, Michael Smith at $445 per hour, and Jackie Tebbe at $175 per hour.  Pls.' Mot. at 12; *Bywaters*, 670 F.3d at 1228 (holding this court "is afforded considerable discretion" in determining the reasonable amount of attorneys' fees and other expenses awarded under the URA); *Hensley*, 461 U.S. at 437 ("[T]he fee applicant bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates.").

### B.      Whether the Rates from January 2021 Onward are Reasonable

    Turning second to the time period after SWS changed its rates in January 2021, plaintiffs request the following rates:  $695 per hour for Thomas S. Stewart; $645 per hour for Steven

Wald; $595 per hour for Elizabeth McCulley; $595 an hour for Michael Smith; $400 an hour for Reed Ripley; $200 an hour for paralegals Jackie Tebbe, Grant Houske, and Rosemarie Allen; and $190 an hour for paralegal Heather Armas.  Pls.' Mot. at 14–15.  To establish SWS' standard billing rates, plaintiffs provide:  (1) Exhibit C, an Affidavit from Thomas Stewart discussing the standard billing rates for all timekeepers; and (2) "Exhibits D, E, F, and G . . . concerning the prevailing market rates for attorneys' fees, that separately and collectively establish that the rates utilized by all of the timekeepers from SW[S] . . . are reasonable and appropriate for the Kansas City market for timekeepers with similar experience."  *Id.* at 16.  Specifically, Exhibit C describes:  (1) the credentials and experience of the SWS attorneys and staff; (2) the expertise of the firm in rails-to-trails cases; (3) the nature of rails-to-trails litigation, including the repeated "vigorous defense" by the government; (4) the reasonableness of the hours expended; and (5) the reasonableness of SWS' billing rates in the Kansas City market.  *See* Pls.' Ex. C.  To the extent the government disagrees with these rates, plaintiffs accuse the government of first "making arbitrary, capricious, and unsupported reductions to hours" and then using "its own conclusion[s] with respect to 'local rates' . . . [to] reduce[] [p]laintiffs' lodestar calculation from $396,312.00 to $194,551.00," thereby "double-dipping [with additional] unreasonable and unsupported deductions to [p]laintiffs' lodestar calculation."  Pls.' Reply at 23.

In response, the government argues "[p]laintiffs identify no cases approving the rates they now seek for the period beginning January 2021."  Gov't's Resp. at 35.  The government argues plaintiffs' attached declarations do not discuss "rail-trail litigation to inform their claim of reasonableness" "[a]nd no judge of this court has found these rates reasonable."  *Id.* at 37.  The government also notes, "[t]he rates also conflict with [local caselaw and] the Missouri Lawyers Weekly survey for Kansas City . . . [which] found that the median rate for partners was $488 and for associates was $325."  *Id.* at 37–38 (first citing *Mayfield v. Rademan Miller*, No. 2:21-CV-04059, 2023 WL 3132010, at *2 (W.D. Mo. Apr. 27, 2023); then citing *InfoDeli, LLC v. Western Robidoux, Inc.*, No. 4:15-CV-00364, 2021 WL 1750892, at *5 (W.D. Mo. Mar. 31, 2021); and then citing *Quiksilver Shuttle Inc. v. Saylor*, No. 18-00245-CV-W, 2020 WL 8259059, at *2 (W.D. Mo. Sept. 22, 2020)).  The government asserts "the Court should award Mr. Stewart $500 per hour, Ms. McCulley $475, [] Mr. Houske and Ms. Allen $150 . . . [and Mr. Ripley] $275 per hour."  *Id.* at 38.

At oral argument, plaintiffs explained their requested increase in rates beginning in 2021 reflects changes in the marketplace given it had been six years since SWS last increased its rates.  Tr. at 85:18–24 ("[PLAINTIFFS:]  [W]e wanted to better reflect what the marketplace was doing in both Kansas City and St. Louis.  It had been six years since those rates had increased.").  Plaintiffs explained SWS determined these rates through lateral hiring, surveying other firms, calling other attorneys in Missouri, and reviewing caselaw.  Tr. at 86:3–17 ("THE COURT:  . . . How did you determine your own marketplace analysis for comparison of your rates?  [PLAINTIFFS]:  Primarily by [laterally] hiring . . . THE COURT:  So you would just call people to ask them their rates?  [PLAINTIFFS]:  Yes."); Tr. at 91:17–21 ("[PLAINTIFFS]:  I'm basing it on my knowledge of the market, in my conversations with lawyers, and in cases approved by this court that approved our rates already. And it includes much more than just *Haggart*, *Stimson Lumber*, and *Hardy*.").  Plaintiffs' counsel disagrees its rates should be lower because SWS is a small firm, arguing instead SWS' increased rates are justified because of the firm's specialization in rails-to-trails litigation.  *See* Tr. at 163:18–24 ("THE COURT:  . . . [Y]ou argued . . . your firm

can substantiate high billable rates because of your specialty in this area and your years of experience. That would result in efficiencies; correct? [GOVERNMENT]: I believe it does result in efficiencies."); Tr. at 103:19–104:7 ("THE COURT: . . . Why do attorneys go to smaller firms? [PLAINTIFFS]: Most often to specialize. THE COURT: When attorneys go to smaller firms, are their costs lower, what would be referred to as overhead costs? [PLAINTIFFS]: . . . [I]t varies. . . . our costs actually are higher, because [our paralegals and office administrators] have been with us for a long time. Probably rent is lower. So I'm not going to agree, blanket, that our costs are lower. No, our costs salary-wise are higher."); Tr. at 105:24–106:8 ("THE COURT: So another district court case . . . said, quote, 'The size of the firm is a factor in determining the reasonableness of attorneys' fees, since the smaller firm does not have the same overhead cost as a larger firm and thus should have a lower rate.' Should that principle apply? [PLAINTIFFS]: Gross overstatement, but in general maybe.").

Plaintiffs' affidavits—submitted in support of SWS' increased rates from 2021 onward—provide detailed accounts of the expertise and experience SWS has in the rails-to-trails space. *See e.g.*, Pls.' Exs. C–G. Thomas Stewart's affidavit discusses the attorneys' backgrounds at SWS; the nature of rails-to-trails cases in this court; the procedural history of this case; and why SWS' hours expended, and the corresponding billing rates are reasonable. *See* Pls.' Ex. C. The Affidavit notes, Mr. Stewart "was a Partner [at] . . . a Missouri law firm with approximately 35 lawyers with its principal office in Kansas City, Missouri" for seven years doing "federal litigation involving . . . [r]ails-to-trails cases across the country." *Id.* at 1–2. Mr. Stewart was also the "Managing Partner of Lathrop & Gage LLP for 18 years," *id.* at 2; indeed, the Affidavit states "[s]ince I have practiced law for almost 44 years, and since I set the billing rates for all attorneys and paralegals at Lathrop & Gage for 18 years, and have also done so for SW[S] since 2015, I am familiar with billing rates and timekeepers in all categories in both Kansas City and St. Louis." *Id.* The Affidavit further states Steven Wald has 29 years of civil litigation experience at law firms; Elizabeth McCulley has "worked on a large number of Trails Act takings cases" since 2009; Michael Smith has "16 years of experience handling all aspects of Rails-to-Trails cases"; and paralegals Grant Houske, Rosemarie Allen, Jackie Tebbe, and Heather Armas have varying past experience working in private practice—ranging from 8 to 24 years. *Id.* at 2–3. The Affidavit notes "over 90% of the legal practice of SWS has been devoted to representing landowners in matters pending in the Court of Federal Claims since 2015." *Id.* at 3–4. Given "something more than an attorney's own Affidavit is required to establish the prevailing market rate for attorney's fees," *Hash v. United States*, 2012 WL 1252624, at *3 (D. Id. Apr. 13, 2012) (quoting *Preseault v. United States*, 52 Fed. Cl. 667, 678 (2002)), however, the Court turns to plaintiffs' other proffered affidavits.

Mr. Barrett Vahle "is a partner in the law firm Stueve Siegal Hanson LLP" who has "personal knowledge and experience concerning prevailing billable hourly rates for complex litigation in the Kansas City area and nationwide." Pls.' Ex. D at 2. Mr. Vahle's affidavit states SWS "provided me with the rate schedule for the firm's work in this matter. . . . These rates are reasonable for legal work in complex federal practice and are appropriate in the Kansas City market." *Id.* at 2–3. Mr. Richard E. McLeod has "been a partner in a multi-national defense firm and a solo practitioner" and has "direct experience in various billing models and [] extensive personal knowledge concerning appropriate billing rates for complex litigation in the Kansas City legal community." Pls.' Ex. E at 3. According to Mr. McLeod, the SWS rates "are

very much within the range I'd expect for experienced counsel in complex and—at least importantly—specialized litigation" and "are reasonable [and appropriate] for legal work for complex federal practice . . . in the Kansas City market." *Id.* at 3–4. Mr. Robert Thompson is "a partner in the Bryan Cave Leighton Paisner []law firm" and is "familiar with hourly rates at [his] own firm and ha[s] personal knowledge of hourly billing rates for attorneys in the Kansas City and St. Louis markets." Pls.' Mot. Ex. F at 3. The Thompson Affidavit states "the hourly rates utilized by [SWS], particularly for Thomas S. Stewart with 44 years of experience, at $695 per hour and Steven M. Wald with 29 years of experience, at $645 per hour, are reasonable for legal work that is based on complex federal practice and are consistent with what [he] believe[s] the market rates are in the Kansas City and St. Louis markets for attorneys with similar experience and practices." *Id.* at 3. Mark Levison has practiced law in St. Louis since 1980 and has "been employed by two Kansas City based law firms: the Polsinelli Law Firm and Lathrop GPM LLP"; he is now a "shareholder at Lashly & Baer, P.C." Pls.' Ex. G at 2. The Levison Affidavit states "the hourly rates of [SWS'] Thomas S. Stewart ($695/hour), who has served our profession for 44 years, and Steven M. Wald ($645/hour) with 29 years of experience are reasonable for their specific legal work which is based upon complex federal practice and are consistent with the high-end market rates in St. Louis and Kansas City for attorneys with similar experience." *Id.* at 4. The Affidavit also states, "the rates of attorneys Elizabeth G. McCulley (22 years at $595/hour)[,] Michael J. Smith (16 years at $595/hour)[,] and Reed Ripley (4 years at $400/hour), and [the] paralegals . . . are also reasonable and appropriate." *Id.* at 4–5. These declarations and affidavits provide necessary insight into the Missouri legal marketplace and elucidate the reasonability of SWS' rates. *See Bywaters*, 670 F.3d at 1228 (holding this court "is afforded considerable discretion" in determining the reasonable amount of attorneys' fees and other expenses awarded under the URA).

The government's primary rebuttal to plaintiffs using their increased rates for 2021 onward is, as with the rates from 2018 through 2020, there is countervailing evidence of judges using Missouri Lawyers Weekly and district court law to reimburse at lower rates than plaintiffs request, *see supra*. *See* Tr. at 83:21–84:10. The government's argument here fails for the same reason it failed in Section VIII.A., *supra*—Missouri Lawyers Weekly does not provide statistically significant evidence, nor does it account for experience and practice area expertise.

Based on the detailed affidavits, the Court will reimburse the following reasonable rates for the post-January 2021 period: $695 per hour for Thomas S. Stewart; $645 per hour for Steven Wald; $595 per hour for Elizabeth McCulley; $595 per hour for Michael Smith; $400 per hour for Reed Ripley; $200 per hour for paralegals Jackie Tebbe, Grant Houske, and Rosemarie Allen; and $190 per hour for paralegal Heather Armas. *See* Pls.' Mot. at 14–15; *Bywaters*, 670 F.3d at 1228 (holding this court "is afforded considerable discretion" in determining the reasonable amount of attorneys' fees and other expenses awarded under the URA); *Hensley*, 461 U.S. at 437 ("[T]he fee applicant bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates.").

## IX.   Whether Plaintiffs' Costs are Reasonable

Plaintiffs argue "[t]he URA . . . allows for reimbursement . . . of reasonable costs actually incurred in connection with the case" "or paid in preparation for trial of the specific case before

the Court, which expenses are those customarily charged to the client where the case is tried."
Pls.' Mot. at 18–19 (first citing *Oliveira v. United States*, 827 F.2d 744 (9th Cir. 1987); and then
citing *R.C. Const. Co., Inc. v. United States*, 42 Fed. Cl. 57, 63–4 (Fed. Cl. 1998)). Plaintiffs
seek reimbursement of $22,643.47 in costs—for (1) Travel Related Expenses; (2) Expert
Expenses; and (3) Miscellaneous—"because all of the expenses are detailed and are reasonable
costs actually incurred in connection with this case." *Id.* at 19. Specifically, for travel expenses
related to oral argument trips, plaintiffs request $12,101.33:

| 1. | Airfare | $2,617.24 |
|---|---|---|
| 2. | Car Rental | $1,482.31 |
| 3. | Meals | $1,298.94 |
| 4. | Airport Parking | $143.00 |
| 5. | Taxis | $127.45 |
| 6. | Tolls | $2.75 |
| 7. | Travel Agent Service Fees | $80.00 |
| 8. | Travel/Lodging | $6,349.64 |
| | **TOTAL** | **$12,101.33** |

*Id.* Plaintiff also requests $6,000 for the 30 December 2020 payment to appraiser David
Matthews for his report in this case, *see id.* at 20, and $4,542.14 for miscellaneous expenses
related to this litigation:

| 1. | Court Reporting | $660.40 |
|---|---|---|
| 2. | Filing Fees | $400.00 |
| 3. | Mailing/Postage | $598.88 |
| 4. | Meeting Room Rental | $435.00 |
| 5. | Covid Testing | $382.47 |
| 6. | Printing/Copying | $271.39 |
| 7. | Vendor Charges for Val Maps, Val Schedules and Deeds | $1,794.00 |
| | **TOTAL** | **$4,542.14** |

*Id.*

The government responds the Court "should reject most of Plaintiffs' claimed expenses
as unsupported" because, besides the appraisal, plaintiffs have submitted no supporting
documentation for these costs as required by the URA. Gov't Resp. at 39 (citations omitted).
The government concedes plaintiffs are entitled to the $6,000 paid to appraiser David Matthews,
however. *Id.* Turning to plaintiffs' remaining costs, the government argues several of the
expenses listed must be rejected because they were incurred before the STB issued the NITU and
before the Complaint was filed in this case. *Id.* The government explains the Court should also
exclude several unexplained charges, including: (1) miscellaneous copying and printing charges;
(2) a charge titled "History Assoc. payment"; and (3) various FedEx charges. *Id.* at 39–40. The
government finally identifies several unreasonable charges and argues they should be excluded:
(1) a restaurant charge of $249.91; (2) various Covid-19 testing charges; (3) travel agent service
fees; (4) travel for Ms. McCulley, including her flights and accommodations; and (5) all hotel
accommodations in connection with the Washington D.C. oral argument. *Id.* at 40–42. The

government argues, with these exclusions, "[p]laintiffs would be limited to an award of no more than $10,383.82." *Id.* at 42.

Plaintiffs reply "[t]he government's objections are completely misplaced because each expense was, in fact, documented (the government, in fact, responded to several individual expenses) and the three separate objections based on the amount of a restaurant charge (split with *Memmer*), charges for Covid testing (required by the Federal Circuit and split with *Memmer*), and the cost of Mr. Stewart's hotel room (expensive under all circumstances but also split with *Memmer*), have no merit." Pls.' Reply at 13.

The URA states:

The court rendering a judgment for the plaintiff in a proceeding brought under section 1346(a)(2) or 1491 of Title 28, awarding compensation for the taking of property by a Federal agency . . . shall determine and award or allow to such plaintiff, as a party of such judgment or settlement, such sum as will in the opinion of the court or the Attorney General reimburse such *plaintiff for his reasonable costs, disbursements, and expenses*, including reasonable attorney . . . fees, actually incurred because of such proceeding.

42 U.S.C. § 4654(c) (emphasis added). Plaintiffs may seek the reimbursement of reasonable costs if they demonstrate the incurred costs were "reasonable and necessary" for the litigation and produce adequate evidence of such expenses. *Arnold v. United States*, 163 Fed. Cl. 13, 41 (2022) (citing *Bratcher v. United States*, 136 Fed. Cl. 786, 801 (2018)); *Campbell v. United States*, 138 Fed. Cl. 65, 78 (2018) (holding certain costs were reimbursable under the URA as they were "sufficiently described for the court to determine that they constituted either travel or support costs related to this case."); *see also Banks v. United States*, 171 Fed. Cl. 142, 153 (2024); *Hardy v. United States*, 157 Fed. Cl. 464, 479–80 (2021) (deeming the analysis of costs incurred a "factual inquiry" and thus requiring proof of the incursion of such expenses).

The Court notes at the outset it will reimburse most of plaintiffs' incurred costs, *infra*. Despite plaintiffs' aversion to providing proof of these costs, however, *see* Tr. at 199:8–14 ("THE COURT: I have to submit receipts . . . . Why not you? [PLAINTIFFS]: I don't believe we should have to. That's not the law. They said document. We documented on Exhibit A1. That's been the law since 2007, other than perhaps *Hardy* when the Government objected, I think, for the first time."), the Court makes many of the below cost awards contingent on plaintiffs providing receipts or other evidence of their expenses to government counsel for review. *See* 42 U.S.C. § 4654(c) (granting the Court discretion to award reasonable costs); Letter from Thomas Jefferson to Skelton Gilliam *supra* (promoting government officials to spend government funds prudently).

## A.    Appraisal Costs

First, the parties agree the $6,000 paid to appraiser David Matthews is reimbursable, *see* Gov't's Resp. at 39; Tr. at 195:3–7. The Court accordingly reimburses plaintiffs $6,000 for this cost.

### B.      Pre-Complaint Costs

Next, the government challenges those expenses logged prior to the NITU and Complaint being filed, which the government collectively calls "Pre-Complaint" costs.  Gov't's Ex. F at 1–3.  As discussed in Section VI.A., *supra*, the Court will not reimburse plaintiffs for work performed prior to 5 June 2018 because the first client had not been retained until that date.  Upon agreeing to represent Mr. Hippely on 5 June 2018, however, SWS began performing work "because of" this case, *see supra* Section IV.A.  42 U.S.C. § 4654(c) (permitting reimbursement of costs "actually *incurred because of such proceeding*"); *see Bradley v. United States*, 164 Fed. Cl. 236, 263 (2023) ("[W]ork more properly classified as client development cannot be reimbursed.").  The Court accordingly will not reimburse plaintiffs for any costs incurred before 5 June 2018.  *See* 42 U.S.C. § 4654(c); *Bradley*, 164 Fed. Cl. at 249.  Further, as the government provides no objection to these costs other than the fact that they were logged prior to the filing of the Complaint, *see* Gov't's Resp. at 39, for all "Pre-Complaint" entries incurred after 5 June 2018, the Court will reimburse plaintiffs unless reduced for a separate reason explained herein or in the Court's Exhibit B.  42 U.S.C. § 4654(c) ("The court . . . shall determine and award or allow to such plaintiff . . . such sum as will in the opinion of the court . . . reimburse such plaintiff for his reasonable costs, disbursements, and expenses . . . actually incurred because of such proceeding."); *Campbell*, 138 Fed. Cl. at 72 (holding certain costs were reimbursable under the URA as they were "sufficiently described for the court to determine that they constituted either travel or support costs related to this case.").

### C.      Meeting Room Costs

The government next challenges three "Meeting Room Rental" entries, specifically:

- 06/13/2018 Entry from Jackie Tebbe for "Holiday Inn Meeting Room $150.00 6.13.18.pdf";
- 06/29/2018 Entry from Jackie Tebbe for "Holiday Inn Meeting Room $150.00 6.29.18.pdf"; and
- 07/27/2018 Entry from Michael Smith for "Holiday Inn Meeting Room $135.00 7.27.18.pdf."

Gov't's Ex. F at 3.  The government labels the entries from 13 June 2018 and 29 June 2018 as "Pre-Complaint/Client Development" and the 7 June 2018 entry as "Unexplained" but does not brief these challenged entries in its Response.  *Id.*  For those costs labeled "Pre-Complaint," as these entries are logged after the 5 June 2018 cutoff date, *see supra*, the Court declines to cut these entries based solely on their timing.  Further, all "Meeting Room Rental" entries are detailed such that they "sufficiently describe" the purpose and timing of the charge.  *Campbell*, 138 Fed. Cl. at 72.  Indeed, they are reservations for space to use while travelling for work or space to meet with clients.  The Court therefore finds these expenses reasonable and related to work performed "'because of' the suit" *after* retaining clients.  *Bradley*, 164 Fed. Cl. at 250; *see* 42 U.S.C. § 4654(c).  The Court will accordingly reimburse these expenses upon presentation of a receipt or other invoice by plaintiffs to government counsel demonstrating proof of purchase, *see infra*.

### D.    Copying and Printing and Mailing/Postage Costs

The government next challenges a number of "Unreasonable/Unexplained" entries; specifically, the government argues plaintiffs should not be reimbursed for "[p]laintiffs' miscellaneous copying and printing charges" and mailing/postage charges.  Gov't's Resp. at 39–40.  Judges of this court have found, however, "[p]rinting and photocopying fall within those reasonable and necessary expenses which are customarily charged to the client."  *See Hardy*, 157 Fed. Cl. at 481 (citing *Haggart*, 149 Fed. Cl. at 666 (quoting *Oliveira*, 827 F.2d at 744)) (internal quotation marks omitted).  Similarly, this court has held "[p]ostage is generally a reimbursable expense, 'assuming [the charges] are documented and reasonably necessary to prosecution of the claim.'" *Id.* at 481–82 (citing *R.C. Constr. Co.*, 42 Fed. Cl. at 63–64).  Here, the copying, printing, and mailing charges provide sufficient detail for the Court to precisely identify the purpose of each charge.  *See* Gov't's Ex. F at 3–4.  The following example entries illustrate the challenged copying and printing entries have specific dates, timekeeper information, and detail regarding the purpose of the charge:

- 06/06/2018 Entry from Eva Ferrario for "Trumbull County OH $63.49 6.6.2018 Printing Charges";
- 06/12/2018 Entry from Eva Ferrario for "June 2018 Print & Copy Charges";
- 07/03/2018 Entry from Jackie Tebbe for printing "7.3.18 report.pdf";
- 08/07/2018 Entry from Jackie Tebbe for "August Printer / Copy Charges 8.7.18 Report.pdf";
- 09/30/2018 Entry from Jackie Tebbe for "Sept 2018 printing and copying expenses";
- 03/31/2019 Entry from Kelsie Barnes for "Print & copy March 2019 $1.20";
- 06/06/2019 Entry from Jackie Tebbe for "Print / Copy jobs 6.4.19 Report.pdf";
- 11/06/2019 Entry from Jackie Tebbe for "Copy. Print Charges Report 11.5.19 Copy Print Charges January 2021.pdf";
- 02/09/2021 Entry from Heather Armas for "Copy Print Charges January 2021.pdf"; and
- 03/04/2021 Entry from Heather Armas for "Copy Print Charges February 2021.pdf."

Gov't's Ex. F at 3–4; *see also* Pls.' Ex. B.  These generally low-dollar charges appear directly related to SWS' internal printing needs for this litigation.  The parties should therefore confer, *see infra* Section X, to confirm these charges are internal costs associated with this case.[28]  Assuming such is the case, the Court finds these entries reasonable and will reimburse plaintiffs $271.39 for their printing charges, 42 U.S.C. § 4654(c) (permitting reimbursement of reasonable expenses).  *Hardy*, 157 Fed. Cl. at 481 ("Printing and photocopying fall within those reasonable and necessary expenses which are customarily charged to the client.") (citations omitted).

---

[28] If the parties determine these costs are external to SWS, meaning performed by a third party, plaintiffs should submit receipts to government counsel to support reimbursement for these costs as part of their upcoming 29 August 2024 JSR.

Similarly, plaintiffs' mailing charges[29] largely provide sufficient detail as to the date, timekeeper, and purpose of the charge:

- 06/19/2018 Entry from Eva Ferrario for "Trumbull County OH - $30.78 Postage 6.19.2018";
- 10/30/2018 Entry from Kelsie Barnes for "FedEx - Discovery - 10.30.18 $35.10";
- 11/28/2018 Entry from Jackie Tebbe for "FedEx - Supplemental Discovery - 11.28.18 $35.10";
- 03/22/2019 Entry from Kelsie Barnes for "FedEx - Trumbull Cty - Deed & Plat Request $40.20 03.22.19";
- 03/25/2019 Entry from Kelsie Barnes for "FedEx - Trumbull Cty - Deed & Plat Request $40.20 03.25.19";
- 09/28/2020 Entry from Heather Armas for "Case Update Ltr Postage 5.50 09.28.2020.pdf";
- 01/22/2021 Entry from Heather Armas for "FedEx Receipt for Ohio Edison Company $36.25 01.22.21.pdf";
- 01/22/2021 Entry from Heather Armas for "FedEx Receipt to Eric Fincham $36.25 01.22.21.pdf";
- 01/22/2021 Entry from Heather Armas for "FedEx Receipt for Marilyn Lanning $36.25 01.22.21.pdf";
- 01/29/2021 Entry from Heather Armas for "FedEx Receipt for The Gwins $60.20 01.29.21.pdf"; and
- 11/15/2021 Entry from Holly Bond for "11.15.2021 Status ltr to Engaged Claimants."

Gov't's Ex. F at 3; *see also* Pls.' Ex. B. The Court only identified two vague entries among these mailing and postage charges not "sufficiently described for the court to determine that they constitute[] . . . support costs related to this case," *Campbell*, 138 Fed. Cl. at 72:

- 03/27/2019 Entry from Jackie Tebbe for "Fed Ex - $40.20. 3.22.19.pdf"; and
- 03/27/2019 Entry from Jackie Tebbe for "Fed Ex - $44.20. 3.27.19.pdf."

Gov't's Ex. F at 3; *see also* Pls.' Mot., Ex. B. For these vague entries from 27 March 2019, plaintiffs should submit receipts to government counsel to provide additional detail as to the purpose of these charges in the upcoming joint status report, *see infra*. The Court will reimburse plaintiffs' clearly explained mail-related charges upon proof of purchase via the provision of receipts or other invoices to government counsel, *see infra*. *Hardy*, 157 Fed. Cl. at 481–82.[30]

    **E.**    **"History Assoc. payment" Cost**

---

[29] The Court will not reimburse plaintiffs for one "Mailing/Postage" entry logged prior to 5 June 2018 given no work was performed "because of" the suit at that point, *see* Gov't's Ex. F at 3 (listing a "06/01/2018 Entry from Jackie Tebbe for "Trumbull County, OH - Postage Expense  $51.30  6.1.18.pdf.").

[30] The Court will not reimburse plaintiffs for those Copying and Printing and Mailing/Postage Costs related to Mr. Neuman for those reasons stated in Section VI.E. *See* Court's Ex. B (filed separate from this Order).

The government next challenges an "unexplained charge of $1,772 for 'History Assoc. payment' on April 16, 2019," Gov't's Resp. at 39. *See* Gov't's Ex. F at 4. When asked at oral argument about this charge, plaintiffs stated they "could not locate [the] invoice." Tr. at 204:11–18 ("[THE COURT:]  April 16, 2019, was a $1,700 expense for History Association. . . . [PLAINTIFFS]:  That's the one that predated the formation of Stewart, Wald & [Smith].  It was for charges that came through us.  It will be for deed research and we could not locate that invoice."). The Court cannot confirm without further documentation what this rather large and vague $1,772 charge is. The Court encourages plaintiffs to talk to the "History Assoc[iation]" at issue to obtain proof of purchase to submit to government counsel, *see infra* Section X, should they desire reimbursement for this expense. The Court will otherwise not reimburse plaintiffs for this unclear cost as the URA permits the Court only to reimburse *reasonable* costs, and the reasonability of this charge cannot be judged without additional explanation, 42 U.S.C. § 4654(c). *Cf. Hardy*, 157 Fed. Cl. at 479–482 (holding reimbursement is not appropriate for various requested costs where plaintiffs have not provided supporting documentation).

### F.    Meal Costs

Next, the government specifically challenges in its brief plaintiffs' "[meal] charge of $249.91 for 'Joe's Seafood'[ in Washington, DC,] which was based on a $499.81 bill that was purportedly 'split w/ [another case called] *Memmer*.'" Gov't's Resp. at 40; *see also* Pls.' Ex. B at 2. The government notes, "[a]s a point of comparison," the General Services Administration (GSA) Per Diem Rate for government travel to Washington, D.C. in 2022 was $36 for dinner. Gov't's Resp. at 40 (citing *FY 2022 Per Diem Rates for District of Columbia*, U.S. GENERAL SERVICES ADMINISTRATION). At oral argument, however, the government explained it was not arguing the Court should apply the GSA Per Diem rates to plaintiffs' entries but rather that it "included [the] GSA per diem" as a point of reference. Tr. at 206:16–20 ("THE COURT:  Is the Government arguing that, that [for] the plaintiffs what's reasonable should be what the Court travels under?  [GOVERNMENT]: No, Your Honor. We just included a GSA per diem [for reference]."). When asked at oral argument about this dinner charge, plaintiffs agreed this charge "could be reduced." Tr. at 205:9–15 ("THE COURT: . . . So the Government notes meal entries of $249 for Joe's Seafood in Washington, D.C., based on $500 bill split with *Memmer*. [PLAINTIFFS]: That could be reduced, Your Honor.  I enjoyed a very good bottle of wine after two oral arguments on back-to-back days.").

Here, the majority of plaintiffs' meal costs are reasonable and, indeed, most fall within or below the GSA Per Diem scale. *See e.g.*, Gov't's Ex. F at 1–2. Further, plaintiffs' meal entries largely contain sufficient detail. *See id.*  As GSA rates are "reviewed on an annual basis" to "ensure that they are fair," *Frequently asked questions, per diem*, U.S. GENERAL SERVICES ADMINISTRATION, https://www.gsa.gov/travel/plan-a-trip/per-diem-rates/faqs#1, the Court finds the GSA meal rate, or daily meal Per Diem rate, to be reasonable (indeed it is the reasonable rate the *Court* is reimbursed at for travel); plaintiffs will be reimbursed for all entries below the Per Diem rates. *See* Court's Ex. B (filed separate from this Order).

The Court identified only five entries, including the Joe's Seafood cost discussed, *supra*, it deems unreasonable and significantly above the GSA Per Diem rates[31]:

- 06/27/2018 Entry from Michael Smith for "Trumbull County OH - Ruth Chris - MJS Meal  $90.00 6.27.18.pdf" for $90.00;
- 07/26/2018 Entry from Michael Smith for "Ruth Chris - MJS Meal $120.44 7.26.18.pdf";
- 06/06/2022 Entry from Thomas Stewart for "Ocean Prime 06.06.2022; $304.20 (split w Memmer)" for $152.10;
- 06/06/2022 Entry from Reed Ripley for "The Hamilton 06.05.2022; $117.06 (split w Memmer)" for $58.53; and
- 06/07/2022 Entry from Thomas Stewart for "Joe's Seafood 06.07.2022; $499.81 (split w Memmer)" for $249.91.

Gov't Ex. F at 1–2.  Each of these charges, including the Joe's Seafood charge, far exceeds the GSA Per Diem scale of $36 per person for dinner in Washington, D.C. in 2022.  *See supra.* More concerning is that three of these five meals actually costed *twice* the price requested by plaintiffs in this case as plaintiffs' counsel split these costs between two cases as indicated by the "split w Memmer" notation.  *See* Pls.' Ex. B at 2.  For these five meal entries, the Court therefore orders plaintiffs to:  (1) submit the receipts for these meals to government counsel; and (2) submit as part of the parties' upcoming joint status report, *see infra*, revised entries bringing these requests in line with the GSA 2022 Per Diem Rates.  If these meals were split between multiple SWS employees (e.g., if three SWS individuals split the $120.44 bill at Ruth's Chris on 26 July 2018), plaintiffs may request the appropriate GSA rate for each person.  *Cf. Hardy*, 157 Fed. Cl. at 479–482 (holding reimbursement is not appropriate for various requested costs where plaintiffs have not provided supporting documentation).

### G.    Covid-19 Testing Costs

Next, the government challenges Ms. McCulley's "three identical $125 charges for 'Farragut Medical (Covid Test for Court) $250.00 (split w *Memmer*),'" as well as an additional COVID-related charge at CVS the "day before."  Gov't Resp. at 40–41.  Ms. McCulley's COVID-related charges, totaling to $382.47, are as follows:

- 06/06/2022 Entry from Elizabeth McCulley for "CVS Pharmacy $14.95 (split w *Memmer*)" for $7.47;
- 06/07/2022 Entry from Elizabeth McCulley for "Farragut Medical (Covid Test for Court) $250.00 (split w *Memmer*)" for $125;
- 06/07/2022 Entry from Elizabeth McCulley for "Farragut Medical (Covid Test for Court) $250.00 (split w *Memmer*)" for $125; and

---

[31] The Court will not reimburse plaintiffs for three meal entries related to Ms. McCulley given it is unreasonable for a fourth partner to bill hours and costs to this case, *see supra* Section VI.D.7.; *infra* Section XI.H:
- 06/12/2022 Entry from Elizabeth McCulley for "SQ SP Plus $159.00 (split w *Memmer*) $79.50";
- 06/07/2022 Entry from Elizabeth McCulley for "Starbucks $22.18 (split w *Memmer*) $11.09"; and
- 06/07/2022 Entry from Elizabeth McCulleyfor "Food Hall $23.32 (split w *Memmer*) $11.66."
Gov't Ex. F at 1–2.

- 06/07/2022 Entry from Elizabeth McCulley for "Farragut Medical (Covid Test for Court) $250.00 (split w *Memmer*)" for $125.

Gov't's Ex. F at 3; *see also* Pls.' Ex. B at 5.  As there was no mandate to take a Covid-19 test to appear in-person in the National Courts Building in June 2022, when the oral argument occurred in this case, and free Covid-19 tests were available nationwide during this time, the Court will not reimburse plaintiffs for these charges.  Gov't's Resp. at 40 (first citing *Order Restricting Court Access to the National Courts Building Until Further Notice*, Ct. Cl. Admin. Order No. 2022-03 (Jan. 18, 2022), https://www.uscfc.uscourts.gov/sites/default/files/order_restricting_access_20220118.pdf; and then citing *Third Round of Free Covid-19 Tests Now Available*, NBC News (May 16, 2022), https://www.nbcnews.com/news/us-news/third-free-covid-19-tests-now-availablercna29129). Voluntary medical examination unrelated to this case is not a reasonable cost to be reimbursed under the URA.  42 U.S.C. § 4654(c).

## H.    Travel-related Costs

The government also challenges all travel charges in connection with Ms. McCulley "because Ms. McCulley's presence was unnecessary at oral argument, and because her work in this case was excessive and redundant."  Gov't's Resp. at 41.  Specifically, the government challenges the following entries related to Ms. McCulley:

- 05/03/2022 Entry from Thomas Stewart for "E. McCulley - MCI/Washington DC 06.05.2022–06.08.2022 (split) $1023.96" for $511.98;
- 05/03/2022 Entry from Thomas Stewart for "E. McCulley Airfare Revision - MCI/Washington DC 06.12.2022; $577.60 (split)'" for $288.80[32];

---

[32] There is a third travel entry associated with Ms. McCulley's airfare that the government challenges as "Unreasonable/Excessive"—a 3 May 2022 Entry from Thomas Stewart for "E. McCulley Airfare Revision CREDIT - MCI/Washington DC 06.12.2022; $379.98 (split)."  Gov't's Resp. at 41; Gov't's Ex. F at 1.  The government notes the following in connection with this entry:  "The related partial 'credit' for this revision would also have to be removed from the calculation of expenses."  Gov't's Resp. at 41 n.23 (citing Pls.' Ex. B at 1).  The government then removes $189.99 from its total calculation.  Similarly, plaintiffs include three other "credit"-related entries in their airfare category:

- 05/30/2018 Entry from Michael Smith for "Trumbull County OH - CREDIT $40.00 Burke Service Fee 5.30.2018" for -$40.00;
- 05/30/2018 Entry from Michael Smith for "Trumbull County OH - CREDIT Southwest Airlines MJS $635.96  5.31.18.pdf" for -$635.96; and
- 05/30/2018 Entry from Michael Smith for "Trumbull County OH - CREDIT $635.96 MJS Air Transportation 5.30.2018" for -$20.00.

Pls.' Ex. B at 1.  Plaintiffs should provide a clarification as to these four credits in the parties' upcoming 29 August 2024 JSR, *see infra*.  Given these were "credits," and the government suggests their removal from the calculation of expenses is warranted, *see* Gov't's Resp. at 41 n.23, the Court anticipates removing these costs from its calculation of expenses but would like to gain additional clarification from plaintiffs first.

- 06/05/2022 Entry from Elizabeth McCulley for "EGM Lyft 06.05.2022; $55.19 (split w Memmer) / (Reimburse/EGM Personal CC)" for $27.59[33];
- 06/12/2022 Entry from Elizabeth McCulley for "EGM Lyft 06.12.2022; $57.49 (split w Memmer) / (Reimburse/EGM Personal CC)" for $28.54; and
- 06/09/2022 Entry from Elizabeth McCulley for "Willard Intercontinental $2716.01 (split w *Memmer*)" for $1,358.

*Id.* (emphasis added); *see also* Gov't's Ex. F at 1–2; Pls.' Ex. B at 1, 3. As stated *supra* Section VI.D.7, Ms. McCulley's presence at oral argument was unreasonable and excessive given she did not argue and was one of *several* partners present. Indeed, Ms. McCulley was the fourth partner staffed on this case and repeatedly billed redundantly with her colleagues. Given this, the Court agrees Ms. Culley's requested costs here are unreasonable. *Id.* The Court will not reimburse SWS for overstaffing and, therefore, will not reimburse SWS for Ms. McCulley's travel costs. *See* 42 U.S.C. § 4654(c).

Also related to case travel, the government challenges SWS' use of a travel agent:

- 06/01/2018 Entry from Michael Smith for "Trumbull County OH - Burke Travel  MJS $40.00  5.30.18.pdf"; and
- 07/10/2018 Entry from Michael Smith for "Trumbull County OH - Burke Travel  MJS $40.00  7.10.18.pdf."

Gov't's Resp. at 41; Gov't's Ex. F at 2; Pls.' Resp. at 3. Regarding the 1 June 2018 entry, as this cost was incurred prior to 5 June 2018, *see supra* Section VI.A, the Court will not reimburse plaintiffs for this cost. Regarding the 10 July 2018 entry, the URA provides the Court discretion to reimburse only those costs deemed reasonable. 42 U.S.C. § 4654(c). The Court, as other judges of this court have found, does not believe it reasonable to hire a travel agent for case travel. *Cf. Hardy*, 157 Fed. Cl. at 480 n.14 ("The court calculates its reduction by subtracting the line-item deductions and travel agent fees."). As such, the Court will not reimburse plaintiffs for their requested travel agent fees. 42 U.S.C. § 4654(c).

## I.    Accommodation Costs

The government finally challenges SWS' accommodation charges as unreasonable, specifically:

- 06/08/2022 Entry from Thomas Stewart for "Willard InterContinental 06.05.2022-06.08.2022; $3,868.48 (split w *Memmer*)" for $1,934.24; and
- 06/08/2022 Entry from Reed Ripley for "Willard InterContinental 06.05.2022-06.08.2022; $1,864.00 (split w *Memmer*)" for $932.00.

---

[33] Ms. McCulley's 5 June 2022 and 12 June 2022 entries related to Lyft rides appear to be treated as credits on the government's calculation of expenses, subtracting $27.59 and $28.74 respectively from the plaintiffs' total for "Taxis." *See* Gov't's Ex. F at 2. The parties should clarify these charges in their 29 August 2024 JSR, *see infra*. For the purposes of this Opinion, the Court will treat these entries as challenged by the government as "Unreasonable/Excessive" per the government's Exhibit F labelling.

Gov't's Resp. at 41.  The government notes "[t]o compare again to GSA [rates], the government's lodging per diem rate for June 2022 [in Washington, DC] was $258 per night." Gov't's Resp. at 42 (citing *FY 2022 Per Diem Rates for District of Columbia*).  When asked about these charges at oral argument, plaintiffs argued finding a hotel in Washington, D.C. at the government rate would be "totally unreasonable" given, according to plaintiff, "you can't get a hotel room in Washington, D.C. anywhere for close to [$]248 or -58 a night."  Tr. at 209:23–210:6 ("[PLAINTIFFS]:  You can't get a hotel room in Washington, D.C. anywhere for close to [$]248 or -58 a night.  So by definition it's unreasonable.  I just happen to stay at the Willard since 2007.  And this is, frankly, I think, the first or second time anyone's ever objected to it, because it's within walking distance to the courthouse.  And I even get a preferred rate there.  So, no, it's -- $248 a night?  No, it's totally unreasonable.").  Further, when asked why three partners had three separate, sizable charges for accommodations during the time period of the oral argument, plaintiffs struggled to articulate a reason but noted the Court has discretion to reduce the costs plaintiffs request for their accommodations.  Tr. at 211:3–18 ("[GOVERNMENT:]  Mr. Stewart's $3,800 bill is just his ro[o]m if Mr. Ripley and Ms. McCulley were billing for separate rooms at separate times.  There's three Willard lodging charges . . . There's a charge for Mr. Stewart, a charge for Mr. Ripley, and a charge for Ms. McCulley all for lodging at the Willard in 2022.  THE COURT: [Plaintiffs]?  [PLAINTIFFS]:  I do not know, Your Honor, but feel free to reduce it under your discretion.").

Plaintiffs, although perhaps correct Washington, DC hotel prices can be high depending on location, time of year, and other factors, are incorrect these challenged lodging expenses are reasonable, *see* 42 U.S.C. § 4654(c).  Indeed, plaintiffs' per night costs at the Willard range from approximately $600 to nearly $1,000.  *See* Gov't's Ex. F at 2–3.  Given the GSA's lodging per diem rate for June 2022 was $258 per night—which, as noted *supra*, reflects a "fair" rate, *see Frequently asked questions, per diem*, U.S. GENERAL SERVICES ADMINISTRATION, https://www.gsa.gov/travel/plan-a-trip/per-diem-rates/faqs#1—the Court finds SWS' expenses at the Willard InterContinental excessive.  The Court orders plaintiffs to:  (1) submit the receipts for all "Travel/Lodging" entries described in the government's Exhibit F to the government for review, particularly Thomas Stewart and Reed Ripley's receipts for the Willard InterContinental; and (2) submit as part of the parties' upcoming joint status report, *see infra*, revised accommodation reimbursement requests in accordance with the GSA 2022 Per Diem Rates.[34]  42 U.S.C. § 4654(c).

## X.      Conclusion

For the following reasons, the Court **GRANTS IN PART AND DENIES IN PART** plaintiffs' motion for reasonable attorneys' fees and costs, awarding $273,490.75 in fees and

---

[34] Plaintiffs include one "Travel/Lodging" entry that is a "credit":  a 27 June 2018 entry from Michael Smith for "check copy.pdf  Airfare, tips and tolls CREDIT - Avalon Inn - MJS Lodging $28.69  6.27.18.pdf" for -$28.69. Pls.' Ex. B at 3.  Given this is a "credit," and the government suggests removal of credits from the calculation of expenses, *see supra*; Gov't's Resp. at 41 n.23, the Court anticipates removing this cost from its calculation of expenses but first requests additional clarification from plaintiffs.

$11.151.39[35] in costs, ECF No. 97.  The parties **SHALL MEET AND CONFER** regarding the Court's Opinion and Order; and **SHALL FILE** a joint status report (JSR) on or before **29 August 2024 at 12:00 p.m. (ET)**:

- Noting whether plaintiffs can provide the government with receipts necessary for review in furtherance of the cost reimbursements described *supra* Section IX, and the government's confirmation of plaintiffs' receipts;
- Providing any additional detail the Court requests in connection with specific fee and cost reimbursement or edits to the Court's revisions, *see supra* n. 1, 27, 28, 31, 32, 34; and
- Providing a new calculation of the specified accommodation and meal entries using the 2022 GSA per diem, *see supra* Section IX.

After the filing of the 29 August 2024 JSR, the parties again **SHALL MEET AND CONFER** and **SHALL FILE** on or before **5 September 2024 at 12:00 p.m. (ET)** a JSR stating whether the parties agree the methodology described in this Order can apply to plaintiffs' Supplemental Motion and Memorandum for an Award of Reasonable Attorneys' Fees and Costs currently requesting additional payment of $95,917.50 for attorneys' fees and $2,220.93 in costs, *see* Pls.' Suppl. Mot.  To the extent the parties cannot apply the methodology from this order to resolve all additional fees, any further dispute on new-fee issues (not addressed in this Order) shall be specifically detailed with brief explanation from both parties in the JSR.  The Court accordingly **LIFTS THE STAY** on plaintiffs' Supplemental Motion and Memorandum for an Award of Reasonable Attorneys' Fees and Costs, ECF No. 112, to the extent full briefing is required on those fees.  In considering the need for new-fees briefing (and additional attorney hours on the briefing), the parties should recall the wisdom of President Jefferson *supra* and the government's agreement at the 21 May 2024 oral argument that "arguing about fees just incurs more fees," Tr. at 13:15–17.

      **IT IS SO ORDERED.**

                                  s/ Ryan T. Holte
                                  RYAN T. HOLTE
                                  Judge

---

[35] Due to the anticipated submission of myriad receipts by plaintiffs to the government, this figure of $11.151.39 will likely change depending on the parties' JSR to be filed on or before 29 August 2024, *see infra*.